# UNITED STATES DISTRICT COURT
Southern District of Florida
Civil Division

FILED by ___PG___ D.C.

OCT 0 1 2018

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. of FLA. - MIAMI

Jack Stone, et al.                          )

             Plaintiff,          ) Case No.:

                               )

vs.                                          ) Trial By Jury Demand

Keisei   Electric   Railway   Co.)

Inc., et al.                                )

             Defendant           )

---

**COMPLAINT FILED PURSUANT TO 106 STAT. 73, 28 U.S.C. § 1605A, 18 U.S.C. § 2071, 28 U.S.C. § 1367, 42 U.S.C. § 1983, 18 U.S.C. § 1503, ARTICLE III, § 2, CLAUSE 1, OF THE U.S. CONSTITUTION AND EQUITABLE RELIEF**

## I. PARTIES TO THE COMPLAINT

### A. The Plaintiffs

Jack Stone
4301 S.W. 109th Court
Miami, Florida 33165
Telephone: 305.226.7972
E-mail: stack.jones@mail.com

Miyuki Suzuki
4301 S.W. 109th Court
Miami, Florida 33165
Telephone: 305.226.7972
E-mail: stack.jones@mail.com

1

**B. The Defendants**

Keisei Electric Railway Company, Inc.
3 Chome-3-1, Yawata
Ichikawa-shi, Chiba-ken, Japan 272-0021
Telephone: 81.477.127.000

Tetsuya Ogura, Keisei Electric Railway Company, Inc. employee.
Yomei Takeuchi, Keisei Electric Railway Company, Inc. employee.

Narashino Police Department
2 Chome-4-1 Saginumidai
Narashino-shi, Chiba-ken, Japan 275-0015
Telephone: 81.474.740.110

Yoshiharu Yano, Narashino Police Department Chief of Police.
John Doe 1, Guard B, police officer and transportation driver for the Narashino Detention Center. John Doe 1 resides in Sakura City, Chiba Prefecture, Japan.
John Doe 2, surname Fujisaki, Narashino Detention Center Supervisor and supervisor of John Doe 1.
John Doe 3, Narashino Police Department police officer.
John Doe 4, surname Mizokuchi, Narashino Police Department police officer.
John Doe 5, surname Miyama, Narashino Police Department officer, and supervisor of John Doe 3, and John Doe 4.

Chiba District Public Prosecutors Office
4 Chome-11-1 Central, Chuo Ward
Chiba, Chiba Prefecture, Japan 260-8620
Telephone: 81.043.221.2071

John Doe 6, Chiba Public Prosecutor's Office supervisor.
Tomoe Kume, Chiba Public Prosecutor's Office prosecutor.
Jane Doe 1, Chiba Public Prosecutor's Office trial attorney.

Chiba Prison
192 Kaizukacho, Wakaba-ku
Chiba-shi, Chiba Prefecture, Japan 264-0023
Telephone: 81.432.311.191

Toru Matsumura, Chiba Prison warden.
John Doe 7, Chiba Prison Cellblock C supervisor.

Tsudanuma Central General Hospital
1 Chome-9-17 Yatsu, Narashino-shi
Chiba-ken, Japan 275-0026
Telephone: 81.474.765.111

John Doe 8, Tsudanuma Central General Hospital doctor. John Doe 8, acts in an official capacity for the Narashino Police Department, inspecting and treating detainees held at the Narashino Detention Center.
John Doe 9, Tsudanuma Central General Hospital orthopedic doctor.
Jane Doe 2, Tsudanuma Central General Hospital, nurse.

U.S. Department of State
2201 C Street, N.W.
Washington, D.C. 20520
Telephone: 202.647.4000

Caroline Kennedy, former U.S. Ambassador to Japan.
Hughes P. Ogier, U.S. Tokyo Embassy consulate.
Thomas A. Duval, U.S. Tokyo Embassy consulate.

## C. F.R.C.P. 15(a), and F.R.C.P. 17(d)

Defendants who are not named in this initial complaint may be joined after serving interrogatories, or through discovery per F.R.C.P. Rule 15(a) which provides, "A party may amend the party's pleading once as a matter of course at any time before a responsive pleading is served or,... a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires."

F.R.C.P. 17(d) provides, "A public officer who... is sued in an official capacity may be designated by official title rather than by name."

## II. JURISDICTION, VENUE, MINIMUM CONTACTS AND PURPOSEFUL AVAILMENT

## A. Jurisdiction and Venue

1. This is a civil action brought for violating, 106 Stat. 73, also known as, The Torture Victim Protection Act of 1991 (TVPA). Enacted in 1992, the Torture Victim Protection Act of 1991, 57 Pub. L. No. 102-256, 106 Stat. 73, is codified as 28 U.S.C. § 1350 (2006). 28 U.S.C. § 1350 refers to "a tort... committed in violation of the law of nations or a treaty of the U.S." The Torture Victim Protection Act provides a civil remedy in federal courts for international law torts, including torture.

2. Congress describes the TVPA as a means to "enhance the remedy already available under" the Alien Tort Statute, in that the Act extends a civil remedy to U.S. citizens who have suffered torture... under the color of law by a foreign state. See: S. Rep. No. 249, 102d Cong., 1st Sess., at § II (1991). In its judgment in Sosa v. Alvarez-Machain, 542 U.S. 692, 731 (2004), the Supreme Court characterized the Torture Victim Protection Act as "supplementing" not replacing, the Alien Tort Statute.

3. In establishing a civil action, the Torture Victim Protection Act states as follows: "An individual who, under actual or apparent authority, or color of law, of any foreign nation, (1) subjects an individual to torture shall, in a civil action, be liable for damages to that individual." See: Torture Victim Protection Act, § 2(a), note following 28 U.S.C. § 1350.

4. Congress recognized that action taken in an official capacity, under the color of office resulted in irreparable harm suffered by U.S. citizens detained abroad. 28 U.S.C. § 1350 provides a ten-year statutory period for filing action in this Court. U.S.C. § 1350 requires plaintiffs to seek redress in the foreign court, if possible, prior to filing a civil suit in state or federal court. The plaintiffs met this threshold having sought redress from Japan's Ministry of Justice Human Rights Division, and relief from Tokyo's High Court of Appeals, Case No. 1744 2014, and thereafter Japan's Supreme Court, Case No. 394.

5. 28 U.S. Code § 1605A Terrorism Exception to the Jurisdictional Immunity of a Foreign State, strips a foreign state, its government officials, and any third party acting on behalf of that foreign government of any sovereignty claims, and gives both U.S. state, and U.S. federal courts jurisdiction over civil claims.

6. 18 U.S.C. § 2071(a), specifically provides penalties to U.S. government officials who willfully and unlawfully conceals,

removes or destroys, with intent to do so, filed or deposited property with any public office of the U.S. 18 U.S.C. 18 U.S.C. § 2071 (b) provides, "Whoever, having the custody of any such record, document, paper, or other thing, willfully and unlawfully conceals, removes, mutilates, obliterates, falsifies, or destroys the same, shall be fined under this title or imprisoned not more than three years, or both; and shall forfeit his office and be disqualified from holding any office under the United States."

7. 42 U.S.C. § 1983, states, "Every person who under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory..., subjects, or causes to be subjected, any citizen of the U.S... to the deprivation of any rights, privileges... secured by the Constitution and laws, shall be liable... in an action at law, suit in equity... for redress... Section 1983 provides relief in the form of money damages, available to those whose constitutional rights had been violated by a person acting under state authority."

8. 18 U.S.C. § 1503 prohibits obstruction of justice.

9. This Court has supplemental jurisdiction over this action pursuant to 28 U.S.C. § 1367, which states, "[I]n any civil action where the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the U.S. Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties."

10. F.R.C.P. Rule 19(a), requires joinder if feasible.

11. F.R.C.P. Rule 20 provides this Court jurisdiction as multiple issues are to be heard in one hearing or trial when the issues or parties involved overlap sufficiently to make the process

more efficient or more equitable.

12. Pursuant to 28 U.S.C. § 1332(a)(2), this Court has subject matter jurisdiction based on diversity of citizenship.

13. Other causes of action that provide this Court jurisdiction fall under <u>Article III, § 2, Clause 1, of the U.S. Constitution</u>, which provides federal courts power to "all Cases, in Law and Equity, arising under this Constitution, the Laws of the U.S., and Treaties made... under their Authority."

14. As per 28 U.S.C. § 1367, a district court may hear state based claims including:

   i. <u>Florida Statute § 768</u>, applicable where a defendant owes a duty of care, and breached that duty through negligence, gross negligence or recklessness.
   ii. <u>Florida Civil Theft Statute 772.11</u>, permits "treble damages... by individuals... for criminal practices that are violations of 812.012-812.037 or 825.103(1)." 772.11 includes theft of personal property.
   iii. <u>Florida Statute § 787.02</u>, false imprisonment.
   iv. Defamation as per Florida Supreme Court case law.
   v. Intentional Infliction of Emotional Distress as per Florida Supreme Court case law. Florida law requires the impact rule, originating from the common law requirement that physical contact must occur in order to allow damages for negligent infliction of emotional distress.
   vi. <u>Florida Statute Chapter 766</u>, is applicable to medical malpractice.
   vii. <u>Florida Statute Section 784.011</u>, pertains to assault.
   viii. <u>Florida Statute Section 784.03</u>, pertains to battery.
   ix. <u>Florida Statute § 95.11</u> permits tort filings within a statutory period of four years.

## B. Minimal Contact and Purposeful Availment

15. The concept of minimum contacts was established by the U.S. Supreme Court, thereby providing this Court personal jurisdiction over a defendant from another State. A state, according to Black's Law Dictionary is, "A body politic, or society of men united together for the purpose of promoting

their mutual safety and advantage, by the joint efforts of their combined strength. Cooley, Const. Lim. 1." The Legal Dictionary defines a state as, "... a people permanently occupying a fixed territory bound together by common habits and custom into one body politic exercising, through the medium of an organized government, independent sovereignty and control over all persons and things within its boundaries, capable of making war and peace and of entering into international relations with other states."

18. The U.S. Supreme Court has established jurisdiction over a party where that party's contacts with the state in which that court sits are such that the party "could reasonably expect to be haled into court" in that state. See: International Shoe Co. v. Washington, 326 U.S. 310 (1945). Jurisdiction must "not offend traditional notions of fair play and substantial justice." See: id. A non-resident defendant may have minimum contacts with the forum state if they 1.) have direct contact with the state, or 2.) have a contract with a resident of the state. See: McGee v. International Life Insurance Co., 355 U.S. 220 (1957), or 3.) have placed their product into the stream of commerce such that it reaches the forum state. See: Gray v. American Radiator & Standard Sanitary Corp., 176 N.E.2d. 761 (1961), or 4.) seek to serve residents of the forum state. See: World-Wide Volkswagen Corp. v. Woodson, 222 U.S. 286 (1980), or 5.) have satisfied the Calder effects test. See: Calder v. Jones, 465 U.S. 783 (1984), or 6.) have a non-passive website viewed within the forum state.

19. Keisei Electric Railway Company (KERC) satisfies the minimum contact requirement, and purposefully avails itself to the jurisdiction of this Court where it openly advertises, and markets its business throughout the state of Florida, and every other jurisdiction within the U.S. KERC operates the only train

line from Narita Airport in Chiba Prefecture to Tokyo Disneyland, and DisneySea. KERC owns and operates numerous Disney Stores through agreements, partnerships, and licensing, with The Disney Company (TDC), an American corporation that markets, and provides their products globally. TDC does business in every state in the nation, including the state of Florida, where TDC operates Disney World, the Disney Epcot Center, resort hotels, shops, etc. As part of TDC's corporate statement, "The mission of the Walt Disney Company is to be one of the world's leading producers and providers of entertainment and information. The Walt Disney Company, together with its subsidiaries and affiliates, is a leading diversified international family entertainment and media enterprise."

20. KERC owns and controls the majority of shares in the Oriental Land Company (OLC). OLC designed, built, and operates the Disney Theme Park Tokyo, Tokyo DisneySea, and numerous Disney Resort Hotels, and engages in business transactions with millions of U.S. citizens, including those domiciled in the city of Miami. Other KERC corporate assets include Milial Resort Hotels Co. Ltd., Disney Ambassador Hotel, Tokyo DisneySea Hotel MiraCosta, Tokyo Disney Hotel, Brighton Corporation, Ltd., and Palm & Fountain Terrace Hotel. KERC owns and operates the Maihama Resort Line Co, Ltd., and the Disney Resort Line, monorail service, which is marketed throughout the U.S., including the state of Florida, and the city of Miami.

21. KERC advertises its services and markets its products in the English language which is accessible in the city of Miami, and every other U.S. territory. KERC offers its products, marketed through an office in the state of Florida, located at, Disney Vacation Club Member Services, 1390 Celebration Boulevard, Celebration, FL 34747.

22. KERC uses U.S., and International toll free phone numbers,

providing reservation services for all Disney theme parks, resorts, and hotels under KERC's ownership, management and control. KERC's U.S. phone number is (800) 800-9800. KERC has a direct line in the state of Florida, (407) 566-3800, and a Florida fax machine number, (407) 938-4117.

23. KERC utilizes a Florida address for "Vacation Club" membership, which is located at, Disney Vacation Club, Member Accounting P.O Box 470727 Celebration, FL 34747. Another KERC contact number is operated directly through The Walt Disney Company, (800) 500-3990. KERC utilizes World Wide Web URL links, marketing Disney Resort Hotel information, including the address, 29-1 Maihama, Urayasu-shi, Chiba-ken Japan, 279-8505 one of KERC's premier hotels.

24. The Disney Company utilizes World Wide Web URL, https://disneyvacationclub.disney.go.com, providing sales and marketing information to promote KERC's theme park holdings, offering online links to KERC's train scheduling, routes, taxis and other services.

25. KERC advertises and markets a non-refundable 95.00 USD fee, which applies to Disney Collection reservations for Tokyo Disney Resort. KERC promotes other marketing schemes to U.S. citizens including, "Know Before You Book" information, which is located on the World Wide Web through a URL linked at: https://disneyvacationclub.disney.go.com/destinations/list/as ia/tokyo-disneyland-hotel/booking.

26. KERC's marketing is directed at U.S. citizens, including Miami residents, which states, "If payment is not received at the time of confirmation, Disney Vacation Club reserves the right to cancel the reservation." Information located at the aforementioned URL includes marketing for purchasing "travel insurance, dream vacation by banking, borrowing and obtaining Vacation Points." KERC provides "Special Offers" to the "Disney

Vacation Club Guide."

27. In addition to its railway business, KERC owns extensive bus and taxi services, and real estate holdings, including holdings in real property located in the U.S. KERC designs, produces and sells trains, and train component parts within the U.S. KERC operates the Keisei Electric Railway train, and the train station at Keisei Tsudanuma, where plaintiff's harm arose. KERC employs defendants Ogura and Takeuchi, who committed hate crimes, assault, battery and other tortious acts against the plaintiffs. KERC employee conduct is the proximate cause of all harm suffered by the plaintiffs in regards to this filing.

28. To provide more examples as to KERC's contacts with this Court's jurisdiction would be exhaustive, and waste the Court's time and resources. KERC's contacts with this forum satisfies the minimum contact requirements as provided by the U.S. Supreme Court. As a result, KERC purposefully avails itself to the jurisdiction and venue of this Court.

## III. REQUIREMENTS UNDER PRO SE PROCEEDINGS

29. Pro se litigants who bring civil claims in U.S. district courts must satisfy F.R.C.P Rule 8, Rule 12, namely Rule 12(b)(6), Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), Ashcroft v. Iqbal, 556 U.S. 662 (2009), Haines V. Kerner, 404 U.S. 519 (1972), and the screening provisions of Section 1915(e), if applicable under 28 U.S.C. § 1915.

30. So as to satisfy the aforementioned federal rules and case law, the plaintiffs must provide supporting evidentiary material to show this claim does not violate F.R.C.P. Rule 11.

31. 28 U.S. Code § 1915 provides that this action may not be frivolous, malicious, fail to state a claim upon which relief may be granted, and seek monetary relief against a defendant who is immune from such relief.

32. The Torture Victim Protection Act of 1991, and The Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, strip any claim of immunity from government officials who resort to the use of torture, to coerce confession statements, whether true, or false while acting in an official capacity, under the color of office. See: 106 Stat. 73, and 28 U.S. Code § 1605A.

33. Under 28 U.S. Code § 1915(e)(1), this Court may request an attorney to represent any person unable to afford counsel. As per 28 U.S. Code § 1915(e)(1), in regards to public interest, if the Court deems it necessary, and if the plaintiffs seeks the Court to appoint legal representation. After reviewing plaintiff's complaint, and after viewing the evidentiary material in support of this complaint, equity requires this Court, under 28 U.S. Code § 1915(e)(1) to provide the plaintiffs legal counsel.

34. In regards to the aforementioned statute, the American Bar Association (ABA) has published that 80% of Americans cannot afford an attorney. Those who cannot afford to hire an attorney now includes the entire middle class. The ABA publication stated that the entire judicial system is broken. Further, the ABA's findings, which are frequently quoted in law journals, and other respectable legal publications states the entire middle class, due to their income, cannot obtain any legal aid whatsoever to assist in regards to any legal proceeding that may arise. Access to this "broken legal system", apparently only belongs to the ultra-rich, the corporations, and their lobbyists who corrupt policy making. The ABA's publication failed to state that its members, and their excesses are almost entirely to blame for the failure of the U.S. legal system.

35. Finally, the plaintiffs have suffered great financial losses as a result of the defendants' conduct. But for the conduct of

the defendants, the time and effort taken to file this action, the costs associated with it, and the costs in the underlying proceedings have resulted in the plaintiffs being unable to pay the excessive fees associated with this filing. Further, the plaintiffs had to relocate and begin life anew directly related to the unwarranted conduct of the defendants named herein.

36. The plaintiffs request that this Court appointment legal representation to aid the plaintiffs in regards to this action.

## IV. 11TH CIRCUIT PATTERN JURY INSTRUCTIONS FOR CIVIL CASES

37. As per the Eleventh Circuit Pattern Jury Instructions for Civil Cases, the plaintiffs have confidence they can meet the burden of proof, or greater weight of the evidence required for each issue raised, under the preponderance of the evidence in regards to the defendant's tortious conduct relevant to this filing.

## V. INTERNATIONAL LAW AND DAIYO KANGOKU

## A. International Law

38. The United States is obligated under the <u>Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment</u>, to prevent, investigate, extradite, and prosecute those that commit torture. Japan is under the same obligation.

39. Article 10 of The Potsdam Declaration, enacted at the end of World War II, states there are two kinds of crimes: one is a violation of international laws and <u>includes abuse of prisoners and detainees</u>. The other is the obstruction of "<u>democratic tendencies among the people, and civil liberties</u>."

40. Former republican senator John McCain was tortured in Vietnam as a prisoner of war. McCain repeatedly stated, "<u>If you inflict a certain amount of pain on anyone, you will get them to say anything you want them to say to make it stop</u>." McCain also

stated, "After WWII Japanese who tortured U.S. citizens were sentenced to death."

41. Andrea Prasow, Washington Deputy Director at Human Rights Watch, a respected human rights organization called on the U.S. and other signatory states to the Convention Against Torture to prosecute officials who commit torture should they ever enter their territory. Amnesty International, another respected human rights organization takes the same stance as Human Rights Watch. Human Rights Watch and Amnesty International write annual reports that are critical of, and call for Japan to eliminate daiyo kangoku detention facilities. In response to plaintiff Stone's communication with Amnesty International, Roseann Rife, Japan chapter president wrote:

> *"Amnesty International... has been following the issue of hate speech in Japan and we have long documented the flaws in the criminal justice system including ill-treatment, forced confessions and prolonged interrogations without access to counsel. AI has urged the Japanese government to bring these procedures into line with international law and standards.*
>
> *We have noted your concerns and will keep them in our records. Amnesty International will continue to raise our concerns about human rights violations in Japan with the Japanese authorities and in reviews of Japan's human rights record at the United Nations."*

42. The Wrongful Conviction Blog is operated by dozens of respected U.S. law school professors and legal advocates. The Wrongful Conviction Blog dedicates an entire section to the abolishment of daiyo kangoku police detention facilities in Japan. See: Confessions as Major Cause of Wrongful Convictions in Japan: https://wrongfulconvictionsblog.org/2012/06/28/false-confessions-as-major-cause-of-wrongful-convictions-in-japan. Also See: United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, published June 15th 2015 in regards to Japan and Torture.

https://nichibenren.or.jp/library/ja/kokusai/humanrights_libr
ary/treaty/data/list_of_issues_cat_loi_3_e.pdf.

**B.  Daiyo Kangoku: Police Detention**

43. Daiyo kangoku is a system of detention and interrogation where
detainees in Japan are held in police custody for a minimum of
23 days. No bail is permitted to any foreigner no matter how
minor the charge. Detainees are held in isolation, refused legal
counsel, interrogated around the clock, refused contact with
the outside world, and no notice is provided to family members
or employers that the detainee is being held. To family and
employers, the detainee virtually disappears off of the face
of the earth. Finally, interrogations are not preserved in
audio, or video format, and collected evidence is rarely, if
at all, turned over to the detainee's legal counsel.

44. Under daiyo kangoku detainees are denied due process, and
fundamental human rights in violation of, The Convention
Against Torture and Other Cruel, Inhuman or Degrading Treatment
or Punishment, the Minimum Standards for the Treatment of
Prisoners, the International Covenant on Civil and Political
Rights, the Universal Declaration of Human Rights, the Body of
Principles for the Protection of All Persons Under Any Form of
Detention or Imprisonment, and the Basic Principles for the
Treatment of Prisoners, all treaties Japan has ratified.
Ratification is a formal declaration of agreement where a nation
is obligated to act upon the terms of a particular treaty.

45. Detainees held in daiyo kangoku are subjected to interrogations
that amount to cruel and unusual punishment.

46. Daiyo kangoku detention violates numerous provisions of Japan's
Constitution in regards to the rights of the accused, resulting
in biased, and unfair proceedings at every stage of procedure.
Daiyo kangoku constitutional violations include:

i. <u>Article 98</u>. Supremacy Clause holds, "This Constitution shall be the supreme law of the nation and no law, ordinance, imperial rescript or other act of government, contrary to the provisions hereof, shall have legal force or validity. Article 98 states, "<u>the treaties ratified by Japan and established laws of other nations shall be faithfully observed</u>."

ii. <u>Article 13</u>. "All of the people shall be respected as individuals. Their right to life, liberty, and the pursuit of happiness shall, to the extent that it does not interfere with the public welfare, be the supreme consideration in legislation and in other governmental affairs."

iii. <u>Article 17</u>. "Every person may sue for redress as provided by law from the State or a public entity, in case he has suffered damage through illegal act of any public official."

iv. <u>Article 31</u>. "No person shall be deprived of life or liberty, nor shall any other criminal penalty be imposed, except according to procedure established by law."

v. <u>Article 36</u>. "<u>The infliction of torture by any public officer and cruel punishments are absolutely forbidden</u>."

vi. Article 37. "In all criminal cases the accused shall enjoy the right to a speedy and public trial by an impartial tribunal. He shall be permitted full opportunity to examine all witnesses, and he shall have the right of compulsory process for obtaining witnesses on his behalf at public expense. <u>At all times the accused shall have the assistance of competent counsel who shall, if the accused is unable to secure the same by his own efforts, be assigned to his use by the State</u>."

vii. <u>Article 38</u>. "<u>No person shall be compelled to testify against himself. Confession made under compulsion, torture or threat, or after prolonged arrest or detention shall not be admitted in evidence</u>. No person shall be convicted or punished in cases where the only proof against him is his own confession."

47. The purpose of Daiyo kangoku police detention is to create a system of fear, hopelessness, and duress, where detainees are interrogated, threatened, assaulted, subjected to battery, excessive force, and cruel and unusual punishment in direct contrast to Japan's Constitution, treaties with the U.S., and international law.

48. Authorities, acting under the color of office in a daiyo kangoku

detention facility have but one goal, and that goal is to obtain a confession statement at all costs, where a confession statement is not provided "voluntarily", that statement will be extracted through coercion regardless as to the truthfulness, or falsehood of that statement. Thereafter, that coerced statement will be used as sole "evidence" to obtain a conviction. Confession statements are also prepared exclusively by Japanese police and/or prosecutors, and are never written by the accused themselves.

49. Japan's Ministry of Justice provides the U.S. Dept. of State annual reports that claim 99.97% of criminal cases result in conviction. In reality, less than 8% of criminal convictions in Japan are obtained without support of evidence, or witness and victim testimony, or without the accused having the right to cross examine. Nearly 93% of criminal convictions in Japan are obtained by nothing more than the tied up, handcuffed and roped accused being dragged before a tribunal, and forced to read a confession statement that had been coerced under cruel, unusual and proceedings that are criminal in nature.

50. Japanese officials have continuously failed to heed warnings from the U.S. Department of State, and the United Nations committees that oversees international law Japan has subjected itself to in regards to abolishing daiyo kangoku detention. The aforementioned reports are posted on the U.S. Department of State's website.

See: U.S. Department of State Country Reports on Human Rights Practices for Japan, 2012-2017.
https://state.gov/j/drl/rls/hrrpt/humanrightsreport/index.htm#wrapper.

51. The Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment is an international human rights treaty, under the review of the United Nations, that aims to prevent torture and other acts of cruel, inhuman, or

degrading treatment or punishment committed under the color of law. The Convention Against Torture was ratified by the United States on October 24th 1988, and ratified by Japan on June 29th 1999. The Torture Conventions is <u>codified as part of Japan's civil code</u>. <u>Both the U.S., and Japan are required to investigate allegations of torture, and to bring criminal charges against those responsible for committing such atrocities</u>.

> *Article 1.1 of the Convention defines torture as: Any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining information or a confession, or punishing that person for an act he or a third person has committed or is suspected of having committed, or intimidating or coercing him or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity. Article 16 of the Convention states signatory nations are <u>obliged to prevent all acts of cruel, inhuman, or degrading treatment or punishment in any territory under that nation's jurisdictional control</u>.*

52. Japanese officials routinely, and systemically violate the aforementioned international laws, treaties with the U.S., and the nation's own Constitution.

53. It is often stated that Japan's Constitution was imposed on the nation at the end of WWII by the U.S. and its allies. This is a false assertion, as Japan's Constitution was signed into effect by a supermajority of the nation's own representatives. Regardless as to whether Japanese police or prosecutors welcome the U.S. written Japanese Constitution, the rule of law is the rule of law, and no official is permitted to act outside of the confines of the laws that govern a nation. Crimes committed under the color of law, under the guise legality, are often far worse than those alleged to have been committed by the accused.

## VI.   JUDICIAL NOTICE

### A.   Federal Rules of Evidence Rule 201

54.   Federal Rules of Evidence Rule 201(b) provides, the court may judicially notice a fact that is not subject to reasonable dispute because it: (2) <u>can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned</u>. Under Rule 201(c), the court: (2) must take judicial notice if a party requests it and the court is supplied with the necessary information. Under Rule 201(d), <u>the court may take judicial notice at any stage of the proceeding</u>. Under subsection(e), regarding timely request, a party is entitled to be heard on the propriety of taking judicial notice and the nature of the fact to be noticed. If the court takes judicial notice before notifying a party, <u>the party, on request, is still entitled to be heard</u>. Finally, here, under subsection(f), "<u>In a civil case, the court must instruct the jury to accept the noticed fact as conclusive</u>."

### B.   Human Rights Watch, Amnesty International and the United Nations Committee Against Torture Recommendations

55.   In regards to, <u>Human Rights Watch: Prison Conditions in Japan</u>, the publications states,

> *"Prisoners in Japan face routine violations of human rights from the moment of arrest through the end of their prison term. After being apprehended, Japanese suspects are placed in police detention (daiyo-kangoku) where they face severe pressure, often involving physical abuse, in order to obtain confessions. They are transferred to detention centers after indictment where they stay until their sentencing, a period that can last several years. They are then moved to prisons where they are subjected to a complex set of rules that regulates every aspect of daily life. Infraction means punishment, and one of the most common forms of punishment is prolonged solitary confinement. Prisoners who complain about their treatment may face particular*

*abuse or retaliation. Sentenced prisoners have tightly restricted access to legal counsel and to contact with the outside world, and death row prisoners sometimes spend decades in total isolation. Human Rights Watch calls on the Japanese government to bring its treatment of prisoners into line with the international human rights law by which the country is bound and acknowledge that prisoners have both obligations and rights."*

See: Prison Conditions in Japan: https://hrw.org/report/1995/03/01/prison-conditions-japan.

56. Amnesty International's Human Rights Concerns in Japan: Submission to the United Nations Universal Periodic Review. concluded:

- *"Japan has made little or no progress in implementing recommendations made to it during its first Universal Periodic Review in 2008."*
- *"Amnesty International is concerned that the daiyo kangoku system continues to be used to obtain "confessions" through torture and other cruel, inhuman or degrading treatment, and has documented measures such as beatings, intimidation, sleep deprivation, prolonged questioning and being forced to stand or sit in fixed positions for long periods."*
- *"Under the daiyo kangoku system a person can be detained by the police for up to 23 days without charge. There are no rules and regulations regarding how long a person can be interrogated while detained."*
- *"Lawyers are not permitted to be present during interrogations in contravention of international standards, notably the Basic Principles on the Role of Lawyers."*

See: Amnesty International Submission to the UN Universal Periodic Review, October-November 2012: https://amnesty.org/download/Documents/20000/asa220072012 en.pdf.

57. United Nations Committee Against Torture Recommendations: Daiyo Kangoku: Japan's 'Substitute Prison' Shocks the World publication states as follows:

- *"Japan is the only country in the world which allows the detention of suspects in police stations for long time periods."*
- *"Daiyo Kangoku: Breeding Ground for False Charges. The Essential Nature of Daiyo Kangoku Is 'Confession-Extraction System'"*

- *"The essential nature of daiyo kangoku is that the police, who perform the investigations, detain and control suspects, and exercise total control over suspects 24 hours [a day]. Suspects who do as the police say are... given preferential treatment, but suspects who deny charges are interrogated from morning until night, and those who do not do as the police say are anxious about what detrimental treatment they might receive. This system totally exhausts suspects physically and mentally, and casts aspersions on or even destroys their character, until forcing confessions. Even if suspects are not subjected to direct violence or intimidation, the total night-and-day control itself acts as pressure on suspects and pushes them to do as the investigating authorities say."*

See: Daiyo Kangoku: Breeding Ground for False Charges: https://nichibenren.or.jp/library/en/document/data/daiyo_kangoku.pdf.

58. United Nations Committee Against Torture Recommendations: Daiyo Kangoku: Japan's 'Substitute Prison' Shocks the World, continues stating:

*"In April 2006 a manual titled, "Guidelines for the Interrogation of Suspects" was leaked from the computer of an active-duty police captain in the Ehime Prefectural Police, and became a major issue throughout Japan. The manual consists of thirteen guidelines to be followed by police investigators conducting interrogations. The manual instructs investigators to "weaken" suspects who deny charges by interrogating them for long hours, to always talk to suspects in cells, and in other ways investigate suspects by making maximum use of the 24-hour physical control over the suspects."*

Interrogation procedures from the "guideline" include:

a. Interrogators must have the drive to always get a confession with persistence and tenacity. Interrogators must be motivated by drive replete with the self-confidence and tenacity which can "definitely get a confession."

b. Don't leave the interrogation room until you get a confession. If you start wondering that the suspect speaks the truth or if the investigation is getting nowhere, you will want to call it quits, but if you leave the room then, you'll have lost.

c. Put the suspect in the interrogation room as much as possible. Just because the suspect won't confess, leaving him in the cell will only make matters worse. In the process of talking you can get into the head of any suspect, and the suspect will also open up. Therefore, you should have as much contact with the suspect as possible. If a suspect denies the charges, keep him in the interrogation room from morning until night (this also weakens the suspect). During a review by the Committee against Torture, the Japanese government admitted that this manual was prepared by a veteran investigator for lectures at a police academy.

### C. Chiba Officials Propensity to Violate Due Process and Fundamental Human Rights While Acting in Official Capacity

59. Propensity evidence is evidence where a person has engaged in prior bad acts and consequently is therefore more likely than not to engage in those bad acts again. See: F.R.E. 404.

60. Uso mo hōben, is an oft quoted saying in Japan. Uso mo hōben translates as, "lying is a means to an end." Uso mo hōben sums up the training and general attitude of police and prosecutors rewarded for malfeasance in Japan.

61. Japanese prosecutors and police have a well-documented history of resorting to the use of threats, intimidation, torture, and coercion to obtain confession statements, which are used as sole evidence to obtain criminal convictions. Examples include:

62. March 2016, the NPD, and the same officers involved in plaintiff Stone's detention, planted DNA evidence at a three-year-old unsolved murder crime scene, with the intention of framing Yang Xiaochun, a Chinese national, as the perpetrator of the murder.

See: Chinese National Arrested in Murder of Chiba Woman Three Years Ago:
https://tokyoreporter.com/japan-news/breaking/chinese-national-arrested-in-murder-of-chiba-woman-3-years-ago.

63. The framing of Xiaochun is important to the plaintiff's cause of action as the NPD, in collusion with Chiba public prosecutors, not only unnecessarily extracted plaintiff Stone's blood in a violent, unusual and cruel manner, tantamount to torture, but also used that extracted DNA, placing it at the center of defendant Ogura's shirt. That planted "evidence" is so transparent that it was never used at plaintiff Stone's underlying trial at Chiba District Court. Ogura had claimed plaintiff Stone had spit on him. The DNA sample was placed on a location of Ogura's shirt that was covered by a tie. Further, videotape recordings prove Ogura's statement was fabricated. Regardless, the NPD, acting out of bias, and in a criminal manner, forgot Ogura was wearing a tie. KERC videotape recordings show plaintiff Stone's DNA could not have gotten on Ogura's shirt in the manner presented by police and prosecutors. The KERC videotape recordings, evidentiary material that plaintiff Stone has seen, and which exists, and which the plaintiffs intended to produce at trial, has been denied to the plaintiffs in three underlying legal proceedings.

64. In 2010, Chiba police tortured, and murdered Abubakar Suraj. Suraj resided in Japan for twenty-three-year with his common law wife, a Japanese national. Suraj, who had no criminal history, was arrested at his home under suspicion of overstaying his visa. In deportation proceedings, the court held that Suraj's wife was employed, and therefore had no need of a foreign husband. The court ordered Suraj deported. Suraj appealed the ruling. As the case was on appeal, Suraj was tortured and murdered. Chiba officials tried to hide their crimes by attempting to smuggle Suraj's corpse out of Japan on an EgyptAir flight to Cairo. The only reason this matter came to light was because the pilot of the flight refused to

leave the tarmac at Narita Airport until Suraj's body was removed from the plane. None of the ten officers involved in Suraj's murder were indicted by Chiba prosecutors. Many of those officers currently work at the NPD.

See: <u>Court Rules Japan Officials Killed Deportee at Narita</u>: https://dw.com/en/court-rules-japan-officials-killed-deportee-at-narita/a-17527619.

65. In 2016, Yusuke Katayama, an internet hacker, took control of other people's computers remotely, and used those computers to send death threats, including threats to attack the Japanese emperor's grandchild's kindergarten. Katayama waited until Chiba Prefecture Police Headquarters (CPPH), the agency charged with oversight of the NPD, coerced several individuals to confess to Katayama's crimes. Each faced decades in prison. Coerced confession statements sealed their fate. The CPPH Chief of Police bathed in national notoriety, and the spectacle he created in regards to obtaining the confession statements. In the aftermath, Katayama publicly revealed what he had done.

66. The Katayama scandal resulted in the Chiba Prefectural Police Headquarters chief of police resigning in humiliation. Katayama received an eight-year sentence for making threats he had no intention of carrying out. Katayama stated that his singular goal was to expose police corruption, most notably coerced confession tactics Japanese police are notorious for committing. The chief of police and none of the officers who had coerced the confession statements where charged by Chiba prosecutors.

See: Death Threat Hacker Who Fooled Police Jailed: https://bbc.com/news/technology-31129817.

67. In 2007, thirteen men and women were indicted for buying votes in an election. All were acquitted by a district court, which found the confessions false, extracted through violence,

intimidation, and prolonged detention, that resulted in injuries. The presiding judge said the defendants had "made confessions in despair while suffering marathon abusive questioning." Ichiko Fujimoto confessed to distributing alcohol and cash to her neighbors, and throwing parties at her home to gather support for a politician whom the police did not support. "... they kept saying, 'Confess, just confess.' They wouldn't listen to anything I said." Toshihiro Futokoro attempted suicide, "They kept saying that everybody's confessing, there was nothing that I could do, no matter how hard I tried." The police told Kunio Yamashita that he could go home if he confessed. "I hadn't done anything, but I confessed, and I told them I'd admit to whatever they said." Yamashita, spent three months in daiyo kangoku detention. Eiko Hamano, "They said that my grandson would be bullied at school, that my son would be fired from his company, and that my whole family would suffer forever." Hamano confessed to accepting money to sell her vote. To prove that she had spent the money, the police told her to find a receipt for an 8500¥ (80.00 USD) purchase. Hamano presented a receipt for adult diapers bought for her mother. Police told Hamano she had to confess to receiving 17,000¥ as well, and needed to come up with a receipt for that amount as well. Tomeko Nagayama, spent 186 days in isolation, in a windowless cell, forced to clean every night after enduring day-long interrogations. "This kind of thing just shouldn't be tolerated in this world," Nagayama said at trial.

68. Govinda Mainali, a Nepalese, working in Japan was denied access to a lawyer, beaten severely, and interrogated for lengthy periods after being detained in 1997. Mainali was convicted of murder even though prosecutors had evidence that proved Mainali was innocent. In 2013, after sixteen years of

evidence intentionally being withheld, and where prosecutors were entirely aware they had sought a wrongful conviction, Mainali was finally acquitted. Immediately immigration officials arrested Mainali under the guise of overstaying his visa for sixteen years, and deported the man.

69. By 2014, Iwao Hakamada had already spent forty-eight years in isolation on death row for a double murder prosecutors knew he did not commit. The suppression of DNA evidence finally resulted in Hakamada being released from prison. Prosecutors sought a retrial, which was denied.

70. Ric O'Barry, is a life-long resident of Miami, and Academy Award winning star of the documentary film, The Cove. O'Barry has a street named after him in Miami, and was one of the creators of the TV series Flipper.

71. In 2016, O'Barry was detained twice in Japan. Once for "DUI" when O'Barry had not been drinking, which blood tests proved. Regardless, it took the actions of legislative officials in Washington to intervene and get the 76-year-old man released.

72. O'Barry was detained a second time upon arrival at the Narita Airport, located in Chiba. O'Barry was detained under the guise of being a "terrorist." O'Barry's only "crime" was participating in the aforementioned documentary film. O'Barry who suffers from cancer, had his cancer medication taken away while he was detained. O'Barry was tortured by Chiba officials who attempted to coerce extract a signed confession statement, that claimed the elderly man was a terrorist.

73. O'Barry was held in a furnitureless, isolated cell, and tied, handcuffed, and roped to a chair every day he was detained. O'Barry was detained 24/7 in a brightly lit room, for no other purpose but to create conditions of duress, to aid officials in obtaining a coerced confession statement. Police and prosecutors remained in O'Barry's cell 24-hours each day, for

a total of nineteen days. Finally, due to poor health, and fear O'Barry might die in detention, O'Barry was deported without a hearing, at the same airport Suraj had been murdered. O'Barry is no longer permitted to enter Japan, and has spent the past few years, as plaintiff Stone has, paying costly legal fees, attempting to clear his name. O'Barry is willing to testify, and present evidence proving Chiba officials have a propensity to engage in a pattern of conduct that violates U.S. law, treaties and international law.

74. The most reprehensible example where Japanese officials conduct themselves with total disregard for non-Japanese is the case of Issei Sagawa. Sagawa lured a Dutch woman, Renée Hartevelt, into his home under the guise of language study. As Hartevelt sat at a desk checking Sagawa's work, he placed a shotgun at the back of the woman's head, and pulled the trigger. Thereafter, Sagawa engaged in sexual acts with the corpse, butchered the body, and ate the woman's raw breasts, vagina and thighs as sashimi. Sagawa was caught in the act of disposing Hartevelt's remains in a lake. Japanese officials determined Sagawa was not insane, and filed no criminal charges. Sagawa spent no time in prison. Thereafter, Sagawa acted in pornographic films, reenacting his heinous crimes, and published "best selling" books about cannibalism and raping and murdering non-Japanese women. Sagawa remains a national celebrity in Japan, and currently resides in Tokyo. See: The Cannibal That Walked Free: https://youtube.com/watch?v=IdXPJWODzjo.

75. The plaintiff could provide hundreds of examples of Japanese police and prosecutors propensity to commit violent crimes against non-Japanese, but doing so would be exhaustive, and waste the court's time and resources.

D. **The United Nations Emergency Committee Addresses Hate Crimes in Japan**

76. Americans and other non-Japanese have become literal punching bags by racist Japanese who commit violent acts against foreigners engaged in business, or who have families and reside in Japan. These crimes are motivated by hate, and occur on a daily basis.

77. Japanese call children like that of the plaintiff's child "hafu", which means half human (Japanese) and half animal (non-Japanese).

78. Beginning in 2012, and escalating in 2013, the year the plaintiff's cause of action arose, Japanese nationalist hate groups used social media such as Twitter, and Facebook, to organize mass rallies. Hate rallies are generally held at train stations. Rallies are terrifying to non-Japanese, and more often than not, result in assaults, and the destruction of personal and/or business property. China responded to Japan's hate rallies by organizing a series of violent anti-Japanese demonstrations during August and September of 2012. These matters were well-covered by the Associated Press, Reuters, and other well-respected publications and broadcasting entities.

79. In 2013, the United Nations formed two emergency committees, to address the rapidly escalating hate crimes that had been occurring in Japan. Special Rapporteurs, independent human rights advocates were appointed by the U.N. Human Rights Council to address this topic. The Rapporteurs wrote scathing reports aimed at pressuring Japanese officials to pass legislation criminalizing hate speech. The Rapporteurs United Nation's Elimination of Racial Discrimination in Japan, committee released a report on August 29th 2014. The report concluded that, "Japan needs a comprehensive law on racial

discrimination." The report strongly criticized Japanese officials for their failure to act on racism and racial discrimination non-citizens face in employment, housing, exclusion from public facilities and businesses such as restaurants and shops, as well as, the absence of any law criminalizing racism, and racial discrimination. "According to information we received, there have been more than 360 cases of racist demonstrations and speeches in 2013", said Yuval Shany, United Nations Committee on Japan and Hate Crimes. "Nothing has been done by the government to react to Japanese-only signs which have been posted in a number of places," Shany said. On July 24th 2014, Shany urged the Japanese government to "prohibit all propaganda advocating racial superiority or hatred," as well as to "ensure that the alleged perpetrators are thoroughly investigated and prosecuted and, if convicted, punished with appropriate sanctions."

80. For over a decade, the Committee on the Elimination of Racial Discrimination has repeatedly exhorted the Japanese government to enact hate crime laws. In 2014, Japanese officials responded by stating, "We do not believe that racist ideas are disseminated or racial discrimination is incited in Japan..." Government bureaucrats have not only turned a blind eye to the numerous hate crimes, but in fact, Shinzo Abe's cabinet staunchly supports hate crimes, often attend hate rallies, and even pose for photographs with some of the most hateful, and dangerous hate group leaders in Japan.

81. In 2013, Osaka Mayor Toru Hashimoto had his trips cancelled to New York, and San Francisco. Mayors of both cities refused to meet Hashimoto, and stated they could not guarantee his safety due to hate speech Hashimoto constantly spewed.

82. Abe's Liberal Democratic Party cabinet member, Eriko Yamatani, the minister for the <u>National Public Safety Commission</u>, which oversees Japan's police and prosecutors, posed for a photograph with Zaitokukai members. Shigeo Masuki, a Zaitokukai member who appeared in the photograph with Yamatani told Reuters he had known Yamatani for more than a decade through and met through "mutual interests."

83. Sanae Takaichi, another member of Abe's cabinet stated in 2014 that if legislators were going to pass a hate-speech law it would be used to <u>imprison those who demonstrate against the government</u>. Takaichi stated, "<u>Lawmakers needed to work without any fear of criticism</u>." Takaichi, and Tomomi Inada, one of Abe's closest allies appeared in photographs alongside a Japanese neo-Nazi leader who was wearing a Nazi uniform at the time.

84. Japan signed the <u>International Convention on the Elimination of All Forms of Racial Discrimination</u> in 1995, but it has not implemented Article 4, paragraphs (a) and (b). Paragraph (a) states signatories, "Shall declare an offense punishable by law all dissemination of ideas based on racial superiority or hatred, incitement to racial discrimination." Paragraph (b) states signatories, "Shall declare such acts illegal."

## E. Hate Groups and Japan

85. In 2013, hate group Zaitokukai converged at a kindergarten, terrifying very young children. Zaitokukai rattled the school's gate, nearly pulling it down, and used megaphones, shouting vile hate speech, and death threats at the children in the school. The Zaitokukai called for the children to be burnt alive, inside the school.

See: <u>https://youtube.com/watch?v=8C1NbntRWDI</u>.
Also see: <u>https://youtube.com/watch?v=ZiYSKllv39c</u>.

86. Japanese lawmaker Arita Yoshihu stated, "It's extremely dangerous to say kill someone under the banner of free speech." Yet, this is exactly the kind of speech that results in attacks against foreigners like plaintiff Stone, with both the speech, and the acts being protected by Japanese officials.

87. It is not uncommon for unsuspecting foreigners to accidentally descend into a hate rally while commuting to or from work, or while vacationing in Japan, and be subjected to large throngs of racists who utilize megaphones that blare vile provocations including threats and shouts of, "Whito Pigu Gou Homu." See: https://youtube.com/watch?v=l-SzvcPs2kg&frags=pl%2Cwn.

88. In March of 2013, the Urawa Red Diamonds, a professional sports team owned by the Mitsubishi Motor Company, hoisted a banner at the entrance of a stadium that read, "Japanese Only." The banner remained in place until the game ended. "There are people who hate foreigners in Japan, and there are people who hate foreigners in this stadium," said Usui, a teacher from a local school. The incident in Urawa occurred as Japan prepares for the 2020 Olympics.

89. The plaintiff's own child had been assaulted three times prior to reaching the age of two. In one incident, a cigarette was put out on the infant's chest as the plaintiffs tried to make their way through the Tsujido train station to return home. Fortunately, the assault occurred in December, as the child was wearing a heavy coat, cap and gloves that prevented the cigarette from coming in contact with the child's skin. This incident occurred after leaving a Toys "R" Us, where the plaintiffs had just purchased the child's birthday gifts.

90. At 11-months of age, the infant was kicked, while riding in a stroller at the Akihabara train station. The kick nearly caused the stroller to turn over on its side. The impact jarred

the child's head, resulting in the child crying out in pain. Plaintiff Stone rushed to the front of the stroller to protect the child from further assault, and got punched in the face in the process. The unprovoked assault occurred in front of two police officers who witnessed what had occurred. The officer took no action whatsoever, even as plaintiff Stone demanded the man to be arrested. Plaintiff Stone noted several cameras that would have caught the entire incident.

91. Shinzo Abe, Japan's prime minister rejected the calls by the United Nations to legislate hate speech. Abe openly considers hate speech, including calls for genocide, lynching, and the burning of foreign owned businesses, "free speech."

92. Hiroshi Ichikawa, a former chief prosecutor who trained at the Yokohama prosecutor's office was taught, "Foreigners have no rights." Ichikawa disclosed, "Prosecutors are instructed to make up confessions and force suspects to sign them." Ichikawa gave an account as to other training methods he received while employed as a prosecutor. This included threatening to beat detainees to death, who would not sign confession statements. "While being trained in this way, I came to believe that these things were natural." Ichikawa was forced to resign as prosecutor after screaming in the face of a terrified detainee, "We'll fucking beat you to death, you bastard."

93. Yatsura, or "bastard" is the way Ministry of Justice officials, including judges, refer to detainees facing criminal charges in Japan.

94. Ishikawa spoke at a symposium on the theme "Prosecution, Public Opinion, and False Charges" at the Graduate School of Communications at Meiji University. "I admit that public prosecutors, have committed errors unsuited to their position, and offer profuse apologies." Ichikawa continued, "I want to tell the whole truth, so the public knows how many threat-

spewing public prosecutors Japan has created." Ishikawa stated his superiors taught him, "Foreigners don't understand Japanese, so you can heap as much verbal abuse on them as you want." Ichikawa also said, "Once when we were interrogating a foreign suspect, we thrust an awl right in front of his eye and shouted abuses at him in Japanese. That's how you get confessions!" That particular abuse being that if the foreigner did not sign the confession statement Ichikawa had prepared, Ichikawa was going to use the awl to rip the foreign detainee's eyes out.

95. The plaintiffs consulted with Ichikawa for a retrial in the underlying matter. Ichikawa told the plaintiffs that Japanese officials used the "Hostage Technique" on plaintiff Stone while he was detained. The purpose of this technique is to disorientate the detainee, and make them feel as if he had been kidnapped. This is exactly how plaintiff Stone felt while detained. Prior to this technique being disclosed by Ichikawa, plaintiff Stone recorded in one of the several notebooks that he had recorded while in detention, "I feel as if I have been kidnapped, but the perpetrators are not criminals per se, but instead, those acting in an official capacity, under the color of office."

96. Ichikawa has stated publicly and to the plaintiffs directly, the "training" Ichikawa underwent as a public prosecutor, included, "All foreigners are not considered human beings and therefore, because foreigners are not human beings, they have no constitutional or human rights. As a result, any method of coercion, including torture, can be used to obtain a confession statement.

97. The plaintiff recorded Ichikawa's interview, which lasted for more than two hours. Ichikawa verified that everything he has stated publicly is factual. Ichikawa never faced criminal

charges for his crimes, and is still permitted to practice law.

98. The disturbing mindset of Japanese officials, revealed by Ichikawa originates from the Shinto Cult.

99. The Shinto Cult is the outlawed "official" religion which holds the Japanese Emperor is a god, and the Japanese people are a nation destined to rule the world's "barbaric hordes", which are all non-Japanese. The Shinto Cult was eradicated at the end of WWII, under the Directive for the Disestablishment of State Shinto, an order directed to the Japanese Government, from the Supreme Commander for the Allied Powers. The Directive for the Disestablishment of State Shinto, was the first directive issued by the Supreme Commander of the Allied Powers. For more than seventy years, the Shinto Cult has worked diligently, behind the scenes, to have its power restored.

100. Retired Tokyo District Court judge Hiroshi Segi spent 30-years as a district court judge. Segi communicated via email with plaintiff Stone after release from detention. Segi reiterated what was published in his 2013 best-selling book, "Court of Despair." Segi spoke at the Foreign Correspondent's Club of Japan. The full speech includes English subtitles.
See: Hiroshi Segi: Former Presiding Judge of the Tokyo District Court & Author of "The Court of Despair":
https://youtube.com/watch?v=NQd7dD7DJrQ&frags=pl%2Cwn.

101. According to Segi foreigners are denied due process and basic human rights, and are treated more harshly than Japanese nationals by Japan Ministry of Justice officials. Segi states these officials, including judges, are controlled by a "dark force." Segi states that judicial officers who don't adhere to the mindset of this "dark force" have their careers destroyed. When Segi's book was released, Chief Justice Hironobu Takesaki abruptly quit, short of obtaining pension.

It is well accepted in Japan that Segi's book, which is harshly critical of Takesaki, and the Court's unconstitutional practices, is the reason for Takesaki's abrupt departure. Segi received numerous threats, including death threats, including death threats from Japanese officials after his book was released. Segi stated, "every judge should be thrown out of office, and the entire system scrapped, and modeled after that of the U.S..."

102. The "dark force" Segi discusses in his book was shortly thereafter exposed in another 2013 book titled, Nippon Kaigi No Kenkyu, written by former high-ranking Nippon Kaigi officer, Sugano Tamotsu. Japan's Supreme Court ordered Nippon Kaigi No Kenkyu banned from publication after the book had already obtained best-selling status.

103. Nippon Kaigi is a political organization wielding great power in Japan. The vast majority of Japanese politicians are members of Nippon Kaigi. All of Shinzo Abe's cabinet, as well, Abe himself, are members of Nippon Kaigi. The goal of Nippon Kaigi is to tear up the U.S. written constitution of Japan, reinsert the Japanese emperor as a god, reinsert the Meiji flag as the national symbol, and reestablish the Shinto cult as the nation's compulsory state religion, and as well, ban all other religions, and external influences, including U.S. influence. Abe publicly called Tamotsu a traitor for revealing the secret goals of Abe, his cabinet, and Nippon Kaigi. Thereafter, legislatures passed a "states secrets" law eliminating information like that which Tamotsu exposed from becoming public knowledge. This new law is much harsher than the U.S. Espionage Act.

104. In the U.S., little is known about Abe's family history. Abe's grandfather, Nobusuke Kishi, was head of munitions prior to, and during WWII. Kishi orchestrated the Mukden Incident, a

false flag operation that was used as a pretext to bring Japan into WWII. Kishi is a Class A war criminal who spent 3.5 years in a CIA prison. Kishi avoided execution by cooperating with the Allied Forces. Kishi became the second prime minister of Japan after WWII, and was so hated by the Japanese that he was physically thrown out of office by a mob of protesters. Shinzo Abe openly states that it is his goal to "exonerate" his grandfather's war crimes past through "revisionism."

105. None of the information stated herein should be construed as superfluous. This information is not being provided as proof of the defendant's conduct, but merely as proof that the defendants have a propensity to engage in such conduct, including violating due process and fundamental rights of foreigners detained in Japan, and as well, using unlawful tactics to coerce confession statements. The Court should accept the aforementioned matters under Judicial Notice as per Article II, Judicial Notice, Federal Rules of Evidence, Rule 201. The information is presented to show the state of mind of the defendants, and that they have the propensity to abuse the power vested in their agency, aimed exclusively at foreign detainees, in violation of Japan's Constitution, treaties with the U.S., and international law.

## VII. DEFENDANT LIABILITIES

### A. Keisei Electric Railway Company, Inc., Tetsuya Ogura, and Yomei Takeuchi

106. Keisei Electric Railway Company, Inc. (KERC), employees Tetsuya Ogura, and Yomei Takeuchi, committed hate crimes, assault, battery, false imprisonment, intentional infliction of emotional distress, theft of personal property, damage to personal property, extortion and defamation to plaintiff Stone's professional reputation.

107. Ogura and Takeuchi engaged in a conspiracy to commit extortion, attempting to financially benefit from their criminal scheme. The negligent, reckless and criminal conduct of Ogura and Takeuchi occurred at a time when plaintiff Stone was disabled, and nearly entirely incapacitated.

108. Ogura and Takeuchi knowingly and intentionally filed false police reports at the Narashino Police Department. The false, and intentionally misleading conduct of Ogura and Takeuchi resulted in plaintiff Stone being detained for 109 days. While detained the plaintiffs suffered irreparable physical, emotional, psychological, and financial losses exceeding $90,000 that continues to toll. Other losses caused by KERC, Ogura and Takeuchi include medical, and legal expenses the plaintiffs would not have suffered, but for the conduct of KERC, Ogura and Takeuchi.

109. KERC, Ogura and Takeuchi are the proximate cause of all of plaintiffs' harm in regards to this filing, including all harm caused by the Narashino Police Department, Narashino Detention Center, Chiba Public Prosecutor's Office, Chiba Prison, and the Tsudanuma Central General Hospital. But for the unconscionable conduct perpetrated by KERC and its employees, Ogura and Takeuchi, the plaintiffs would not have suffered any harm whatsoever, and would not have engaged in attempting to resolve this matter through numerous proceedings, including proceedings at Chiba District Court, Tokyo High Court of Appeals, and Japan's highest court, Japan's Supreme Court. KERC, Ogura and Takeuchi are liable to the plaintiffs as per:

    I. 42 U.S.C. § 1983.
   II. Florida Statute Section 784.011.
  III. Florida Statute Section 784.03.
  IV. Florida Statute § 787.02.
   V. 2012 Florida Statute 768.
  VI. Florida Civil Theft Statute 772.11.

VII.  Defamation as defined by the Florida Supreme Court.
VIII. Intentional Infliction of Emotional Distress as defined by the Florida Supreme Court.
 IX.  2018 Florida Statutes, Title XLVI, Chapter 836.05.
  X.  18 U.S.C. § 1503.

**B.  Narashino Police Department, Chief of Police Yoshiharu Yano, John Doe 1, 2, 3, 4, and 5**

110. The defendants in this group violated plaintiff's due process and fundamental human rights. The defendants engaged in biased proceedings, and resorted to the protracted use of excessive force, and torture resulting in serious physical, psychological, and emotional harm. The plaintiffs suffered financial losses, which continues to toll due to the tortious, and criminal conduct of these defendants.

111. The defendants herein committed assault, and battery, false imprisonment, intentional infliction of emotional distress, and resorted to the use of threats, duress, cruel and unusual punishment, and torture in violation of Japan's Constitution, treaties Japan has with the U.S., and international law Japan has ratified. The defendants herein committed said conduct while acting under the color of office, and in an official capacity for Japan's Ministry of Justice. None of the conduct these defendants engaged in could be construed as "incidental" to generally accepted norms of detention, investigation, and legal proceedings that exists in a civilized society.

112. The purpose of the unconscionable, and violent acts committed by these defendants occurred to coerce extract confession statements the defendants knew were false, and which the defendants intended to use to obtain a wrongful conviction.

113. The Narashino Police Department (NPD), along with the Chiba Public Prosecutors Office (CPPO), and three pre-trial judges refused to preserve evidence they knew existed, and which supported the plaintiffs' contention that plaintiff Stone had

not committed any crime whatsoever, including evidence where KERC employee Ogura had kicked plaintiff Stone on October 19th 2013, in the left leg shin area, resulting in bleeding, and permanent scarring. Finally, on day forty-two of plaintiff Stone's detention at the NPD, court appointed interpreter Shoko Doi, while interpreting for attorney Kushida used a cell phone to take a photographic image of the kick wound. Even after said length of time, and the poor quality of the photograph, taken through thick glass, the injury is apparent. See: Exhibit A.

114. The NPD and the CPPO refused to interview eyewitnesses who had seen KERC employee Takeuchi assault plaintiff Stone on September 5th 2013. The NPD and the CPPO's tortious and criminal conduct resulted in biased and unfair proceedings, ultimately resulting in wrongful criminal conviction.

115. Plaintiff Stone's wrongful conviction ultimately resulted in immigration proceedings where plaintiff Stone can no longer return to Japan. The criminal conduct of the NPD and CPPO has resulted in irreparable damage to plaintiff Stone's professional reputation, and family unit.

116. Plaintiff Suzuki's family, including sisters, and parents, all Japanese citizens, who are very close to the plaintiffs and their minor child, are unable to have a close, physical, and personal relationship with child because the plaintiffs have left Japan due to constant harassment by Japanese officials. The conduct of the NPD and the CPPO are the proximate cause of the damage to this family unit.

117. The plaintiff's are currently in the process of filing for plaintiff Suzuki's visa, if this visa is not approved, plaintiff Suzuki, who has no criminal record, and who entered the U.S. lawfully, would be forced to return to Japan, resulting in government sanctioned child kidnapping, which has occurred extensively under the current regime that sits in the executive

branch in Washington. These proceedings do not permit plaintiff Suzuki to be employed until such matters are finally resolved.

118. Due to the wrongful conduct of the NPD and the CPPO, plaintiff Stone will not permit his minor child to return to Japan for any purpose whatsoever, including family visitation. This is due to the fact that Japan is one of the worst violators of The Hague Convention on Child Kidnapping. The rationale behind plaintiff Stone not permitting his U.S. citizen child to return to Japan is if he permitted his spouse, plaintiff Suzuki to return to Japan with the child, and thereafter plaintiff Suzuki was not permitted to return, or if plaintiff Suzuki chose not to return to the U.S., plaintiff Stone would never see his child again. Japan, even after ratifying The Hague Convention on Child Kidnapping, has never returned any U.S. citizen child that has been kidnapped.

119. The Hague Convention on the Civil Aspects of International Child Abduction or Hague Abduction Convention is a treaty that provides an expeditious method to return a child internationally abducted by a parent from one member country to another. In May of 2018, the U.S. State Department listed Japan as one of the countries engaged in a systemic pattern of noncompliance with The Hague treaty, which sets procedures to settle cross-border parental child abduction cases.

See: Lawmaker: U.S. Needs to Pressure Japan to Comply with International Child Abduction Laws:
https://usatoday.com/story/news/2018/04/11/lawmaker-u-s-needs-pressure-japan-comply-international-child-abduction-laws/508880002.
See: U.S. Department of States Department of Justice: International Parental Kidnapping:
https://justice.gov/criminal-ceos/international-parental-kidnapping.
See: Abducted to Japan: Hundreds of American Children Taken:
https://abcnews.go.com/International/abducted-japan-hundreds-american-children-returned/story?id=12898351.
Also see: https://youtube.com/watch?v=IVwCzim8VMw.

> *"Children who are victims of family abduction are uprooted from their homes and deprived of their other parent. Often they are told the other parent no longer loves them or is dead. Too often abducted children live a life of deception, sometimes under a false name, moving frequently and lacking the stability needed for healthy, emotional development." Family Abduction: Prevention and Response, 6th ed., The National Center for Missing & Exploited Children, 2009.*

120. While Japan constantly opines a handful of Japanese kidnapped, and taken to North Korea some fifty or more years ago, currently there are more than 1400 children, including U.S. citizens, who have been kidnapped to Japan. Most U.S. citizen children who have been kidnapped to Japan have one parent who is U.S. military personnel, and who had married a Japanese national. Congressman Chris Smith has fought for the return of these children, some for many years. Regardless, no kidnapped child has ever been returned from Japan.

121. The issue here is not plaintiff Stone's distrust of his spouse, it is his distrust of U.S. officials who refuse to take action against Japan, and distrust of Japanese officials who do not want foreigners in Japan, yet ironically won't return kidnapped children to their foreign parent.

122. Plaintiff Stone left Japan with his family after enduring four years of unwarranted police and prosecutorial harassment. This harassment includes false arrests, prolonged detention, threats to filing false charges in retaliation for plaintiff Stone seeking redress against the NPD and the CPPO, and immigration deportation proceedings.

123. The NPD violated Japan's Supreme Court's holding in <u>Watanabe v. Japan</u>, when plaintiff Stone was paraded as a spectacle through the public areas of the Tsudanuma Central General Hospital (TCGH). Plaintiff Stone suffered humiliation, and intentional infliction of emotional distress, as he was tied up, roped, and

handcuffed to a wheelchair and paraded through the corridors of TCGH. Several counts of violations of Watanabe, include occurring on November 13th 2013, and December 18th 2013.

124. The NPD knowingly violated, <u>The Vienna Convention on Consular Relations of 1963</u>, refusing plaintiff Stone to communicate with the U.S. Embassy in Tokyo. The reason for refusing plaintiff Stone contact with the U.S. Embassy in Tokyo was to create an atmosphere of duress while detained, and to prevent plaintiff Stone from reporting the criminal conduct he was subjected to, including excessive force, cruel and unusual punishment, and interrogations tantamount to torture.

125. The NPD and the CPPO subjected plaintiff Stone to 109 days of terror, severe pain and suffering, and gross injustice, while simultaneously subjecting the plaintiffs to the deprivation of due process, and fundamental rights, common to civil and democratic societies.

126. Plaintiff Stone was detained without cause, and without adequate clothing, resulting in irreparable injuries due to being subjected to conditions that resulted in severe frostbite. The NPD and the CPPO were entirely aware they were causing plaintiff Stone to suffer severe pain, and injury, and cared not, even going so far as to refuse medical treatment. Plaintiff Stone's frostbite injuries were entirely avoidable and would not have occurred but for the criminal, and reckless conduct perpetrated by the NPD and the CPPO.

127. The NPD and the CPPO engaged in protracted physical, psychological, and emotional torture, causing extensive, and severe pain, while engaging in abusive conduct in total disregard for human decency. The malfeasance of the NPD and the CPPO is unconscionable. These officials lack moral turpitude, and should stand trial for the crimes they have committed and be incarcerated. The NPD and the CPPO consistently conducted

themselves in an impetuous, biased, adversarial, and petty manner. Their conduct was entirely motivated by hate and racism.

128. Plaintiff Stone, because he was not Japanese, was kept in isolation, segregated from Japanese detainees. Plaintiff Stone was subjected to a cruel and unusual, and irrational "rule of silence" that resulted in serious consequences, including physical beatings, and the removal of personal items, such as pen and paper.

129. On November 8th 2013, defendants John Doe 1, Fujisaki, John Doe 3 and other officers broke plaintiff Stone's supporting metatarsal bone in the right foot, as they resorted to the use of torture, frustrated because plaintiff Stone would not succumb to signing false confession statements, prepared by the NPD officers, in Japanese, a language plaintiff Stone cannot communicate in. Thereafter, the entire time plaintiff Stone was detained he was unable to walk due to this broken foot, as the frostbite that followed resulted in near total incapacity.

130. The November 8th 2013 tortured occurred on day twenty-one of plaintiff Stone's detention. Plaintiff Stone would not have access to an attorney until day thirty-eight of detention, long after being indicted for petty assault. This particular torture occurred as NPD officers grew increasingly frustrated because they could not coerce extract a false confession statement from plaintiff Stone, who adamantly proclaimed his innocence.

131. During said torture plaintiff Stone was held on the floor in a crucifixion position, arms opened, and legs forced together while held in that position by several Narashino Detention Center guards and NPD officers. Plaintiff Stone never attempted to engage in combative conduct or even struggle as he feared being gravely injured, and, having other false charges filed.

132. Plaintiff Stone's feet, legs and knees were tied tightly with one-inch black nylon rope. John Doe 1 did the tying of the

ropes, aided by supervisor Fujisaki, who applied a leather restraining device to plaintiff Stone's arms. The use of this particular leather restraining device violates international law, as it has caused numerous deaths.

133. Fujisaki, placed the leather restraining device on backwards, and upside-down, resulting in a severely injured right hand, and the cutting off of the circulation of blood. John Doe 1 tightened the ropes so tightly that it broke plaintiff Stone's right foot, metatarsal bone. The snap of the bone was heard by officers who were outside of the cell. This caused a few of the guards to respond in shock, and immediately, and rapidly leave the area, and not return. Guard 2C, who had befriended plaintiff Stone, even pleaded with supervisor Fujisaki to remove the rope and restraining device, which Fujisaki refused. As this torture continued unabated, plaintiff Stone screamed out in pain, including, "Take it off! Take it off!" At one point, where plaintiff Stone's face was covered in swollen bruises, he turned to the camera and irrationally proclaimed, "There not doing anything wrong. There not doing anything wrong", this, even where it was obvious to everyone in the cell that what was occurring was not only entirely wrong, but criminal in nature. It is for the sole purpose of covering up these crimes that defendant NPD Chief of Police Yano, has refused to release the videotape recordings taken by Guard 2A, at the time of this protracted incident which resulted in permanent injury to plaintiff Stone.

134. The acts of John Doe 1, Fujisaki and other officers was deliberately cruel, inhumane, unjust, unwarranted, and callous in nature. Adding to the disturbing protracted incident, and elevating plaintiff Stone's fear was the fact that plaintiff Stone could not understand anything that was being communicated

by these officials, and none of them could communicate with plaintiff Stone as well.

135. Plaintiff Stone believed he was going to die, as immediately he was unable to breath, due to the tightness of the ropes which caused swelling to all limbs, and blockage of blood flow to plaintiff Stone's lower extremities.

136. Due to the lack of circulation, plaintiff Stone's heart pounded, as the circulatory system attempted to force blood into the lower extremities. Breathing caused the chest to expand, and resulted in indescribable sharp pain to the heart, brain, and throughout the body. While screaming to the officials to remove the ropes, plaintiff Stone fell unconscious, and was left in this condition for an unknown period of time. Plaintiff Stone awoke several hours later, in that condition. At that time, the cell was empty except for plaintiff Stone, with one guard, Guard 2C, sitting on the outside of the cell in a chair.

137. For purposes of reporting this torture to the U.S. Embassy in Tokyo, plaintiff Stone noted as much detail of the cell, and adjacent room, and the officers involved.

138. Plaintiff Stone could identify the officers, not only by physical appearance, but also by name, even where police and guards in Japan intentionally hide their identity. The officers at the NPD use identifiers for communication purposes. For example, Guard 2C was called, "Ni C San", which translated into English as Mr. 2C. At the NDC, there were three shifts of guards. Guards 1A, 1B and 1C were on the first shift. Guards 2A, 2B and 2C were on the second shift, with Guards 3A, 3B and 3C being on the third and final shift. Guard B is a transportation driver, and is one of three guards that had the identifiers of Guard A, Guard B, and Guard C. Finally, each guard stayed on duty for a total of 28 hours. The excessive length of time on each shift likely exacerbated these officials' capacity to make reasonable

decisions, and added to their frustration, recklessness and indifference.

139. At some point on the following day, November 9th 2013, plaintiff Stone remained tied up and restrained in said manner. Defendants John Doe 1, and Fujisaki, still on duty, untied plaintiff Stone and escorted him to an interrogation room, where an interpreter awaited. The specific purpose of the interpreter's presence was to aid John Doe 1, and Fujisaki into coercing plaintiff Stone to sign false statements claiming plaintiff Stone had caused his own injuries.

140. Three different statements were prepared by John Doe 1, and Fujisaki. The first two documents were crumpled up, and placed in Fujisaki's coat pocket, as John Doe 1, and Fujisaki sought the exact language they believed would exonerate them of criminal culpability and civil liability. Plaintiff Stone was threatened with further torture if he did not sign the prepared statements.

141. Plaintiff Stone briefly communicated to the interpreter what had occurred the previous day, and stated that he was signing the statement, not as a confession, but instead as proof that he had been tortured, and that the officers were extracting a coerced statement to hide their criminal culpability. The plaintiff asked the interpreter not to tell Fujisaki, and John Doe 1 what he had communicated in this regard. The interpreter did not. The circumstances clearly made the interpreter uncomfortable. Plaintiff's swollen fact, cuts, bruises, and inability to walk, would have been obviously not self inflicted to anyone.

142. The plaintiff told the interpreter that at some point he would be released, and that the interpreter could be called to testify as to what he was a witness to. Plaintiff Stone then signed the

third, and final document, which Fujisaki picked up, and left the interrogation room with.

143. The NPD chief of police Yano also refused to turn over this signed confession statement for any of the underlying proceedings. The refusal of providing this coerced confession statement would be apparent to anyone.

144. Fujisaki refused medical treatment to plaintiff Stone for <u>six days</u>. During this period NPD officers, Mizokuchi and Miyama, and others, continued to interrogate plaintiff Stone. The purpose of these interrogations was to coerce plaintiff Stone to sign false confession statements that claimed he had assaulted KERC employee Ogura. One interpreter used at these interrogation sessions was a Japanese man who had a seriously deformed eye, and who stated he was a graduate of the University of Georgia. Any interpreter would be easily identified as they would be paid for their time acting as an interpreter.

145. During all interrogations, plaintiff Stone was handcuffed, and tied to a chair, with a rope placed tightly around his waist. Mizokuchi who never obtained a written confession statement from plaintiff Stone, slammed plaintiff Stone's hands with his fist, threw papers, crumple paper and toss them onto the floor, and refused to rewrite any part of the statement defendant Mizokuchi and defendant Miyama alone prepared. Nothing in those statements were based in fact, and available evidence and testimony proved this as well. Regardless, these interrogations went on for days, with no breaks for food, drink, toilet, etc. The clear purpose of these interrogations was to break plaintiff Stone down until he finally succumbed to signing the prepared statements. All this occurred even after KERC had turned over to the NPD, videotape recordings that showed Ogura made a false police report, and that plaintiff Stone had committed no crime.

146. During legal proceedings, including appeals to the Tokyo High Court and Japan's Supreme Court, the NPD chief of police Yano, refused to turn over police reports, and videotape recordings taken by Guard 2A, who had recorded the November 8th 2013, torture of plaintiff Stone on a Sony handheld camera.

147. Refusal of medical treatment resulted in undue, and chronic pain, and reasonable fear that death would result due to further torture. Plaintiff Stone feared that his right foot might have to be amputated, as it was greatly swollen, purple, yellow, and excessively painful.

148. Due to the lack of medical treatment, deformity to plaintiff Stone's right foot resulted, which continues as of writing this complaint. Plaintiff Stone has to use a handicap placard for parking purposes, due to the leg injury.

149. Yano's refusal to cooperate with plaintiff Stone's attorneys, and refusal to turn over videotape recordings of plaintiff Stone's torture, violates Japan's Supreme Prosecutor's Rules of Procedures, Rule 2005, which requires all evidentiary material in the possession of police, and prosecutors to be turned over to opposing parties in any civil or criminal proceeding. Japan Criminal Code 281(4)(5) REQUIRES prosecutors to turn over evidence that the defendant knows exists, and which is sought for court proceedings, be it criminal or civil matter. In a telephone call which was recorded by the plaintiffs on October 10th 2014, the prosecutor stated they WOULD NOT permit the plaintiffs access to the evidence, or even view it until AFTER the Supreme Court appeal was finalized.

150. While refusing medical treatment for nearly a week, the NPD also refused plaintiff Stone the ability to notify the U.S. Embassy in Tokyo, and report the injuries sustained at the hands of the NPD and NDC officers. Yano, reported to the U.S. Embassy that plaintiff Stone had "punched himself in the face eight times",

and had caused his own injuries. Yano later retracted this written statement. Yano attempted to conceal from the U.S. Embassy plaintiff Stone's broken right foot, and did not mention it in the report. John Doe 1 claimed plaintiff Stone had "kicked the floor", causing his own broken right foot.

151. The NPD told plaintiff Stone's employer to write letters stating plaintiff Stone would be deported, and would not be allowed to take any of his personal property with him. Plaintiff Stone has retained this communication.

152. The employer's letter, written on December 10th 2013, stated that all of plaintiff Stone's property, including fourteen thousand dollars in brand new, and unused professional Nikon photographic gear would be destroyed, as well as more than sixty-thousand dollars in professional audio and video engineering equipment, a house full of nearly all brand new furnishings, and an automobile, a Toyota Fun Cargo in excellent condition. See: Exhibit B.

153. Plaintiff Stone had other valuable property, including copyright protected intellectual property, master audio files, an extensive photographic reportage collection, and other valuable property preserved on a computer, and external hard drives that the NPD were claiming would be destroyed. These false communications in regards to the destruction of all of plaintiff Stone's personal property had but one intention, and that was to inflict psychological, and emotional torture.

154. Fear of deportation was prevalent, as plaintiff Stone's wife was expecting a child at any time, and in fact did give birth on January 4th 2014, while plaintiff Stone was being detained. Plaintiff Stone would not be released from Chiba Prison until February 4th 2014, one month after the plaintiff's child was born. Chiba officials would not tell plaintiff Stone that his

child was born, and he would not learn of this birth until the day of release from detention.

155. While detained at the NDC, every time the guards phone rang, a cell door opened, or the door where interrogators entered, plaintiff Stone would immediately become ill, often resulting in vomiting, and trembling.

156. Plaintiff Stone was detained 38-days under said conditions without appointment of counsel in violation of Japan's Constitution. Article 37 of Japan's Constitution provides for the immediate appointment of counsel during all stages of criminal proceedings. There is no ambiguity in this, or any other Constitutional Article stated herein, as the language is craned from Japan's Prime Minister and His Cabinet official website.

See: The Constitution of Japan
http://japan.kantei.go.jp/constitution_and_government_of_japan
/constitution_e.html.

157. Further, these articles were written by U.S. attorneys, in English, during the aftermath of WWII, when the Japanese government surrendered, unconditionally to the U.S. and its allies. Finally, the Japanese text was translated from the English version, not the other way around.

158. The type of harm plaintiff Stone was subjected to was reasonably foreseeable, as the use of excessive force, threats, intimidation, coercion, and where officials resorted to the use of a controversial leather restraining device, banned in all civilized nations, is known to have caused serious bodily injury, even deaths to other foreign detainees held in Japan. The manner in which plaintiff Stone was detained could have resulted in death. Plaintiff Stone believed the extreme, cruel and unusual conditions would result in death, as he had clearly already suffered serious bodily injuries.

159. Early on as plaintiff Stone was being detained, videotape recordings were turned over to the NPD, and CPPO, by KERC. These videotape recordings exonerated plaintiff Stone of any wrongdoing. Regardless, the NPD and the CPPO continued to falsely imprison, continued to interrogate, and continued to coerce written confession statements that were to be used to obtain a wrongful conviction and which these officials knew were false. A cursory inspection of these KERC videotape recordings should have resulted in plaintiff Stone being released without charge. Regardless, plaintiff Stone was not released. The violation of plaintiff Stone's due process and fundamental human rights includes the following Japanese constitutional provisions:

Article 14. "All... people are equal under the law and there shall be no discrimination... because of race, creed, social status or family origin."
Article 17. "Every person may sue for redress as provided by law from the State or a public entity, in case he has suffered damage through illegal act of any public official."
Article 31. "No person shall be deprived of life or liberty, nor shall any other criminal penalty be imposed, except according to procedure established by law."
Article 35. "The right of all persons to be secure in their homes... against entries, searches and seizures shall not be impaired except upon warrant issued for adequate cause and particularly describing the place to be searched and things to be seized... Each search or seizure shall be made upon separate warrant issued by a competent judicial officer."
Article 36. "The infliction of torture by any public officer and cruel punishments are absolutely forbidden."
Article 37. "In all criminal cases the accused shall enjoy the right to a speedy and public trial by an impartial tribunal. He shall be permitted full opportunity to examine all witnesses, and he shall have the right of compulsory process for obtaining witnesses on his behalf at public expense. At all times the accused shall have the assistance of competent counsel who shall, if the accused is unable to secure the same by his own efforts, be assigned to his use by the State."

Article 38. "No person shall be compelled to testify against himself. Confession made under compulsion, torture or threat, or after prolonged arrest or detention shall not be admitted in evidence. No person shall be convicted or punished in cases where the only proof against him is his own confession."

Article 98, Japan's Constitutional Supremacy Clause holds, "This Constitution shall be the supreme law of the nation and no law, ordinance, imperial rescript or other act of government, contrary to the provisions hereof, shall have legal force or validity." Article 98 states, "the treaties ratified by Japan and established laws of other nations shall be faithfully observed."

160. The NPD refused to investigate, and preserve as evidence information plaintiff Suzuki had provided. Once Suzuki's evidence had been presented to the NPD, defendants Mizokuchi, and Miyama resorted to the use of duress, and threatened plaintiff Suzuki, who was more than seven months pregnant at that time, to use whatever means necessary to aid the police into coercing plaintiff Stone to sign false confession statements. Mizokuchi and Miyama told plaintiff Suzuki that if she did not get plaintiff Stone to do what they wanted, plaintiff Stone would have other charges filed, and would be detained indefinitely. The NPD would make good on this threat, bringing a second false charge, resulting in plaintiff Stone being detained an additional minimum of 23-days, subjecting plaintiff Stone to further abuse, and interrogations under the conditions described herein, only by then, plaintiff Stone had already suffered physical beatings and a broken right foot. This second charge meant that plaintiff Stone would be detained a minimum of 46-days, under conditions of interrogation and torture as described herein.

161. Plaintiff Suzuki's evidence which she had provided to Mizokuchi and Miyama included two email communications she had received from plaintiff Stone on September 5th 2013. These email communications were made several weeks prior to

plaintiff Stone's detention. Those email communications include where plaintiff Stone had notified plaintiff Suzuki that plaintiff Stone was going to quit employment. Plaintiff Stone stated as the reason he would quit employment was that he was no longer going to tolerate being subjected to battery committed by racist KERC employees. At the time of this communication, plaintiff Stone did not know that the identity of the KERC employee was Takeuchi.

162. Plaintiff's email communications showed that the former manager, whose employment plaintiff Stone had replaced, Timothy Havil-Austin, had been assaulted six times at the same Keisei Tsudanuma train station as plaintiff Stone had. Likewise, Havil-Austin was no longer willing to be subjected to hate crimes in Japan, and returned to New Zealand, the country of Havil-Austin's citizenship.

163. Plaintiff Suzuki provided another September 5th 2013 email communication between plaintiff Stone and plaintiff Suzuki. In this email communication plaintiff Suzuki pleaded with plaintiff Stone to reconsider quitting, as their child was due in December. Further, plaintiff Suzuki brought to the attention of Mizokuchi and Miyama that plaintiff Stone had attempted to file a police report with the NPD, against KERC employee Takeuchi, on September 6th 2013, and that the attempt at filing the complaint was IGNORED.

164. The reason the NPD provided as to why they were unwilling to permit plaintiff Stone to file a police report was because, "We can't speak English." This, statement is false as every jurisdiction in Japan has police officers whose specific duty it is to translate for victims of crimes who can't communicate in the Japanese language. See: Exhibit C.

165. After plaintiff Suzuki provided her evidentiary material to Mizokuchi, and Miyama, these officials took that information

to Takeuchi. Thereafter, Mizokuchi, and Miyama aided Takeuchi in filing a false police report. Takeuchi claimed plaintiff Stone assaulted him on September 12th 2013. This, September 12th 2013 "assault" was a legal impossibility as plaintiff Stone had not worked on that day, and had not gone to the Keisei Tsudanuma station. Plaintiff Stone's work schedule reflects this as fact. Regardless, plaintiff Stone would be charged with committing battery against Takeuchi, who claimed plaintiff Stone had punched him several times in the face, head and chest. See: Exhibit D.

166. What actually transpired was on September 5th 2013, plaintiff Stone entered Keisei Tsudanuma train station with a folding bicycle that was to be used for commuting purposes, because plaintiff Stone was disabled, and unable to walk to work from the Keisei Tsudanuma train station. After finishing work on that day, plaintiff Stone returned to the Keisei Tsudanuma train station and attempted to go to the train platform to return home. As plaintiff Stone was approaching an elevator, which led to the platform, Takeuchi blindsided plaintiff Stone from behind, and to the left, grabbing, shoving, and punching plaintiff Stone, while attempting to rip plaintiff Stone's folding bicycle from his grasp. Plaintiff Stone screamed out in pain, as Takeuchi's assault forced plaintiff Stone to place all the weight of his body, and the folding bicycle onto plaintiff Stone's injured right leg.

167. Takeuchi ripped the folding bike from plaintiff Stone's hand, and threw it to the ground. Thereafter, Takeuchi falsely imprisoned plaintiff Stone by not permitting plaintiff Stone to leave the area. As plaintiff Stone attempted to leave the area, Takeuchi positioned himself in front of plaintiff Stone, and placed himself in a fighting stance. Plaintiff Stone instinctively called out for police intervention.

Takeuchi's supervisor was alerted by plaintiff Stone's calls for help and arrived at the location shortly thereafter. Takeuchi was reprimanded by the supervisor, and sent away. As Takeuchi left the area he mumbled hate speech aimed at plaintiff Stone. The supervisor apologized to plaintiff Stone, and permitted plaintiff Stone to proceed to the train platform, with the folding bicycle. Plaintiff Stone went home.

168. On the next morning, plaintiff Stone filed a report in regards to Takeuchi's assault to his employer, who had already learned about the incident from two students, and a branch manager who had witnessed what had transpired. All of this matter was turned over to the NPD, yet none of the witnesses were interviewed by the NPD or the CPPO.

169. Plaintiff Stone is a well-published author and photographer. Plaintiff Stone has a BA in Communications in film production, and certification in audio-video engineering. Plaintiff Stone has a juris doctorate. At the time of detention, plaintiff Stone held the position as General Manager for the DaSilva Group, where plaintiff Stone represented the pooled speaker talent of CAA, ICM, William Morris, Harry Walker Talent Agency, and International Talent. The speakers plaintiff Stone represented includes former U.S. presidents, former U.S. vice presidents, and former senators and congressmen, among other notable international political figures, and Nobel laureates. For KERC employees to claim plaintiff Stone assaulted them, for no apparent reason, in front of several CCTV cameras is absurd. What was transpiring at this time were hate rallies, generally taking place at train stations, all over Japan. These hate rallies were violent, and aimed at foreigners, including Koreans, Chinese and Americans.

170.   CCTV cameras are located all over the Keisei Tsudanuma train station, and would have recorded Takeuchi's assault on plaintiff Stone, which occurred on September 5th 2013. Footage taken on September 5th 2013 would be time stamped, and refute Takeuchi's bogus September 12th 2013 assault claim. KERC has refused to release these videotape recordings to the plaintiffs, as well, as the videotape recordings where Ogura claimed plaintiff Stone had assaulted him on October 19th 2013, which is discussed below. See: Exhibit E.

171.   Bicycles are permitted on KERC trains. KERC had a duty to train Takeuchi in regards to bicycles being permitted on trains but failed to do so. Further, there was no issue with the folding bicycle when plaintiff Stone entered the Keisei-Usui train station, managed by KERC, where plaintiff Stone brought that folding bicycle to the train platform, and boarded a KERC operated train, bound for the Keisei Tsudanuma train station, managed by KERC, where Ogura and Takeuchi were employed. See: Exhibit F.

172.   After NPD officer Mizokuchi and Miyama contacted Takeuchi, a sham September 12th 2013, KERC report was created. This occurred about six weeks after the September 5th 2013 assault of plaintiff Stone. Takeuchi's false company report was created several weeks after plaintiff Stone had been detained. Takeuchi's September 12th 2013. report claimed that plaintiff Stone had assaulted Takeuchi. With this newly created report, Mizokuchi and Miyama entered plaintiff Stone's home, without a warrant, and took possession of plaintiff Stone's folding bicycle. Thereafter, the NPD engaged in creating a "crime scene reenactment" with Mizokuchi standing in for plaintiff Stone, and Takeuchi performing as himself. Takeuchi claimed plaintiff Stone had "thrust" the 36-pound folding bicycle at Takeuchi's face. The

report failed to mention that plaintiff Stone was also carrying a large bag at that time, which included medical devices, medicine for plaintiff's prior injury, books, containers, etc. The police report also failed to mention that plaintiff Stone's right foot didn't have a shoe on it, or that it was wrapped in an Ace Bandage, and that plaintiff Stone was nearly totally incapacitated due to being struck by a reckless driver as a pedestrian, a matter addressed in the plaintiff's Statement of Fact.

173. During Takeuchi's "crime scene reenactment", Mizokuchi did not use plaintiff's Montague Paratrooper Pro folding bicycle, even though it was in the unlawful possession of the NPD. Instead, <u>Mizokuchi used a child's bike, which was much smaller, had a thinner frame, and which was much lighter</u>.

174. Plaintiff Stone was released from detention on February 4th 2014. On February 14th 2014, at 6:34PM, plaintiff Stone's employer Hitomi Katsuyama sent an email communication to plaintiff Stone stating:

> "Hi Jack,
>
> The station employee you had trouble with your bike called me up. He said he, and his station master is demanding you to give them money. I told them Jack may leave Japan in a few months and he doesn't have money. I think that made them give up to do so. Hitomi."

175. The "station employee" who made the phone call to plaintiff's employer is <u>KERC employee Takeuchi</u>. The "station master" referenced in the email communication is <u>KERC employee Ogura</u>. See: Exhibit G.

176. Shortly after obtaining the aforementioned email communication, plaintiff Stone contacted Katsuyama who stated Takeuchi was engaging in false claims that would be reported to police if plaintiff Stone did not pay money to Takeuchi,

and Ogura. Takeuchi and Ogura apparently obtained Katsuyama's phone telephone number from a billboard that is posted adjacent to the Keisei Tsudanuma station window. Katsuyama is the largest advertiser at the Keisei Tsudanuma station, as well as other stations managed by KERC. See: Exhibit H.

177. But for the intentional, reckless, biased, abusive, hateful, and wrongful conduct of the NDP, NDC and the CPPO, the plaintiffs would have suffered no harm whatsoever, had they performed their duties in a professional manner. The Narashino Police Department, Yoshiharu Yano, John Doe 1, John Doe 2, John Doe 3, John Doe 4, and John Doe 5 are liable to the plaintiffs for damages under:

    I. 28 U.S.C. § 1350 (2006).
   II. 42 U.S.C. § 1983.
  III. Florida Statute Section 784.011.
  IV. Florida Statute Section 784.03.
   V. Florida Statute § 787.02.
  VI. 2012 Florida Statute 768.
 VII. Intentional Infliction of Emotional Distress as defined by the Florida Supreme Court.
VIII. 18 U.S.C. § 1503 prohibits obstruction of justice.

## C. Chiba District Public Prosecutor's Office, John Doe 6, Tomoe Kume, and Jane Doe 1

178. Chiba District Public Prosecutor's Office, John Doe 6, Tomoe Kume, and Jane Doe 1, did knowingly and intentionally falsely imprison, and knowingly and intentionally bring false criminal charges against plaintiff Stone. These tortious, and criminal acts occurred during grossly biased proceedings that violated plaintiffs' due process, and fundamental human rights. These knowingly wrongful acts, committed under the color of office, and in and official capacity culminated in wrongful conviction, and irreparable harm, including financial losses that continues to toll.

179. Chiba prosecutors engaged in numerous procedural violations, including refusing to preserve evidence, and refusing to provide legal representation for 38-days. Appointment of legal counsel is required immediately after being detained under Japan's Constitution, Article 37.

180. Chiba officials engaged in protracted physical, psychological and emotional torture, grossly violating the authority permitted them by the Japanese Ministry of Justice. These CPPO officials knowingly aided the NPD and the NDC officials in covering up their reckless and violent criminal conduct where plaintiff Stone's right foot had been broken.

181. For the first two weeks of detention, plaintiff Stone was not permitted paper or pen for any purpose whatsoever. During interrogation plaintiff Stone was not permitted paper and pen for note taking purposes as well. At no time did prosecutors contact plaintiff Suzuki and notify her that plaintiff Stone had been detained. After several days of plaintiff Suzuki frantically attempting to locate plaintiff Stone, plaintiff Suzuki wrongfully determined that plaintiff Stone had abandoned her, and their child.

182. Chiba prosecutors intentionally prolonged plaintiff Stone's detention, using it as a front, a form of duress, psychological torture, and cruel and unusual punishment because plaintiff Stone refused to be coerced into signing false confession statements the CPPO had prepared themselves.

183. Beginning on the morning of October 20th 2013, plaintiff Stone was tied up, handcuffed and roped, and brought to the Chiba Public Prosecutors Office for the purpose of interrogations, which plaintiff Stone refused to participate in. Plaintiff Stone was stripped of shoes, socks, jacket, and other articles of clothing, even where temperatures were at, or near freezing during these interrogations.

184. The CPPO refused medical treatment, threatened false charges, and verbally abused, and mocked plaintiff Stone. Plaintiff Stone was led to interrogations through public corridors, for no purpose whatsoever but to humiliate, and to subject plaintiff Stone to being treated as a public spectacle.

185. Even where plaintiff Stone had finally obtained legal counsel, long after indictment, interrogations continued unabated, without legal counsel permitted to be present during those interrogations.

186. The CPPO and its officials violated Supreme Prosecutor's Rule 2005, which requires all evidentiary material in prosecutor's possession, including said videotape recordings, to be turned over to the opposing party for civil or criminal proceedings. As of the filing of this complaint, the CPPO continues to refuse to turn over any evidentiary material in their possession, in regards to this, and all underlying proceedings.

187. Japan Criminal Code 281(4)(5) REQUIRES prosecutors to turn over evidence that the defendant knows exists, and which is sought for criminal or civil court proceedings.

188. The violations of Japan's Constitution the CPPO officials committed while acting under the color of office, and in an official capacity includes:

> Article 14. "All... people are equal under the law and there shall be no discrimination... because of race, creed... social status or family origin."
> Article 31. "No person shall be deprived of life or liberty, nor shall any other criminal penalty be imposed, except according to procedure established by law."
> Article 35. "The right of all persons to be secure in their homes, papers and effects against entries, searches and seizures shall not be impaired except upon warrant issued for adequate cause and particularly describing the place to be searched and things to be seized... Each search or seizure shall be made upon

separate warrant issued by a competent judicial officer."

Article 36. "The infliction of torture by any public officer and cruel punishments are absolutely forbidden."

Article 37. "In all criminal cases the accused shall enjoy the right to a speedy and public trial by an impartial tribunal. He shall be permitted full opportunity to examine all witnesses, and he shall have the right of compulsory process for obtaining witnesses on his behalf at public expense. At all times the accused shall have the assistance of competent counsel who shall, if the accused is unable to secure the same by his own efforts, be assigned to his use by the State."

Article 38. "No person shall be compelled to testify against himself. Confession made under compulsion, torture or threat, or after prolonged arrest or detention shall not be admitted in evidence. No person shall be convicted or punished in cases where the only proof against him is his own confession."

Article 98, Japan's Constitutional Supremacy Clause holds, "This Constitution shall be the supreme law of the nation and no law, ordinance, imperial rescript or other act of government, contrary to the provisions hereof, shall have legal force or validity." Article 98 states, "the treaties ratified by Japan and established laws of other nations shall be faithfully observed."

189. In regards to Chiba prosecutors "investigation", as per the NPD, plaintiff Stone's witnesses were never contacted or interviewed. Prosecutors never contacted plaintiff Suzuki even where plaintiff Suzuki had attempted to provide the same evidentiary material to the prosecutors as she had the NPD.

190. Just as the police had done, Chiba prosecutors refused to preserve evidence that showed KERC employee Ogura had assaulted plaintiff Stone.

191. Because plaintiff Stone was a U.S. citizen, and had a law degree, legal knowledge, and knowledge of Japan's constitution, and Japan's rules of procedures, prosecutor Kume heaped as much injury, and verbal abuse upon plaintiff

Stone as possible. This abuse included refusing to appoint counsel for 38-days, in violation of Japan's Constitution, namely Article 37. When plaintiff Stone sought appointment of counsel, prosecutor Kume shouted, "THIS IS JAPAN! GET YOUR EMBASSY TO GET YOU AN ATTORNEY!" Plaintiff Stone responded by telling Kume, "My embassy isn't detaining me on false charges, you are." Kume also shouted, "YOU NEED TO LEARN OUR PROCEDURES." Plaintiff Stone responded by stating to Kume's assistant, "These proceedings are entirely unlawful. I hope if you end up working as a prosecutor you do not engage in such abuse of power."

192. It must be noted that **JAPAN DOES NOT HAVE PUBLIC DEFENDERS**. The appointment of counsel is provided by public prosecutors.

193. After the NPD broke plaintiff Stone's right foot, and because plaintiff Stone was unable to walk, Kume went to the NDC for interrogation purposes. This is not permitted under Japan's procedural rules, and certainly why daiyo kangoku police detention must be outlawed in Japan. While at the NDC, Kume resorted to intimidation, resorted to making threats of filing bogus false charges, and continued to attempt to extract coerced confession statements, even after more than one month of plaintiff Stone being held under said conditions.

194. Kume interrogated plaintiff Stone at the NDC in the presence of several police officers, including those involved in breaking plaintiff Stone's right foot, including John Doe 1 and supervisor Fujisaki. Kume's interrogation, which took place at the NDC was recorded on a Sony handheld camera. This, and other videotape recordings taken at the NDC, were sought by the plaintiffs for evidentiary purposes, but as the other evidentiary material raised herein, police and prosecutors have refused to turn it over to the plaintiffs, and for obvious reasons.

195. While at the NDC, plaintiff Stone told Kume that he wanted to file criminal battery charges against John Doe 1, Fujisaki, and other Doe defendants named herein; all participating in torturing plaintiff Stone on November 8th 2013. Kume demanded plaintiff Stone to "UDADSAI", which is Japanese for <u>SHUT UP</u>!

196. Kume continued to resort to coercing plaintiff Stone's signature on confession statements, placing documents and a pen in front of plaintiff Stone, continually stating, Sign! Sign! Sign!

197. Plaintiff Stone would not sign, and kept raising the issue of videotape recordings he was sure had been turned over to the NPD and the CPPO. Kume refused to acknowledge being in possession of any videotape recordings, even though the CPPO was, instead Kume would shout, "<u>SHUT UP ABOUT THE VIDEO RECORDINGS</u>."

198. Kume again threatened to file false charges if plaintiff would not sign the confession statements the CPPO had prepared. When plaintiff Stone refused, exasperated, Kume filed a second charge for "assaulting" KERC employee Takeuchi. Kume left the NDC, and plaintiff Stone was booked for assaulting Takeuchi. This meant the CPPO would detain plaintiff Stone in daiyo kangoku police custody for at least another 23 days, and continue to resort to abusive conditions of duress, and interrogations, on a daily basis, for a minimum of 46-days.

199. The filing of this second false charge resulted in plaintiff Stone's child being born while plaintiff Stone was detained at Chiba Prison, where Kume ordered plaintiff Stone to be transferred on December 20th 2013. Chiba Prison houses 85% of Japan's convicted murderers, and most violent convicted prisoners. <u>Kume was well-aware filing this second bogus charge would result in plaintiff Stone being detained while</u>

<u>his wife gave birth to their child</u>. Kume, her supervisor, and the NPD officials cared not.

200. Defendant John Doe 1, Guard B, the transportation driver for the NPD, would transport plaintiff Stone to the CPPO for interrogations, on the way, John Doe 1 would stop in front of a large billboard where an illustration of a pregnant woman was the main subject of the advertisement. See: Exhibit I. Also see Exhibit J, CPPO's indictments brought against plaintiff Stone.

201. Chiba public prosecutors entered into a conspiracy with Narashino police to cover up torture that resulted in irreparable harm to plaintiff Stone. This criminal conspiracy went so far as to order the removal of plaintiff Stone's leg cast, on December 18th 2013, the evening before plaintiff Stone's initial trial date was to begin. The sole purpose of removing the cast was to deceive the trial court judge. John Doe 1 communicated this malfeasance to John Doe 9, an orthopedic doctor employed at the TCGH. Under order of the CPPO, plaintiff Stone was taken to the TCGH under the guise of having the cast on his right leg replaced with a new one, for "trial purposes." John Doe 9, removed the initial cast under the guise of replacing it, and thereafter left plaintiff Stone without a cast, and in the physical condition of being unable to walk. The terror of being placed in this circumstance, heaped together with all that had already transpired cannot be communicated adequately in this complaint. See: Exhibit K.

202. Plaintiff Stone was warned by Kume, Fujisaki, and John Doe 1, not to mention how his right foot had been broken to the trial court judge. Plaintiff Stone's "appointed" attorney also warned plaintiff Stone not to mention the broken right foot to the judge as well. While detained plaintiff Stone contacted

several rights groups, including, Japan Federation of Bar Association, Houterasu, The Center for Prisoner's Rights, former prosecutor Takeshi Nakamura, and the U.S. Embassy in Tokyo. All warned plaintiff Stone of violent repercussions for reporting abuses while detained. The <u>Center for Prisoner's Rights</u> responded by stating, "<u>A lawsuit against Japanese government would be difficult to win, and the likely negative consequences of the suit would be placement in solitary confinement by day and night</u>." See Exhibit L.

203. Plaintiff Stone sent numerous communications to the U.S. Embassy in Tokyo, and pleaded with them to go to the trial and protest the unlawful treatment plaintiff Stone suffered while being detained. <u>The U.S. Embassy in Tokyo sent NO REPRESENTATIVE to appear at the trial</u>. The plaintiffs obtained these communications, and other pertinent records through the FOIA.

204. John Doe 1, who was mostly responsible for plaintiff Stone's broken right foot, escorted plaintiff Stone into the initial trial proceeding which took place on December 19th 2013 at Chiba District Court. John Doe 1 sat directly behind the tied up, handcuffed and roped, plaintiff Stone, holding a rope that was tied around plaintiff Stone's waist, during the entire initial trial court proceeding.

205. The evening before trial, attorney Kushida who "represented" plaintiff Stone had told plaintiff Stone, if he did not attempt to fight the charge, he would be released in time to go home and be present with his wife during the birth of their child.

206. At trial, plaintiff Stone would not enter any plea. Only stating, "I cannot fight this." Plaintiff Stone would not answer any questions posed by prosecutor Jane Doe 1. Jane Doe 1 harassed plaintiff Stone, repeatedly asking, "Why won't you

answer my questions?" The judge permitted this to continue unabated, even over the objection of plaintiff Stone's attorney. One question posed by Jane Doe 1 was, "Did you say fuck?" Another asked, "Did you call Ogura a monkey?"

207. The proceeding ended after a mere 40-minutes. Regardless as to what plaintiff Stone was told about not fighting the charge, the matter was held over for another 34 days. The trial judge quickly exited the court. Plaintiff Stone would not be present at the birth of his child.

208. On the following day, December 20th 2013, Kume ordered plaintiff Stone to be moved from the NDC to Chiba Prison. At Chiba Prison, plaintiff Stone was treated even more brutally than while detained at the NDC.

209. The CPPO and its officials violated plaintiff Stone's due process, and fundamental human rights. The CPPO falsely imprisoned plaintiff Stone and continued to detain plaintiff Stone even where they knew they did not have any cause to do so. The CPPO knowingly filed false charges of "petty assault", and "battery" resulting in a wrongful conviction, even where no evidence, and no "victim" or other testimony was presented at trial. The prosecutor presented nothing to the Chiba District Court judge as to why charges had been brought. Regardless, the District Court found plaintiff Stone guilty. The best way to describe these proceedings in colloquial speech is the entire matter was a lynching.

210. The CPPO is directly responsible for the unconscionable conditions plaintiff Stone was detained under, including conditions of torture, and inadequate clothing that resulted in freezing conditions culminating in permanent physical injuries.

211. The CPPO is directly responsible for wrongfully detaining plaintiff Stone, false imprisonment and for filing false

charges, resulting in the plaintiff's child being born while plaintiff Stone was being unlawfully detained. The conduct of the CPPO is unforgiveable, and no amount of compensation could repair the fact that plaintiff Stone was not present at the birth of his only child.

212. The CPPO is directly responsible for the loss of wages, and other financial losses that continue to toll.

213. All of the plaintiff's harms were avoidable had these hateful, racist, arrogant, and ignorant CPPO officials engaged in humane, and unbiased proceedings, conducted themselves professionally, and considered evidence that was in their possession, and that which had been presented, which they refused to acknowledge, including eyewitness accounts, and plaintiff Suzuki's email communications.

214. After plaintiff Stone was released from detention, and during appeal proceedings, plaintiff Stone contacted the CPPO via telephonic communications, seeking to obtain evidentiary material that was in their possession. Plaintiff Stone mostly wanted to obtain the videotape recordings to show plaintiff Suzuki's family that he was not guilty of the crimes he was convicted of. Plaintiff Stone audio recorded these telephonic communications with the CPPO. During one phone call the prosecutor stated, the reason for not turning over any evidentiary material was because, "You'll go to the media with it." Plaintiff Stone responded stating, "Whether I go to the media or not is not relevant, the law requires that evidentiary material in your possession be turned over to me." Chiba prosecutor reiterated, "No, we won't do that, because you'll go to the media with it." While said evidentiary package, including said videos were in the possession of attorney Kushida, he too refused to turn the

evidentiary package over to the plaintiffs, even for appeals purposes.

   I. 28 U.S.C. § 1350 (2006).
  II. 42 U.S.C. § 1983.
 III. Florida Statute Section 784.011.
 IV. Florida Statute Section 784.03.
  V. Florida Statute § 787.02.
 VI. 2012 Florida Statute 768.
 VII. Intentional Infliction of Emotional Distress as defined by the Florida Supreme Court.
VIII. 18 U.S.C. § 1503 prohibits obstruction of justice.

### D. Chiba Prison, Warden Toru Matsumura, and John Doe 7

215. Plaintiff Stone was detained at the NPD from October 19th 2013 to December 20th 2013. On December 20th 2013, <u>prosecutor Kume ordered plaintiff Stone to be transferred to Chiba Prison</u>. Chiba Prison houses 85% of Japan's murderers, and the nation's most violent convicted criminals.

216. Conditions in detention at Chiba Prison from December 20th 2013 until February 4th 2014, was even worse than those at the NDC. While at Chiba Prison, plaintiff Stone obtained injuries that have yet to heal, nearly five years after the fact. This includes where plaintiff Stone was subjected to, on a daily basis, severe frostbite; permanent injuries that were entirely avoidable. Plaintiff Stone was frozen, starved, abused, traumatized and tortured beyond what mere words could state herein. See: Exhibit M. Also see: Exhibit N.

217. All detainees spend their days on the floor in tiny furnitureless cells, kneeling in front of the cell door. In any cell, one would find a distraught, and mentally ill individual, rocking back in forth in a manner one would expect to see in a mental asylum a century ago. In cell after cell, silent men rocked back and forth, with faces mere inches from the cell's door. This was required of detainees, individuals who had yet to be found guilty of any crime.

218. Plaintiff Stone has had five knee surgeries, and kneeling in that manner was a physical impossibility. The guards employed at Chiba Prison, including medical staff gave this no consideration, believing plaintiff Stone's "refusal" to do so was an act of "disobedience." While plaintiff Stone was subjected to freezing conditions on a daily basis, medical staff sat in well-heated offices. This shows the Chiba Prison officials including medical "professionals" knew, or should have known, the conditions at Chiba Prison were unfit for human beings. Plaintiff Stone received no medical treatment in regards to the broken right foot the entire time detained at Chiba Prison.

219. All foreigners at Chiba Prison are segregated from Japanese detainees. The medical staff determine all foreign detainees mentally ill, merely because they are not Japanese. Cellblock C is the location where all foreigners, or mentally ill "undesirables" are detained.

220. The indifferent medical staff, and officers grossly violated the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, the International Convention on the Elimination of All Forms of Racial Discrimination, and the the Minimum Standards for the Treatment of Prisoners.

221. During the entire time plaintiff Stone was detained at Chiba Prison, the exterior grounds were covered in several feet of snow. Freezing wind blew into the cell through cracks in the wall, and through the dilapidating window frames. Chiba officials falsify conditions by presenting a "public display" as to what a cell looks like at Chiba Prison. See: Exhibit O.

222. Where Narashino police and prosecutors were not able to coerce signed confession statements in regards to false charges being brought against plaintiff Stone, Chiba Prison officials

took over, going so far as to prepare an in-court statement which was to be read by plaintiff Stone, and which placed criminal blame on plaintiff Stone due to "insufficient ability to communicate in the Japanese language." Chiba Prison officials even went so far as to aid plaintiff Stone in "practicing" the statement, which was to be read in court, in the Japanese language. This coerced statement, made under duress and torturous conditions remains in plaintiff Stone's possession, as evidentiary proof to show how far Japanese officials will resort to, to obtain a false conviction, and uphold that nation's bogus 99.97% conviction rate. See: Exhibit P.

223. Plaintiff Stone preserved sixteen notebooks that detail what occurred while detained at the NDC and Chiba Prison. Those notes include the daily temperatures at Chiba Prison. The temperatures were easy to preserve as there was a thermometer nailed to a wall, directly across from the cell plaintiff Stone was detained in. The average indoor temperature was between 35-39 Fahrenheit, never higher and often much lower, especially at night. No human could survive these conditions for very long without suffering permanent and debilitating injuries.

224. Plaintiff Stone first twelve days at Chiba Prison were undertaken without adequate food, and without adequate clothing, including socks, shoes, jacket, coat, gloves, cap, blankets, and any other essentials to present frostbite, and freezing. For the initial twelve days, plaintiff Stone was held in isolation, provided no bath, shaving, and other hygienic materials, including toothbrush, soap, toothpaste, etc. For more than half the time plaintiff Stone was detained at Chiba Prison he suffered under the exact same conditions described above. Plaintiff Stone was not permitted writing

paper or pen during the initial twelve days, and any other time at the whim of Chiba Prison officials.

225. The only heat plaintiff Stone, and other detainees had, including other American detainees, was when convicted prisoners, orderlies, brought a small pot of tea, and left it at the cell window. Once the pot was received, plaintiff Stone didn't drink the tea, instead he crouched on the floor, placing as much of his hands, and feet on the pot as possible, so as to absorb the heat. Plaintiff Stone dreaded the moments, as the heat drained from the pot. Mere words cannot explain the suffering endured in this regard. If the tea spilt out onto plaintiff Stone's clothing, it quickly turned to ice.

226. All possessions, including reading material, and even stamps purchased at the NPD, which were to be used to communicate with the U.S. Embassy were confiscated and destroyed by Chiba Prison officials. Plaintiff Stone feared that his detailed notebooks would be destroyed was well, as all possessions had been taken away, and he did not know where they were being held.

227. Plaintiff Stone was not permitted to contact the U.S. Embassy in violation of the Vienna Convention, and was subjected to cruel and unusual punishment that included being held in isolation 24/7, and subjected to an arbitrary, and draconian "silence" rule. This silent rule forbade communications by speaking with anyone, at any time.

228. Chiba Prison officials refused to administer medical treatment for plaintiff Stone's broken right foot, and permitted the prematurely removed cast to remain off plaintiff Stone's right leg for the duration of detention. Plaintiff Stone suffered irreparable nerve damage to his wrists from the intentional misuse of Type II Handcuffs.

229. Cheiralgia Paraesthetica is neuropathy of the hands generally caused by compression or trauma to the superficial branch of the radial nerve. The area affected is typically on the back or side of the hand at the base of the thumb, but may extend up the back of the thumb and index finger and across the back of the hand. Symptoms include numbness, tingling, burning or pain in various degrees. The most common cause of Cheiralgia Paraesthetica is associated with the improper use of handcuffs and commonly referred to as handcuff neuropathy. The intentional improper use of handcuff is excessive force, and criminal in nature. Handcuff neuropathy symptoms may resolve on their own within several months. However, in some cases surgical decompression is required. Permanent damage is possible. See: Exhibits Q.

230. The U.S. Supreme Court, in Graham v. Conner, 490 U.S. 386 (1989), held that force used be objectively "reasonable" under the particular circumstances encountered, and that is necessarily based on a very fact-specific inquiry.

231. Detainees were not permitted to communicate to any other person, nor would there be any means, as all detainees were held in isolation. There were no TVs, books, recreational materials, or anything to occupy the mind. These conditions rapidly resulted in psychological deterioration.

232. Cleaning the body, including washing hands at a sink was forbidden. These acts were often impossible as the water was frozen in the pipes that led to the sink.

233. Physical exercise so as to attempt to stay warm was forbidden. Attempting to exercise to stay warm resulted in punishment. Even with the extreme cold conditions which was often at, or below freezing, plaintiff Stone was not permitted to exercise so as to circulate blood and warm the body. Attempting to do therapy on the uncast broken right foot was forbidden. Not

being permitted medical treatment for the broken right foot, or to have a cast on the right leg resulted in permanent deformity.

234. On a daily basis, plaintiff Stone was injected unknown drugs, against his will. The drugs were meant to keep plaintiff Stone lethargic, and "silent." The drugs caused hallucinations.

235. Plaintiff Stone was subjected to a humiliating "punishment committee", and placed in further isolation for "refusing to bow to the committee." The officials used excessive force, battery, and threats while attempting to force plaintiff Stone to comply with bowing, which he would not. Exhibits R.

236. Plaintiff Stone was dragged naked through heavy snow, and forced to sit in a wooden box that was only high enough to sit in, and not wide enough to even turn one's head to the right or left. Approaching these torture devices is one of the most sickening memories plaintiff Stone has of Chiba Prison, as others held inside those boxes screamed, perhaps due to being claustrophobic, or from the excessive length they were forced to endure in those cramped confines. The only noticeable part of the body while placed in the confines of these torture boxes were the toes of the poor victims, jutting out at the bottom.

237. Day after day of this continued abuse finally resulted in serious mental illness, exacerbated by hallucinations caused by the unknown drugs. No manner of "artful" description could adequately relate the conditions of abuse, degradation, fear and torture Chiba Prison officials spitefully, and recklessly heaped upon plaintiff Stone. Plaintiff Stone was certain he would die prior to being released.

238. U.S. Embassy consulate Thomas A. Duval, having been aware of the excessive conditions plaintiff Stone was being detained under, smuggled a camera into Chiba Prison. While meeting

with plaintiff Stone, Duval took photographs, preserving for evidentiary purposes, Japanese officials' reckless, and criminal nature.

239. Plaintiff Stone detailed to Duval, an account of having witnessed an unconscious Korean national, in his early twenties, chained to a wall in a cell. When a detainee is outside of a cell, Chiba Prison requires them to look straight ahead. Looking right, or left is forbidden, and results in punishment. When plaintiff Stone was being led down a corridor, he noticed the Korean man chained to a wall inside a cell. Shocked at the sight of the young man, plaintiff Stone involuntarily froze, staring in disbelief into the cell. The young man was unconscious, and clearly had been beaten, as he was covered with bruises and cuts. As cold as it was, the Korean man was almost naked, wearing only a pair of underwear. Prison guards beat plaintiff Stone for stopping, and looking into the cell. Those guards forced plaintiff Stone to continue on.

240. During the entire time plaintiff Stone was detained he was intentionally kept from having access to his jacket, shoes and other essential items. The conditions of cold were so dire heaters, blankets, coats, thick socks, gloves, and wool caps were required, yet none were provided. The U.S. Department of State, the United Nations, and respected human right groups have protested these conditions for decades. Annual reports describe these conditions as torture, especially where several detainees have frozen to death, or suffered permanent limb loss due to frostbite. Freezing conditions occur even where Chiba Prison has indoor heating, and ventilation in each cell for heating purposes.

241. To further exacerbate suffering, detainees have blankets stacked in the corner of the cell, but use is forbidden, no

matter how cold it is. Plaintiff Stone would attempt to place his feet under the blankets when guards were not present, but each cell has a camera overhead, and immediately the phone at the floor officer's station would ring, warning of this, or any of a myriad of absurd and irrational "infractions." See: Exhibit O.

242. Relative cell size was equivalent to one tatami mat. A tatami mat is straw mat, 6' by 4'. The toilet area, which is adjacent to the exterior concrete wall, was so cold it was impossible to use the area without first putting one of the blankets onto the floor and place the feet over it. Trying not to panic in such tight confines is how plaintiff Stone passed each day. Sounds of crying, and the occasional screams of those that succumbed to insanity, at any hour, broke the endless monotony.

243. A futon for bedding was permitted only at night. The futons had a removable sheet as a cover, which were ragged but generally clean. The futons themselves were covered in human filth, including dried urine, blood, mucus, semen, and fecal matter. The futons should have been destroyed decades ago. Plaintiff Stone feared obtaining some kind of infectious disease from the aged "bedding", and the generally poor hygienic conditions at Chiba Prison.

244. Prison clothing are mere rags, and have the appearance of prison garb like that in the movie, Public Enemy, which starred James Cagney. The prison clothing absolutely dated back to the 1920s, or 30s. Buttons had been sewn on again, and again, perhaps replaced numerous times over several decades.

245. Plaintiff Stone wore four shirts, two pants, and four socks, but even this was inadequate to stave off freezing. Barred cell windows did not close entirely, and wind blew in through

numerous cracks in the walls, and window jambs. Water froze in a sink that was not permitted to be used. Water from condensation dripped down the cell walls and resulted in endless, and excessive moisture build up, causing black, and red mold to cover much of the cell's interior, which aided in respiratory infection.

246. General conditions were appalling, such as the kind of conditions one might expect in a third world nation, or a WWII prison camp operated by war criminals.

247. Once, plaintiff Stone was taken to an "exercise" yard. First, the freezing air made exposure to the elements unbearable. Second, at first glance, the small metal cage the plaintiff was placed in appeared to be covered in snow. Although it did snow on a near daily basis, the entire time plaintiff Stone was detained. The ground inside the exercise cages were not covered in snow, but instead covered in years of fingernail and toenail clippings. The sight was incredibly appalling. See: Exhibit S.

248. The United Nations standards in regards to the treatment of prisoners and detainees is that they are to be permitted one hour each day, outside of a cell, for purposes of exercising. Japan's Ministry of Justice defies this standard, as plaintiff Stone was taken out of a cell to exercise, only once, the entire time he was detained. Once, in a period of 109 days. The period of "exercise" was under conditions of grossly inadequate clothing in temperature at or below freezing, without coat, gloves, wool cap, shoes, etc.

249. After more than 90-days of detention, plaintiff Stone's hallucinations were ever present. Plaintiff Stone's hands, and feet were covered in black dead skin, and the pain was unbearable. Plaintiff Stone's hands and feet were covered in

bloody cracks that were so painful that it was impossible to use fingers to pick up, or grasp an object like soap when bathing was permitted, every fifth day. The only "medicine" provided for frostbite was a waxy substance that didn't provide any relief whatsoever.

250. Plaintiff Stone was unable to walk due to the untreated broken right foot, and the frostbite that covered both feet. Plaintiff Stone's hands and feet were covered in cracks that bled, and the cracks swelled significantly, oozing a yellow liquid. Skin turned yellow, bright red, purple, and finally black.

251. Panic and involuntary trembling due to the confines of the small space, unknown drugs, stress positions, extreme temperature, hallucinations, and unknown outcome, was no longer controllable. Reality was skewed. In this state, plaintiff Stone undressed, and folded the few articles of clothing he had on, and placed them in a neat pile. Plaintiff Stone stood naked at the barred window, and watched as a crow flew over the Chiba Prison outer wall. Plaintiff Stone flew over that wall with the crow. Tears were frozen on plaintiff Stone's face.

252. Naked, plaintiff Stone stood at the window, faced outward, and shouted, "My name is Stone, not 2061." Immediately, numerous guards came to the cell, and began to bang on the glass window with batons. Plaintiff Stone ignored the guards, and shouted again, "My name is Stone, not 2061." The guards, each wearing a pair of black gloves, entered the cell, and dragged plaintiff Stone to the other side of Chiba Prison, through heavy snow. This was recorded on a handheld camera by one of the guards. Plaintiff Stone has sought for the release of this videotape recording, but Chiba Prison officials refuse to release it.

253. Plaintiff Stone was placed in an isolation chamber. The chamber appeared to have never been cleaned. It was extremely cold. The cell was designed so that any sound reverberated, like sound in an echo chamber. There was no access to water. The "toilet" was a hole in the floor, and could only be flushed by a guard outside the cell. Down the corridor, someone was in a similar situation. That person was as near insanity as plaintiff Stone. That person howled, moaned and screamed as an animal would, being stripped of its skin.

254. Plaintiff Stone remained in this isolation chamber for several days. The entire time, the room was brightly lit. Before long the bright light became maddening. There was no manner in which to alleviate the pain that light caused. Plaintiff Stone became savage, and refused to eat. Exacerbating the circumstances is that the plaintiff's child birth was overdue, and no one would tell him if his child had been born, had yet to be born, or had been stillborn due to trauma plaintiff Suzuki had been subjected to.

255. These conditions went on for uncountable days. During this time, plaintiff Stone was placed in confinements, including an odd suit, and two pairs of double locking Type II handcuffs, placed as tightly as possible on the wrists, and behind the back. This occurred because plaintiff Stone had saved several cups of water, and used it to bath in, which was not permitted.

256. The Chiba official responsible for injuries sustained in isolation was John Doe 7, the Chiba Prison Cellblock C supervisor.

257. The improper use of handcuffs resulted in wrist and phalange swelling. This swelling made the handcuffs tighten further. Very quickly, any movement, including breathing resulted in pain that cannot be described in mere words. The handcuffs

felt like blades on a knife slowly cutting off each wrist. Exacerbating the matter is where plaintiff Stone had undergone shoulder surgery while in law school. While in law school, plaintiff Stone had to take final exams speaking into a tape recorder as a result of of the inability to use the right arm for writing purposes. The improper use of handcuffs by John Doe 7, resulted in permanent neurological damage to both of plaintiff Stone's wrists. See: Exhibit T.

258. The excessive, and protracted conditions left plaintiff Stone feeling helpless. Plaintiff Stone no longer felt human. Plaintiff Stone did not want to live any longer. The indignity of knowing he was innocent, and detained under such barbaric, illogical and asinine conditions, not knowing if his child was born, and where those that detained him knew he was innocent, and cared not, was too heavy to bear.

259. Plaintiff Stone, because he had no other means to commit suicide, began to bite chunks out of his wrists, so as to reach the brachial artery, for the purpose of bleeding to death. This process was interrupted when several guards entered the isolation chamber, preventing plaintiff Stone from engaging in further self mutilation. The plaintiffs wrestled with whether this information should have been included in this complaint, for obvious reasons. Nevertheless, this complaint is filed to show the extensive damages the plaintiffs have suffered, and the affects of long-term exposure to irrational, cruel, unusual, extensive, unnecessary treatment of detainees, which ultimately amounts to torture.

260. If plaintiff Stone had access to a weapon he would have killed any, and all, of those who had entered that cell. For more than three years, if any of these officials had come across plaintiff Stone, especially Guard B, Fujisaki, Kume,

Mizokuchi, or John Doe 7, plaintiff Stone would have been unable to have prevented viciously attacking them, seeking retribution in the most violent manner imaginable, giving no thought whatsoever to any repercussions that might have followed. The one thought that has kept plaintiff Stone from seeking revenge is that the plaintiffs have a child, and that child needs to be raised properly by father and mother.

261. Plaintiff Stone spent the remainder time in detention heavily sedated, and forced to sit on a cardboard box in front of a cell door. When plaintiff Stone fell to the floor in a state of semi-unconsciousness, the phone would ring, and guards would rush into the cell, and force plaintiff Stone back on the cardboard box, in a seated position.

262. On February 4th 2014, the District Court sentenced plaintiff Stone to 1.5 years of hard labor, suspended for four years. Every Japanese attorney plaintiff Stone had spoken to in regards to the sentencing said is was excessive, and disproportionate for what plaintiff Stone had been accused of. The CPPO initiated deportation proceedings immediately upon release.

263. When plaintiff Stone left Chiba Prison on February 4th 2014, he was unable to walk, and addicted to the unknown drugs he was forced to take. It took plaintiff Stone FOUR DAYS to withdraw from the unknown drugs. During that time, plaintiff Stone's sister, located in the U.S., remained on the internet with plaintiff Stone, as he slowly came off of the effects of the unknown drugs. It was at that time that plaintiff Stone was able to recognize the true impact of the injuries suffered in regards to physical pain, as whatever medication had been provided, masked much of the physical pain.

264. Plaintiff Stone who had only learned of the birth of his child on the day of release, was in no condition to see his child. By that time, the child was already more than one month old.

265. Plaintiff Stone, having weighed 155 pounds prior to detention, left Chiba Prison, having lost more than 30 pounds.

266. Plaintiff Stone returned home on February 4th 2014 to discover the heavy snow had collapsed the carport, destroying plaintiff's automobile. The destruction of this car was entirely avoidable because if plaintiff Stone had not been detained, he would have prevented the structural collapse by removing the snow buildup, as he had always previously done. See: Exhibit U.

267. After seeing the destroyed car, plaintiff Stone entered his home, and immediately noticed that it had been ransacked. Property, including plaintiff's Montague Paratrooper Pro folding bicycle was gone. No warrant had been issued by any judicial officer, or sought by the NPD, who had entered plaintiff Stone's home unlawfully. Article 35 of Japan's constitution states, "(1) The right of all persons to be secure in their homes, papers, and effects against entries, searches, and seizures shall not be impaired except upon warrant issued for adequate cause and particularly describing the place to be searched and things to be seized or except as provided by Article 33. (2) Each search or seizure shall be made upon separate warrant issued by a competent judicial officer.

268. As per the teachings of Japan's Ministry of Justice to prosecutors, where foreigners are not considered humane beings, apparently there is no need to obtain a warrant to enter the dwelling place of an animal.

269. For nearly four years, plaintiff Stone was unable to sleep, suffering endless nightmares. For more than four years, plaintiff Stone has suffered from rage, often uncontrollable.

270. Having suffered extensive frostbite, plaintiff Stone's hands, fingers, feet, and toes were covered in black skin for nearly five years. As of the date of this filing, frostbite damage is still visible on plaintiff Stone's hands and feet. See: Exhibit V.

271. Chiba Prison officials caused the plaintiffs physical, psychological, and emotional harm under conditions of excessive force, recklessness, abuse, medical malpractice and torture. Plaintiff Stone was falsely imprisonment, held in isolation, nearly frozen to death, assaulted, traumatized, injected with unknown drugs, tortured, and suffered intentional infliction of emotional distress. Detention at Chiba Prison resulted in medical expenses the plaintiffs would not have suffered had these officials not acted in total disregard for the safety of plaintiff Stone. The plaintiff's financial harm suffered, as a result of the intentional and reckless acts of the Chiba Prison officials, continues to toll.

272. None of the harm plaintiff Stone suffered, as a result of the conduct of those who acted in an official capacity at Chiba Prison can be construed as "incidental" to generally accepted norms in regards to detention. The Chiba Prison warden, medical staff, and John Doe 7 are liable to plaintiffs under:

    I. 28 U.S.C. § 1350 (2006).
    II. 42 U.S.C. § 1983.
    III. Florida Statute Section 784.011.
    IV. Florida Statute Section 784.03.
    V. Florida Statute § 787.02.
    VI. 2012 Florida Statute 768.
    VII. Intentional Infliction of Emotional Distress as defined by the Florida Supreme Court.

VIII. 18 U.S.C. § 1503 prohibits obstruction of justice.

**E.  Tsudanuma Central General Hospital (TCGH), John Doe 8, John Doe 9, Jane Doe 2**

273.  Tying up, roping and handcuffing a detainee, to a wheelchair, and dragging them through the public corridors of a hospital violates the Japanese Supreme Court holding in Watanabe v. Japan. In Watanabe, even a murder suspect may not be placed in a wheelchair, tied up, handcuffed to the wheelchair, and have a rope placed around their waist, and brought through the public corridors of a public hospital. The Watanabe decision forbids detainees, even convicted prisoners of being exposed to public areas, and treated as a spectacle, resulting in humiliation, and degradation. Plaintiff Stone was paraded through the TCGH corridors numerous times, and had to wait in public areas, in plain view of hospital workers, patients, and visitors in the identical manner forbidden in Watanabe.

274.  TCGH, having full knowledge of the requirements of Watanabe, v. Japan, permitted plaintiff Stone to be paraded through the public areas of the hospital for no purpose whatsoever but to humiliate and degrade plaintiff Stone as a public spectacle.

275.  TCGH fell far below the professional duty of care required by medical facilities, doctors and nursing professionals.

276.  John Doe 8, a general practitioner employed at the TCGH, performed inspections, and provided medical care to detainees held at the Narashino Detention Center. Upon discovering plaintiff Stone's untreated, and broken right foot, on November 12th 2013, John Doe 8 ordered the NDC supervisor Fujisaki to transport plaintiff Stone to the TCGH for X-ray and casting of said broken right foot. After John Doe 8 left the NDC, Fujisaki refused to transport plaintiff Stone to the TCGH for treatment of the broken right foot.

277. Prior to John Doe 8 leaving the NDC, plaintiff Stone notified John Doe 8 that the broken right foot had been the result of the NDC supervisor Fujisaki, John Doe 1, and other guards resorting to violence, and excessive force, while attempting to coerce confession statements. Regardless, John Doe 8 failed to notify authorities that plaintiff Stone had reported NPD and NCD officials had caused plaintiff's injury.

278. John Doe 8 was placed on notice by plaintiff Stone that he was held for at that time, FIVE DAYS without medical treatment. Regardless, John Doe 8 failed to notify authorities that plaintiff Stone had refused medical treatment.

279. John Doe 8 failed to follow up as to why plaintiff Stone was not taken to the TCGH as he had ordered on November 12th 2013.

280. On November 13th 2013, the SIXTH DAY of being denied medical treatment, plaintiff Stone, unable to walk, crawled to the bars of cell 6-1, pulled himself up, and stood facing frosted over windows, opposite a guard catwalk. Plaintiff Stone screamed toward the city below, "HELP", "HELP", "HELP." This was repeated over and over, again and again. Plaintiff Stone feared losing his right foot due to infection, as the untreated broken right foot was not healing, but worsening. As plaintiff Stone screamed, "in violation of the silence rule", guards ran to the cell demanding plaintiff Stone to SHUT UP. Plaintiff Stone did not shut up, but continued to scream HELP, toward the public street, without stopping. Finally, after several minutes of this, plaintiff Stone was taken to the TCGH, in the manner already described, tied, handcuffed and roped to a wheelchair in violation of Watanabe v. Japan.

281. After being X-rayed, and it being discovered that plaintiff Stone had a broken right foot, his right leg was cast, up to

the knee by John Doe 9. Immediately upon returning from the TCGH to the NDC, plaintiff Stone was taken into an interrogation where CPPO Kume was waiting. When Kume couldn't obtain a confession statement plaintiff Stone was handed an indictment and detained for an additional 23-days, for the charge of committing "battery" against KERC employee Takeuchi. See: Exhibit W.

282.  After being released from detention at Chiba Prison on February 4th 2014, plaintiff Stone filed an appeal, seeking medical records from the TCGH. The plaintiffs paid a fee of 3000¥ to obtain two sets of X-rays, and a complete medical report. These medical records were to be used for appeals purposes. The plaintiffs obtained the X-rays, which were accurately dated, but only a bullet list of supposed medical treatment. The information in that report was false, and misleading. See: Exhibit W.

283.  John Doe 8 knowingly falsified this TCGH medical report, signing it with his seal. John Doe 8 signed this false medical report claiming plaintiff Stone had a broken finger, instead of a broken right foot. There was no mention in the report that plaintiff Stone had laid blame on the NPD officials. John Doe 8 falsely reported that internal bleeding suffered by plaintiff Stone was "hemorrhoids", instead of plaintiff Stone suffering internal injuries from physical beatings, being tied up with ropes so tight that it was nearly impossible to breath, and held in a furnitureless empty cell on a hard floor.

284.  John Doe 9, aided and abetted the NPD and NDC by knowingly, and intentionally prematurely removing a cast from plaintiff Stone's leg on December 18th 2013. The removal of this cast resulted in unnecessary serious prolonged pain and deformity, which requires plaintiff Stone to undergo having the right

foot re-broken, set properly and recast. The aforementioned malpractice, and deceptive conduct of John Doe 9 was done for the sole purpose of aiding the NPD and NDC officials in covering up plaintiff Stone's broken right foot injury, and to keep said injury from being discovered by the Chiba District Court judge who presided over plaintiff's lower court proceedings. John Doe 9 also falsified said medical record, which the plaintiffs have obtained a copy of.

285. Jane Doe 2, knowingly wilfully, recklessly, and incompetently, caused great pain, suffering, assault and battery, while attempting to draw blood from plaintiff Stone's arms unsuccessfully. NPD officers, including Mizokuchi forced plaintiff Stone to be taken to the TCGH to have blood extracted. This use of excessive force was performed to obtain plaintiff Stone's DNA. This terrified plaintiff Stone as the NPD was notorious for planting DNA at crime scenes so as to clear up unsolved cases.

286. The NPD officials were not interested in obtaining plaintiff Stone's DNA in the least invasive means, but instead the most violent, so as to cause as much physical and psychological pain as possible. If any DNA sample was necessary, which it wasn't, such sample should have been sought in the least invasive means. A mere cotton swab placed in plaintiff Stone's mouth would have netted the same results as the extraction of blood. Subjecting plaintiff Stone to this unnecessary procedure amounts to several counts of criminal battery, as well, cruel and unusual punishment, and torture.

287. Jane Doe 2, being a licensed nurse, should have refused to partake in this clearly abusive, disgusting, and reprehensible extraction of blood. Regardless, Jane Doe 2, who immediately became incompetent upon discovering that she was to extract plaintiff Stone's blood, performed

incompetently. Jane Doe 2 knew, or should have known she was unable to perform this task when she became nervous, began to tremble, and fumbled pertinent objects, and dropping them onto the dirty floor, including the needle used to extract blood, then using the items without sterilization, as she lost composure.

288. Even after Jane Doe 2 became entirely aware that she was unable to draw blood, Jane Doe 2 continued to subject plaintiff Stone to great suffering, resulting in physical, and psychological pain, as well as humiliation, and hopelessness in violation of Japan's constitution, and The Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, and the the Minimum Standards for the Treatment of Prisoners, and treaties with the U.S.

289. Jane Doe 2 was unable to extract blood, stabbing said dirty needled twice into plaintiff Stone's left arm, and missing plaintiff Stone's veins twice. On the second attempt, the frustrated nurse took hold of the needle as it was still imbedded into plaintiff Stone's arm, and began to twist it about, unsuccessfully attempting to somehow pierce a vein in that reckless manner. After failing to locate a vein in plaintiff Stone's left arm TWICE, Jane Doe 2, resorted to stabbing plaintiff Stone in his right arm to extract blood.

290. By the time Jane Doe 2 had completed what was required of her, plaintiff Stone's left arm was profusely bleeding, with blood running down the left arm from two perforated holes. The blood pooled in plaintiff Stone's palm, and dripped downward onto the floor. Plaintiff Stone turned to Mizokuchi and stated, "Are you happy now? Look what you did to this woman (the nurse)." Mizokuchi grunted, "Mmmm", which is guttural Japanese for, "yes."

291. Three vials of plaintiff Stone's blood were extracted. Mizokuchi alone, took possession of those three vials of blood, placed them in a small Styrofoam container, and left the hospital. Plaintiff Stone protested Mizokuchi exiting the hospital alone with his blood, his DNA, but this protest fell on deaf ears. There was clearly no protocol in place to ensure those vials of blood would not be tampered with by Mizokuchi. For the remainder of time in detention, every time plaintiff Stone heard the guard's phone ring, a cell door buzzer, of the entry into the detention center door open, plaintiff Stone became immediately ill, often vomiting, believing Mizokuchi would enter the NDC and proclaim a new charge, perhaps an unsolved rape, or unsolved murder, with plaintiff Stone's blood DNA being the catalyst tying him to those crimes.

292. John Doe 8, John Doe 9, and Jane Doe 2 are liable to plaintiff Stone for medical malpractice, assault, battery, gross negligence, and reckless disregard for plaintiff Stone's health, and safety. The TCGH, John Doe 8, John Doe 9, and Jane Doe 2 are liable for the intentional infliction of emotional distress.

293. The TCGH charged the plaintiffs a 3000¥ medical report fee, yet knowingly and intentionally provided a false medical report, which was prepared for the purpose of misleading judicial officers in appeal proceedings.

294. When the plaintiffs notified the TCGH as to the obvious fraudulent reporting, the TCGH demanded the false report be returned. The TCGH demanded the plaintiffs not photocopy said fraudulent report. Regardless, the plaintiffs photocopied the false report and returned it to the TCGH. Thereafter, a more accurate report, signed by John Doe 8 and John Doe 9 was provided to the plaintiffs. This second report addressed the

broken right foot, but did not address the fraudulent internal bleeding aspect of said report.

295. The defendants Tsudanuma Central General Hospital, John Doe 8, John Doe 8, and Jane Doe 2 are liable to the plaintiffs as per:

    I. 42 U.S.C. § 1983.
    II. Florida Statute Section 784.011.
    III. Florida Statute Section 784.03.
    IV. 2012 Florida Statute 768.
    V. Intentional Infliction of Emotional Distress as defined by the Florida Supreme Court.
    VI. 2018 Florida Statute Chapter 766.
    VII. 18 U.S.C. § 1503 prohibits obstruction of justice.

**F.  U.S. Embassy in Tokyo, Caroline Kennedy, Hughes P. Ogier, and Thomas A. Duval**

296. With full knowledge that plaintiff Stone was being detained in conditions that violated the aforementioned Japanese law, U.S. federal law, and international law and treaties, the U.S. Embassy in Tokyo took no action whatsoever to protest plaintiff Stone's wrongful detention, and unlawful treatment, even after consulate Leslie Glass reported on November 22nd 2013, that John Doe 1 (Guard B), was drunk when she confronted him about his role in torturing plaintiff Stone. Glass wrote about John Doe 1 in the November 22nd report stating, "When he spoke I smelled alcohol on his breath." Glass further stated, "I was accompanied by the embassy driver who assisted me by interpreting. I don't know if he smelled alcohol but it was hard to miss." Glass' report was filed after visiting plaintiff Stone at the NDC, and where plaintiff Stone had identified Guard B, as one of the chief perpetrators of the torture that occurred on November 8th 2013. For fifteen days, plaintiff Stone's had attempted to notify the U.S. Embassy in Tokyo in regards to having been tortured, regardless the NDC

supervisor Fujisaki had refused to forward said statement. See: Exhibit X.

297.  The U.S. Embassy in Tokyo didn't bother sending anyone to attend, protest, or monitor, the Chiba District Court's criminal proceedings plaintiff Stone was subjected to. Even where this is the main responsibility of U.S. Embassies. The U.S. Embassy didn't bother to appear at the Tokyo Appeals Court hearing, even where plaintiff Stone had sought the embassies participation at each proceeding, sending letters in this regard from the NDC, from Chiba Prison, and from plaintiff's residence after being released. The plaintiffs even went to the U.S. Tokyo embassy for the purpose of providing information, documentation, and to have the embassy get involved with the proceedings. Instead, a female consulate, who refused to identify herself, told plaintiff Stone, "We don't have to do that." The U.S. Department of State's Citizen Services states clearly that they do. U.S. See: Embassy Japan website: https://jp.usembassy.gov/u-s-citizen-services/arrest-of-a-u-s-citizen.

> "*Providing assistance to U.S. citizens arrested or detained abroad is one of the highest priorities of the Department of State. The U.S. Department of State is committed to the welfare of U.S. citizens detained overseas. Our embassies and consulates stand ready to assist citizens and their families within the limits of our authority in accordance with international, domestic and foreign law. The Embassy/Consulates will make every effort to ensure that U.S. citizens are treated in accordance with Japanese laws and regulations.*"

298.  Plaintiff Stone cited consulate rules in this regard, and the woman, who became more arrogant, belligerent, and hostile, repeated that consulate staff didn't have to go to trials of American citizens in foreign countries, and didn't have to come to their aid under any circumstances. Plaintiff Stone

responded by stating, "Even where you have embassy staff reporting drunken police officers, and where your staff is smuggling photos out of foreign prisons that prove detention conditions violate international law?" The embassy staff continued to claim the consulate didn't have to do anything in that regard.

299.   Thomas A. Duval smuggled a camera into Chiba Prison, and took photographs of plaintiff Stone, including images that exposed that plaintiff Stone had been subjected to abusive conditions, gross recklessness, torture, and cruel and inhumane conditions while detained.

300.   Participating in taking the photographic images placed plaintiff Stone in great peril. Had Duval and plaintiff Stone been caught by Chiba Prison officials, Duval would have merely been ejected, and not permitted to return. Plaintiff Stone would have been left to face the wrath of the abusive and barbaric Chiba Prison officials, their irrational punishment committees, and John Doe 7.

301.   The purpose of taking said photographs of plaintiff Stone's injuries was to aid the U.S. Embassy in Tokyo to obtain evidentiary proof that Japan's Ministry of Justice, which had been reported for decades, had subjected U.S. prisoners/detainees to horrific conditions that resulted in severe frostbite, in violation of treaties, and international law in regards to the treatment of U.S. citizens detained in Japan. Another purpose of taking said photographs, and which was clearly communicated to Duval, and discussed extensively, was for the photographic images to be preserved as evidence for legal proceedings once plaintiff Stone obtained release. Regardless, in an email communication between Thomas A. Duval, and Hughes P. Ogier, which took place on February 19th 2013, Ogier wrote, "We don't have the photo. It was deleted after

we showed it to the doctor to get his verbal opinion. See my edit. HO". See: Exhibit Y.

302. Tokyo Consulate staff Chiharu Kasai, responded to Ogier's communication stating, "He [plaintiff Stone] may ask why the photo is not kept as a record though..."

303. As per Hughes P. Ogier's email communication to Thomas A. Duval, the photographic images taken by Duval and plaintiff Stone were intentionally and recklessly destroyed in violation of 18 U.S.C. § 2071(a). This violation occurred even after said photographic images had been preserved on government computers, and servers. This meant that someone at the U.S. Embassy in Tokyo, or Washington, had ordered the photographic images deleted not only from embassy computers, but also government servers.

304. Plaintiff Stone wrote a detailed, 42-page statement, to the U.S. Embassy, which detailed the torture plaintiff Stone had been subjected to. That statement was mailed directly to Caroline Kennedy, who IGNORED that communication. Given Kennedy's status as the daughter of a former U.S. president, she enjoyed the respect, and admiration of the Japanese people. Had Kennedy intervened, plaintiff Stone would not have suffered to the extent he had, and more likely than not, had been released if the embassy had pressed to view the available videotape recordings, which exonerated plaintiff Stone, and which the embassy was entirely aware existed.

305. Plaintiff Stone's attorney Kushida went to the U.S. Embassy in Tokyo, when he had possession of said KERC videotape recordings. Regardless, the U.S. Embassy staff in Tokyo cared not to view those videotape recordings, and in fact did not. The U.S. Embassy should have demanded a copy of those videotape recordings, and preserved them for evidentiary purposes, and gone to the Chiba officials, demanding an explanation. The

U.S. Embassy in Tokyo should have held a press conference, and uncovered those videotape recordings to the media, and exposed the crimes of the NPD, the NDC and the CPPO. Instead, the U.S. Embassy in Tokyo embassy took no action whatsoever.

306. In plaintiff Stone's communication to Kennedy, he asked Kennedy to view the video recordings, and to protest plaintiff Stone's detention as those video recordings proved his innocence. Kennedy never read the statement, never viewed the video recordings, and never responded to plaintiff Stone's communication. Instead, in a single Twitter post, Kennedy gave more time to opining the plight of the dolphins lured into a cove in Taiji, and slaughtered. Kennedy knew, or should have known that as the ambassador to Japan, her foremost duty was for the protection of U.S. citizens, not the slaughter of dolphins which Japanese fishermen annually engage in.

307. Plaintiff Stone sent several communications to the U.S. Embassy while detained, always seeking the embassy to intervene. NO ACTION WHATSOEVER was taken to come to the aid of plaintiff Stone, in direct violation of the duties, and requirements of U.S. embassies.

308. Through the Freedom of Information Act (FOIA), the plaintiffs sought the release of the U.S. Embassy Tokyo communications, and reports related to plaintiff Stone's detention in Japan. This included communications with the NPD, Chiba prosecutors, Chiba Prison and consulate reports. The plaintiffs sought the release of the photographic images taken at Chiba Prison by Duval, and the identity of the doctor whose "opinion" the embassy sought. The embassy has refused to provide any information to the plaintiffs, including who the doctor is that had provided his professional medical opinion as to whether the conditions plaintiff Stone was detained in

amounted to torture. Instead, the plaintiff would learn this evidentiary material had been destroyed.

309. No embassy staff, from ambassador to field worker has the power to order the destruction of government property, especially property that was intended to be used to exonerate an American citizen, and to be used in legal proceedings. The documents released under the FOIA reveal reckless indifference, and reckless disregard for plaintiff Stone's human rights, and due process on the part of U.S. Embassy Tokyo staff. This includes Caroline Kennedy, Hughes P. Ogier, and Thomas A. Duval.

310. The plaintiffs demand to know why said evidentiary material was intentionally destroyed, who ordered its destruction, for what purposes, and for those involved to face the consequences of U.S.C. § 2071. Justice and equity demands it.

311. The defendants, U.S. Department of State, Caroline Kennedy, Hughes P. Ogier, and Thomas A. Duval, are liable to the plaintiff as per:
  I.  18 U.S.C. § 2071(a).
  II. 42 U.S.C. § 1983.
  III. 18 U.S.C. § 1503 prohibits obstruction of justice.

## VII. STATEMENT OF FACT

### A. The Plaintiff's Background

312. Plaintiff Stone is a U.S. citizen who was born in, and currently resides in Miami, Florida. Prior to being domiciled in the city of Miami, Plaintiff Stone resided in Japan for more than a decade. While residing in Japan, plaintiff Stone married plaintiff Suzuki, a Japanese national. The plaintiffs have been together for approximately ten years. The plaintiffs have a child, an American citizen, currently under the age of five.

313. Plaintiff Stone holds a BA in Communications, and obtained a Juris Doctorate in 2007 from an ABA accredited law school. While employed in Japan, plaintiff Stone worked as a journalist and photographer, speaker, and taught business, language, and law courses. At the time the plaintiff's cause of action arose, plaintiff Stone was also under contract with the DaSilva Group, as General Manager for all Japanese territories. Plaintiff Stone's DaSilva contract aggregated speakers represented by CAA, ICM, The William Morris Agency, Harry Walker Agency, and International Talent. Plaintiff Stone represented former U.S. presidents, former U.S. vice presidents, senators, congressmen, Nobel laureates, United Nations representatives, leaders of foreign nations, sports figures and entertainers.

314. Plaintiff Stone obtained certification as an audio/video engineer in 1997, and had previously been employed as an audio and video engineer performing legal depositions. Plaintiff Stone worked as a certified public defender in various courts in Pomona City and San Bernardino California while attending law school. Plaintiff Stone argued and won trial cases, and negotiated hundreds of plea deals. Plaintiff Stone "amjured" Lawyering Skills Practicum, and Conflicts/International Law while attending law school. Plaintiff Stone also won the IVAMS Award for mediation and arbitration excellence.

315. Plaintiff Stone is permanently disabled via court order, in a case that dates back to May 14th 1988. See: Jack Stone v. Spectrum Contracting Company, et al. The case number is plaintiff Stone's social security number, which is not provided herein for obvious reasons.

316. At the time the plaintiff's cause of action arose, plaintiff Stone held a California Broker's License, Identification Number 01734416. This license was in good standing and expired on March 6th 2014. See: Exhibit Z.

317. Plaintiff Stone had no intention of allowing the broker's license to expire. However, as a direct result of the conduct of the NPD and the CPPO, being detained at the time of licensing renewal, plaintiff Stone was unable to take the required ethics courses timely, and as a result, plaintiff Stone's broker's license expired. But for the conduct of the NPD and the CPPO, plaintiff Stone would still hold a valid California broker's license, a license that permits obtaining a broker's license in the state of Florida. Plaintiff Stone lost employment opportunities as a result of said broker's license expiring.

318. Plaintiff Suzuki holds a BA in Architect, and at the time plaintiff Stone was detained, held a management level position at Tachibana Industry Corporation, one of Japan's premier insurance companies. Plaintiff Suzuki was in the third trimester of pregnancy at the time this action arose, went on maternity leave from said company, and delivered child as plaintiff Stone was being detained.

**B. Underlying Cause of Plaintiff Stone's Physical Injury**

319. On the morning of August 29th 2013, plaintiff Stone was on his way to work, walking from his home, to the Keisei-Usui train station. The Keisei-Usui train station location is: 3 Chome-30 Ojidai, Sakura-shi, Chiba-ken 285-0837, Japan. Keisei Electric Railway Company, Inc. (KERC) operates, and manages the Keisei-Usui train station, and owns and operates the train lines that do business at Keisei-Usui train station. KERC's train lines run directly to the Keisei Tsudanuma station. Keisei Tsudanuma train station is located at: 3 Chome-1 Tsudanuma, Narashino-shi, Chiba-ken 275-0016, Japan. KERC operates, and manages the Keisei Tsudanuma train station, where defendants Ogura and Takeuchi are employed. Keisei Tsudanuma

was the work location of plaintiff Stone at the time this cause of action arose.

320. As plaintiff Stone was crossing the main thoroughfare, as a pedestrian, with right-of-way, heading to the Keisei-Usui train station, a car recklessly operated by a Japanese national crossed the intersection, lost control, and slammed into plaintiff Stone. Instead of stopping at the intersection and permitting on-coming vehicles to pass, the driver accelerated, to beat the oncoming traffic. The driver did not notice plaintiff Stone in the crosswalk. After finally noticing plaintiff Stone in the crosswalk, the driver slammed on his brakes, fishtailed, swerved back and forth, and slammed the vehicle into plaintiff Stone. The impact caused plaintiff Stone's body to be dragged across the hood of the vehicle, and thereafter slammed into the windshield. The windshield broke as a result of the impact. This accident resulted in serious injury requiring immediate medical treatment.

321. Usui police refused to file charges, or even ticket the reckless driver responsible for plaintiff Stone's injuries. The Usui police "rationalized" the reason for not bringing charges was due to the driver being employed a delivery driver, and charging the driver with fault meant the driver may have lost his job. This is the typical attitude of Japanese officials when foreigners are victims of crimes in Japan.

322. Usui police told plaintiff Stone he should pay the cost of the damage to the reckless driver's vehicle. The reckless driver attempted to deflect blame, and claimed plaintiff Stone, who after being hit by the car, and was unable to walk, had punched the reckless driver after the accident occurred. Regardless, three eye-witnesses, all Japanese women who employed at a nearby real estate office told police the reckless driver was lying.

323. Plaintiff Stone pointed out traffic cameras, which would have recorded the accident. The Usui police refused to acknowledge plaintiff Stone, or the three eye-witness statements and was preparing to arrest plaintiff Stone for assault, on nothing more than the reckless driver's word. See: Exhibits A1.

324. Plaintiff Stone's employer at that time, a prominent citizen of Usui, known to the police, arrived at the scene, and prevented plaintiff Stone's arrest. But for plaintiff Stone's employer's intervention, plaintiff Stone would have been detained under the false pretense of assaulting the reckless driver responsible for plaintiff Stone's injuries.

325. Plaintiff Stone was taken to the Daichi Orthopedic Clinic where he was treated for his injuries. An X-Ray was taken of plaintiff Stone's right foot, which shows that on July 29th 2013, plaintiff Stone's right foot had not been broken in the accident, but was otherwise seriously injured. The medical examination concluded plaintiff Stone had received a severe sprained right foot, with torn ligaments that prevented plaintiff from being able to put any weight on the right foot, impeding the ability to walk. See: Exhibits A2.

326. As severe as plaintiff Stone's injuries were, his wife, plaintiff Suzuki was expecting a child in December of 2013, and regardless of injury, plaintiff Stone had to work. Driving to work in Japan is nearly impossible as there are few, if any, available parking spaces. Transportation to work via train is the only viable means of work related transportation, as well, companies generally pay all work related travel.

327. The aforementioned accident is the precursor as to what transpired at the Keisei Tsudanuma train station on September 5th 2013, and October 19th 2013, which is addressed below.

328. Plaintiff Stone's work location in Tsudanuma is approximately 1.6 miles from the Keisei Tsudanuma train station. The distance

made it impossible for plaintiff Stone to walk from the Keisei Tsudanuma train station to the work location, given the injuries sustained in the aforementioned accident. Plaintiff Stone had previously noticed that people commuted to work with folding bicycles. See: Exhibit F.

329. Plaintiff Stone sought to address the transportation issue by purchasing a Montague Paratrooper Pro folding bicycle, which was only available in the U.S. Plaintiff Stone did purchase a Montague Paratrooper Pro folding bicycle and had it shipped to Japan. The cost associated with the purchase of the folding bicycle was approximately 1200.00 USD. The purpose of purchasing the folding bicycle was to be used for work related commuting purposes, because plaintiff Stone was unable to walk. See: Exhibit A3.

## C. Keisei Tsudanuma Train Station: Defendant Takeuchi Incident

330. On the evening of September 4th 2013, plaintiff Stone prepared to use the newly purchased Montague Paratrooper Pro folding bicycle for commuting purposes, discussing the matter with plaintiff's employer, who had checked, and verified that bicycles were permitted on trains including the KERC lines.

331. On September 5th 2013, the plaintiff entered the Keisei-Usui train station with the aforementioned folding bicycle, purchased a 310¥ ticket, entered the turnstile, and rode an elevator to the train platform without issue. Plaintiff Stone boarded the KERC owned and operated train, bound for the KERC operated Keisei Tsudanuma train station without incident. Upon arriving at the Keisei Tsudanuma train station plaintiff Stone traveled through, and exited the station without incident, and proceeded to work.

332. At approximately 9:15PM, on September 5th 2013, after leaving work, plaintiff Stone arrived at the Keisei Tsudanuma station.

The plaintiff entered the station with the folding bicycle, purchased a 310¥ ticket, entered the turnstile, and proceeded toward the elevator, which led to the train platform which would have returned plaintiff Stone to the Keisei-Usui train station.

333. It would have been impossible for anyone, including KERC employees to have not noticed that plaintiff Stone was having great difficulty walking. While proceeding through the Keisei Tsudanuma train station toward said elevator with the folding bicycle placed on plaintiff Stone's left shoulder, he was suddenly blindsided from behind and pushed toward his left. This battery caused plaintiff Stone to stumble, resulting in his weight, and the weight of the folding bicycle being placed on his injured right leg. Plaintiff Stone cried out in pain, as he attempted to balance himself, and remove the weight off of his right leg. Immediately, thereafter the folding bicycle was yanked from plaintiff Stone's arm, and crashed to the floor causing minor damage. Initially, plaintiff Stone could not see who had assaulted him, as the bicycle obstructed his view. As the folding bicycle crashed to the floor, plaintiff noticed a much younger, and much larger man who continued to push plaintiff Stone about. Plaintiff Stone shouted in Japanese, "Police, help!" Shortly thereafter, a KERC station manager appeared, chastised the man, who turned out to be KERC employee, Yomei Takeuchi. The station manager then told Takeuchi to "leave the area", which Takeuchi did. As Takeuchi was leaving he mumbled hate speech directed at plaintiff Stone. Immediately thereafter, the station manager apologized to plaintiff Stone, and permitted him to proceed to the train platform.

334. On the following morning, plaintiff Stone reported the Takeuchi assault incident to his employer. The employer told the

plaintiff that two students, and a branch manager of the school that plaintiff Stone was employed at had told the employer they had witnessed what had happened. Takeuchi's conduct was out of character of most Japanese, and the witnesses at first had believed Takeuchi was a homeless man.

335. On September 6th 2013, plaintiff Stone went to a police box located on the ground floor of the Keisei Tsudanuma train station to file a police report as to what had occurred the evening before. Plaintiff Stone attempted to file a police report because plaintiff Stone's employer was a long-time advertiser at the station, and because the school's former manager, Tim Havil-Austin, whose employment plaintiff Stone had replaced, had reported similar incidents which occurred at the KERC operated, and controlled Keisei Tsudanuma train station. According to Havil-Austin, he had been assaulted six times at the Keisei Tsudanuma train station, and this was the reason he left Japan, returning to New Zealand, his country of citizenship.

336. When plaintiff Stone attempted to file said police report, an officer identified as defendant Mizokuchi stated a police report would not be filed because, "... police can't speak English." As aforementioned, all prefectures in Japan employ police translators who are available 24/7. See: Exhibit C.

*On February 14th 2013, plaintiff Stone, while on location at Jigokudani-Yaen Koen (Nagano's Snow Monkey Park often featured in National Geographic), was shooting photography for an article plaintiff Stone was writing for Tokyo Weekender Magazine. The article was published in Tokyo Weekender's March 2014 issue. See: https://tokyoweekender.com/2014/03/snow-monkey-paradise-in-hell-valley-jigokudani-yaen-koen.*
*While at Jigokudani-Yaen Koen, plaintiff Stone was viciously assaulted, stabbed and punched several times by a Nagaden city bus driver. Plaintiff Stone had merely asked the Nagaden Bus Company driver if that bus went to the*

*city's main station.*
*In regards to the aforementioned Nagaden bus assault, the matter was reported to the Nagano Police Department, Nagano Public Prosecutor's Office, and Nagano city mayor's office. No action whatsoever was taken by any Nagano official. Yoshifumi Shinoda, Nagaden Bus Company manager, investigated the matter, and determined the attack was race motivated, and that the driver spewed hate speech at the plaintiff. Nagaden Bus Company paid plaintiff Stone's assault related medical expenses, on condition that bus driver was not terminated, paid the medical expense, and was trained to treat all customers properly.*

See: Exhibits A4.

337. Due to the incident that occurred with KERC employee Takeuchi on September 5th 2013, plaintiff Stone never attempted to use the folding bike to commute to work again. The September 5th 2013 incident would be the only time plaintiff Stone ever used the folding bicycle. Plaintiff Stone's folding bike was sold for the equivalent of 180.66 USD at the rate of exchange as of the date of filing this complaint. Plaintiff Stone lost more than $1000.00, unable to use the folding bicycle due to defendant Takeuchi's criminal and tortious conduct. Plaintiff Stone suffered unnecessary pain having to walk to work on the injured foot. But for the assaultive conduct of KERC's employee Takeuchi, plaintiff Stone would not have suffered this pain.

338. Several weeks after plaintiff Stone was detained at the NDC, defendant Takeuchi knowingly, and intentionally, filed a false police report claiming that on September 12th 2013, plaintiff Stone had assaulted Takeuchi. Plaintiff Stone's employment record shows plaintiff Stone had not worked on September 12th 2013. Further as previously stated, plaintiff Stone's employer paid all work related transportation costs, and kept record of such in a Microsoft Excel database. Takeuchi's false police report resulted in the CPPO indicting plaintiff Stone on December 3rd 2013 for the crime of battery. This false charge

resulted in plaintiff Stone being detained an additional minimum of 23-days, resulting in plaintiff Stone being unable to be present at the birth of his child. But for KERC's employee Takeuchi's wilful criminal and tortious conduct, plaintiff Stone would not have suffered any of these damages. Finally, nothing was presented to support the CPPO's indictment save for Takeuchi's false statement. At trial, which took place at the Chiba District Court, Takeuchi did not testify, and was not available for examination by the defendant.

**D. Keisei Tsudanuma Train Station: Defendant Ogura Incident**

339. On the morning of October 19th 2013, plaintiff Stone arrived at the Keisei-Usui train station for the purpose of commuting to work. Plaintiff Stone attempted to purchase a 310¥ ticket, which was the cost to commute to the Keisei Tsudanuma train station. The button malfunctioned and the plaintiff received no ticket. After several failed attempts at pushing the 310¥ button to obtain a ticket, plaintiff Stone pushed the next highest amount button, which was 360¥. The machine produced a 360¥ ticket. Plaintiff Stone used the 360¥ ticket to board the train owned, and operated by KERC, bound for Keisei Tsudanuma train station operated by KERC. See: Exhibit A5.

340. Upon arrival at the Keisei Tsudanuma train station, plaintiff Stone went to the ticketing window to obtain a reimbursement for the 50¥ overpayment, as the company plaintiff Stone was employed for paid all work related transportation costs. Plaintiff Stone wanted to ensure there was no cost discrepancy with his employer in regards to the commute to work.

341. Prior to going to the ticketing window, plaintiff Stone attempted to obtain the reimbursement at a <u>fare exchange machine</u> located inside the Keisei Tsudanuma station. Plaintiff Stone was unable to use the machine as it only operates in the

Japanese language. If the fare machine functioned in English, plaintiff Stone would have been reimbursed the 50¥, and would not have had to involve Ogura at the ticketing window. See: Exhibit A6.

342. KERC employee, Tetsuya Ogura couldn't understand plaintiff Stone during the communication for reimbursement of the overpayment. Ogura quickly became agitated, and interrupted plaintiff Stone as he tried to explain the issue. Ogura shouted, "Your fault, go!" Plaintiff Stone told Ogura that it wasn't his fault, and to get his supervisor, Ogura responded by shouting, "Baka gaijin, go!" Baka gaijin is hate speech. Baka gaijin translates into English as "stupid foreigner." Baka is a derogatory term and one of the worst insults in the Japanese language. Gaijin translates as "outsider" or, "not one of us."

343. Ogura's hate speech was repeated. Plaintiff Stone pressed Ogura to get his supervisor. Ogura refused to get the supervisor, and refused to reimburse plaintiff Stone for the overpayment. Plaintiff Stone, needing to be on-time to work, picked up the 360¥ ticket off of the ticketing window counter with his left hand, and turned to leave the Keisei Tsudanuma train station.

344. In plaintiff Stone's right hand, he carried a large bag, which contained medical necessities for the aforementioned leg injury. The bag also contained a wallet, lunch, juice, containers, cell phone, house keys, educational material, etc.

345. Plaintiff Stone left the Keisei Tsudanuma station window and proceeded to exit the station. Ogura left his post, charged after plaintiff Stone, and committed assault and several counts of battery, punching and kicking plaintiff Stone repeatedly. Plaintiff Stone did not respond by engaging Ogura in a physical altercation. Plaintiff Stone was aware that cameras operated at the Keisei Tsudanuma station and that in Japan, whenever an

altercation arises between a Japanese national, and a foreigner, more likely than not, the foreigner will be blamed for the altercation. Plaintiff Stone continued to move toward the Keisei Tsudanuma train station exit. Ogura continued to commit assault and battery against plaintiff Stone. Plaintiff Stone's right leg injury had still not healed at this time. Even so, plaintiff Stone attempted to run away from Ogura, heading toward the Keisei Tsudanuma station exit so as to avoid being assaulted, and battered. Attempting to run exacerbated plaintiff Stone's previous injury. This caused plaintiff Stone to limp. It would have been impossible for Ogura not to have noticed that plaintiff Stone was disabled, and had great difficulty walking.

346. Ogura kicked plaintiff Stone, breaking the skin on the shin area of the left leg. Regardless, Ogura continued to assault and batter plaintiff Stone, and continued to spew hate speech.

347. As plaintiff Stone arrived at the stairwell, which led to the main thoroughfare two stories below, Ogura raced up to plaintiff Stone, intending to use this momentum to punch plaintiff Stone in the face. Ogura threw a violent, and powerful wild punch, for the purpose of knocking plaintiff Stone down the long stairwell. At that time two women were ascending that same stairwell. As Ogura cocked back with his left hand to throw the punch at plaintiff Stone's face, plaintiff Stone reflexively raised the bag that he was carrying in his right hand, attempting to block Ogura's punch. Simultaneously, plaintiff Stone ducked to avoid the punch. As Ogura lunged at plaintiff Stone, he recklessly smashed his forehead into the bag plaintiff Stone was carrying. This caused Ogura's glasses to fall from his face. Ogura's punch partially connected with the back of plaintiff Stone's head.

348. Plaintiff Stone shouted at Ogura to stop, and bent down to pick up Ogura's glasses. As plaintiff Stone attempted to hand Ogura his glasses, Ogura tried to kick plaintiff Stone in the face. Ogura shoved his glasses away, which caused them to hit the floor a second time. Thereafter, plaintiff Stone hopped down the stairwell on his left leg, simultaneously clutching onto the bag in his right hand, with the aforementioned ticket still in plaintiff Stone's left hand. As plaintiff Stone reached the bottom of the stairwell, he turned left to head to the police box located adjacent to the Keisei Tsudanuma train station's main entrance. This was the same police box where plaintiff Stone had attempted to file a police report after being assaulted by Takeuchi on September 5th 2013, approximately six weeks earlier.

349. The Keisei Tsudanuma police box was located on the opposite side of the train tracks from where plaintiff Stone was located when he exited the station. Plaintiff Stone saw three officers on the other side of the tracks approaching on foot. Plaintiff Stone motioned for the police, and waited for them to arrive. As plaintiff Stone motioned for the police, Ogura made his way down the aforementioned stairwell. Ogura jumped in front of plaintiff Stone, and got into a fighting stance. Plaintiff Stone motioned in the direction of the police to Ogura, who had not noticed them, as Ogura's back was facing the police as they arrived. All of this matter, from ticketing window to the street location took less than one minute. The police arrived, and the incident ended. See: Exhibit A7.

350. Immediately upon the arrival of the Narashino police, Ogura played the victim, telling the police plaintiff Stone had spit on him, and punched him three times. None of the police could speak English. One of the officers was defendant Mizokuchi. Soon other officers arrived. Plaintiff Stone tried to

communicate with each officer, but none could understand what plaintiff Stone was attempting to state. Mizokuchi approached several of the officers, and began stating that plaintiff Stone had assaulted Ogura, and called Ogura a "yellow monkey."

351. Plaintiff Stone showed officers his left shin, where Ogura had kicked, and left a bloodied injury. The police ignored plaintiff Stone as they attended to Ogura, who was not injured whatsoever. An unidentified officer asked plaintiff Stone to go to the Narashino Police Department to make a statement, as a police interpreter would be made available. Plaintiff Stone voluntarily road in a police car to the Narashino Police Department to make a report. See: Exhibit A.

352. Defendant Narashino Police Department chief of police Yano, and defendant police supervisor Miyama put Mizokuchi in charge of investigating Ogura's claim.

**E. Narashino Police Department: Daiyo Kangoku Detention**

353. Upon entering the Narashino Police Department, plaintiff Stone was led into an interrogation room, and told to have a seat. There was no interpreter present. Instead, a non-English speaking police officer took a seat across from where plaintiff Stone sat. The officer began writing on a piece of paper, and when finished, he turned the paper around, and pushed it in front of plaintiff Stone. The officer then placed the pen he had been writing with next to the paper, and stated, "sign." Plaintiff Stone had no idea what was written on the paper, as he cannot read Japanese, and refused to sign the document, and instead asked the officer if he could speak English. The officer didn't respond. Plaintiff Stone asked the officer to locate the police interpreter. The officer did not attempt to locate an interpreter, but instead kept pressuring plaintiff Stone to sign the document. Shortly, other officers entered

the room, including defendants Mizokuchi and Miyama. One officer had a camera.

354. The police took plaintiff Stone's bag and began searching through it. By that time plaintiff Stone had placed the 360¥ ticket in one of the bag's pockets. The police removed the bag's content as aforementioned in the Defendant Liabilities section of this Complaint.

355. The police forced plaintiff Stone to stand near a wall. Mizokuchi placed plaintiff Stone's bag over his left shoulder, with the bag dangling down toward plaintiff Stone's right waist. Plaintiff Stone told Mizokuchi that was not the manner in which he was carrying the bag. Plaintiff Stone showed the police that he was carrying the bag in his right hand. Plaintiff Stone attempted to remove the bag, but Mizokuchi would not allow this. The police took photographs of plaintiff Stone with the bag draped over his left shoulder, and dangling down by his right side.

356. Plaintiff Stone showed the police the bloody kick wound that he had received from Ogura, and told the police to take a photograph of it. At this point the blood had run down plaintiff Stone's leg, and was beginning to clot above the sock area. The police refused to take a photograph of the bloodied kick wound. Plaintiff Stone asked the police to take a photograph of the kick wound several times. They adamantly refused to do so. Plaintiff Stone recognized the Narashino police were as biased as they were everywhere in Japan, and were not interested in hearing what plaintiff Stone had to say. Without the presence of an interpreter, and without permitting plaintiff Stone to make a statement, the police were already staging phony crime scene photographs.

357. After taking photographs the police tied plaintiff Stone to a chair using one-inch thick black nylon rope. Police placed a

pair of Type II double locking handcuffs on plaintiff Stone's wrists. A rope was tied tightly around plaintiff Stone's waist. There were no cameras operating to record what was transpiring. See: Exhibit A8.

358. An officer sat behind plaintiff Stone, holding onto the rope attached to his waist. The rope was placed on so tightly that it quickly resulted in pain, and restricted breathing. Inflammation caused the rope to tighten. The handcuffs were placed on plaintiff Stone's wrists so tightly that he was not able to move his wrists at all. This immediately resulted in the cutting off of blood circulation to plaintiff Stone's hands, and inflammation caused stinging pain in the wrist areas. This and other improper use of handcuffs, over time, resulted in permanent injury to plaintiff's wrists.

359. Plaintiff Stone is a recording artist, and former producer and artist for Cherry Street Records. In May of 2014, Miami New Times magazine wrote an article proclaiming that one of plaintiff Stone's former musical projects was one of Miami's top twenty all time acts. At the time of detention at the Narashino Police Department, plaintiff Stone had recorded half an album. The album has never been completed, due to plaintiff Stone's wrist injuries suffered by the reckless, and excessive force used by the Narashino police, and Chiba Prison officials.

360. Plaintiff Stone showed the police both of his hands, and told them to photograph his hands. Plaintiff Stone's hands clearly showed he had not used them to engage in any physical altercation. There were no cuts, bruises, swelling, scrapes, or any marks on either hand indicating there had been a physical altercation. The police removed the handcuffs and took photographs of both of plaintiff Stone's hands. Plaintiff Stone asked the police to go into his bag and produce the ticket he had purchased for 360¥. They did. Plaintiff Stone told the

police about the machine malfunction and that he had merely sought reimbursement. Plaintiff Stone told the police to photograph the ticket. They did. Plaintiff Stone then asked for the bloodied left shin injury to be photographed. Police refused to take photographs of the shin injury. Without an interpreter present, without plaintiff Stone being able to present the facts as they were known to him, he was booked for assaulting Ogura. Plaintiff Stone asked to contact his wife and tell her where he was. This was refused.

361. It is absurd for any Japanese official to claim that plaintiff Stone engaged in assault, given his certification, and expertise in photography, and videography, and where he was aware CCTV cameras were in operation at the Keisei Tsudanuma train station.

362. At some point, early on into plaintiff Stone's detention, KERC turned over videotape recordings taken at the time of the incident at the Keisei Tsudanuma train station to the Narashino Police Department (NPD), and the Chiba Public Prosecutor's Office (CPPO). These video recordings proved early on that plaintiff Stone had not assaulted Ogura, but instead, had been assaulted, and battered by Ogura. The videotape recordings show Ogura was not spit on, and at not time had plaintiff Stone punched Ogura. Regardless, the NPD, and the CPPO, even after obtaining said videotape recordings, and analyzing them, refused to drop charges, and refused to release plaintiff Stone. Instead, the NPD and the CPPO opted to create a false narrative, that did not support evidence known to them, and engaged in criminal and tortious conduct, resorting to refusing to preserve evidence known to exist, such as the kick wound stated herein, refused to use an interpreter before jumping to conclusions, refused to contact witnesses that supported plaintiff Stone's account, and instead resorted to duress,

intimidation, assault, battery, and the use of protracted isolation to coerce plaintiff Stone to sign confession statements, which said officials intended to use in legal proceedings to obtain a wrongful conviction. The criminal and tortious conduct of the police and prosecutors would culminate in the use of torture, committed under the color of office.

363. Initially, within the first few minutes of being tied to a chair, plaintiff Stone asked the police to provide a lawyer. This was refused, even where Japan's Constitution requires immediate appointment of counsel as per Article 37 which states, "At all times the accused shall have the assistance of competent counsel who shall, if the accused is unable to secure the same by his own efforts, be assigned to his use by the State." Instead of being appointed legal counsel, and provided an interpreter, the NPD, notably defendant Mizokuchi, continued to resort to duress, and making threats, attempt to coerce a signed confession statement, which plaintiff Stone refused to succumb to.

364. Article 38 of Japan's Constitution states, "No person shall be compelled to testify against himself. Confession made under compulsion, torture or threat, or after prolonged arrest or detention shall not be admitted in evidence. No person shall be convicted or punished in cases where the only proof against him is his own confession."

365. Plaintiff Stone told Mizokuchi that his wife was seven months pregnant, and that she previously had a miscarriage. Plaintiff Stone asked Mizokuchi to contact plaintiff Suzuki letting her know he was being detained. Plaintiff Stone told Mizokuchi that he had a duty to protect the unborn child. Mizokuchi refused to notify plaintiff Stone's wife that he had been detained. For five days, plaintiff Stone's wife would not be notified that he had been detained. Even the U.S. Embassy, who met

plaintiff Stone at the NPD, and obtained plaintiff Suzuki's contact information, DID NOT notify plaintiff Suzuki that plaintiff Stone had been detained.

366. Plaintiff Stone and his wife were together for more than six years at the time of plaintiff Stone's detention. During that entire time, not one day had passed that they hadn't communicated. The sudden, unexplained disappearance of plaintiff Stone caused stress, fear and great suffering to plaintiff Suzuki. Her frantic email communications and attempts at contacting plaintiff Stone via telephone calls, prove that she had resolved herself to the belief that plaintiff Stone had left Japan, and abandoned her, and their child, which was due in less than two months.

367. The unconscionable, reprehensible, and outrageous conduct of the NPD, and the CPPO, refusing to contact plaintiff Suzuki, and their total disregard for the health, and safety of an unborn fetus is de facto child endangerment. No civilized society should accept such malfeasance. This disgusting, protracted refusal to contact plaintiff Suzuki was not isolated to the NPD. But also the Chiba Public Prosecutors Office and extends to a PRETRIAL JUDGE who plaintiff Stone was brought before, and who had been notified, through a court interpreter in regards to no notice being provided to plaintiff Suzuki. Plaintiff Stone had asked the pretrial judge to compel the NPD and the CPPO to contact plaintiff Suzuki, but this was refused.

368. Extreme stress can affect a developing baby's health. According to a 2008 Danish study of more than 19,000 pregnant women, those with a high level of psychological stress had an 80% greater risk of stillbirth than women who had an intermediate level of stress during pregnancy. Other researchers found that high stress can result in premature birth, low birth weight, and lead to allergies and asthma later in life.

See: Robinson, GE (January 2014). "Pregnancy loss". Best practice & research. Clinical obstetrics & gynaecology. 28 (1): 169-78. doi:10.1016/j.bpobgyn.2013.08.012. PMID 24047642.

369. The NPD and the CPPO used this form of duress, emotional and psychological torture, as a means to coerce confession statements from plaintiff Stone. What makes these "officials" conduct even more egregious is where the NPD, CPPO and pretrial judge had been put on notice that the plaintiff's first child had miscarried, and where plaintiff Stone was concerned that if his wife was not notified that he was detained, their child could suffer long lasting effects, and perhaps even be stillborn. None of this concerned any of these Japanese officials.

370. During detention, the police relentlessly attempted to intimidate plaintiff Stone into signing a "confession" statement they alone had prepared, and they alone knew the content of. Plaintiff Stone refused to sign anything, and repeatedly asked for an interpreter, and a lawyer. Plaintiff Stone asked why the interrogations he was being subjected to were not being preserved in audio and video format. Plaintiff Stone was told the police didn't have to do that.

371. Without being given the opportunity to tell the facts as plaintiff Stone knew them to be, he was stripped of shoes, socks, jacket, all belongings, including writing material. Plaintiff Stone was booked for "petty assault", and taken in chains to an isolation cell, located inside the Narashino Detention Center. The cell was numbered 6-1. The Narashino Detention Center is located inside the Narashino Police Department.

372. The isolation cell was small, and had no furnishings. The cell was empty, except for a toilet and a sink. Plaintiff Stone was segregated from Japanese detainees because he was a foreigner.

373. A silence rule was strictly enforced. Plaintiff Stone was not allowed to contact anyone, including his wife, an attorney, or the U.S. Embassy in Tokyo. For the next fourteen days, plaintiff Stone was denied access to writing material, and subjected to daily interrogations at both the NPD, and, at the CPPO.

374. From October 19th 2013 until February 4th 2014, plaintiff Stone was held without shoes, jacket, or adequate clothing, even where plaintiff Suzuki, upon learning of detention from plaintiff Stone's employer, brought winter items to the NPD, and where plaintiff Stone had money to purchase said items.

375. Plaintiff Stone is a vegan. The food Japanese officials provide to detainees is for the most part not edible. Most of what was provided was mercury contaminated tuna, twice a day, arsenic contaminated bleached white rice or bleached white bread, or other sources that a vegan will not eat, and in reality is not fit for human, or animal consumption. It has been well-reported, and shown to be factual that radiation contaminated crops from Fukushima's nuclear debacle is served as "food" to detainees and prisoners in Japan.

376. Plaintiff Stone did not eat for the first five days, which resulted in hospitalization for kidney failure. The Tsudanuma Central General Hospital, which contracts with the NPD, refused to perform any tests to see if there had been any kidney damage, even where doctors told plaintiff Stone he could suffer permanent kidney damage within the next ten days, if plaintiff Stone would not eat. Plaintiff Stone communicated that he was permitted to purchase his own food, and that he had the funds to do so, but this was denied by the NPD.

377. Japan's Ministry of Justice rules permit detainees to purchase their own food, but because plaintiff Stone would not "cooperate", meaning not sign false confession statements,

officials would not permit plaintiff Stone to purchase his own food. By the time plaintiff Stone was released on February 4th 2014, he was unable to walk of his own accord, and had lost more than 30 pounds in weight.

378. On November 8th 2013, plaintiff Stone was indicted for petty assault. Realizing that the health and safety of his unborn child was at risk, and that he may not be present at the birth of the child caused great suffering. Plaintiff Stone entered the toilet area, shut the door, and began to cry. Guards immediately ran to cell 6-1, and began banging on the bars. The guards repeatedly told plaintiff to "UDASAI", which means, SHUT UP. Plaintiff Stone attempted to make no noise, regardless, numerous guards, including Guard 2A, Guard 2B, Guard 2C, Guard B, supervisor Fujisaki, and two NPD police officers entered cell 6-1, and dragged plaintiff Stone out of the cell, and into an area of the NDC that plaintiff Stone had not previously known existed. Plaintiff Stone did not resist whatsoever for fear of having new charges filed.

379. Plaintiff Stone was forced into a corridor located on the east side of the NDC facility. Two doors were located inside this corridor. Both doors led into different holding cells, but appeared identical. The cells metal framing was white in color. Each cell had large glass windows that covered the front area. Inside the cells, the walls were covered in a green padding. The corners in those cells were curved. Near each room stood large, wall size cabinets. Plaintiff Stone was forced into the door on the left, which was the northern most cell. Inside the cell was a hole in the floor which was to be used as a toilet. There was a circular metal plate attached to the floor in the center of the room. Very bright lights were located overhead. The door into this room operated electronically. See: Exhibit A9.

380. Plaintiff Stone was thrown onto, and then pinned to the floor. Plaintiff Stone was pushed and pulled into a crucifixion position. Plaintiff Stone did not resist at all. Guard 2A operated a Sony handheld camera, videotaping the entire incident. Guard B, Fujisaki, and John Doe 3, an officer involved in Ogura's phony crime scene reenactment, were most responsible for what was to follow, including plaintiff Stone's right foot being broken, several face punches and numerous other injuries, including injury to plaintiff Stone's right hand. Guard B pulled two, one-inch black nylon ropes out of a cabinet that was located on the exterior of the cell. A leather restraining device was also taken out of the cabinet. Apparently Guard B had never used those devices as he had to rely on viewing a "manual" that was tied together with a red string at the top left of the document. The document was large, consisting of two large 8.5" x 11" paper. The document contained few words, but instead visual images that attempted to show how to use the devices. Guard B then took one rope and tied plaintiff Stone's feet together. Thereafter plaintiff Stone's two knees were tied together. While tying together the feet in the manner being done, plaintiff Stone's feet were forced apart, with ankles being forced together. This manner of using the thick rope strained the feet, forcing them in the opposite direction they were biologically created. This resulted in the 3rd metatarsal bone on plaintiff Stone's right foot snapping. There wasn't anyone in the room that did not immediately recognize the bone was broken. See: Exhibit A10.

381. Other injuries suffered by plaintiff Stone include where John Doe 3 continuously punched plaintiff Stone in the face, head, chest and other areas of the body. Supervisor Fujisaki used a leather restraining device, upside-down and backwards on plaintiff Stone's arms. The leather restraining device's

improper use caused serious injury to plaintiff Stone's right hand. As Fujisaki, and the other guards held plaintiff Stone down, Guard B looped the one-inch black nylon rope around plaintiff Stone's feet intentionally tightening the rope to the point that the right foot bone snapped. When the right foot bone snapped, several officers present, who had not partaken in the assault left the area immediately. Guard 2C, sought for his supervisor to cease torturing plaintiff Stone.

382. The U.S. Embassy in Tokyo believes that the device used by Fujisaki on plaintiff Stone violates international law. The Tokyo embassy sent a questionnaire to the NPD chief of police Yano, asking if the leather restraining device was the kind that was banned for use. Yano did not respond to the embassy's communication. The plaintiffs obtained this Tokyo embassy communication through the FOIA. See: Exhibit A11.

383. Plaintiff Stone was certain that he was going to die as a result of the November 8th 2013 torture. Plaintiff Stone describes the pain as feeling as if an automobile had been placed upon him. Plaintiff Stone was unable to move at all. The swelling, due to the lack of blood flow, immediately began causing the pain to escalate. Every breath caused great suffering. Plaintiff Stone had previously undergone five knee surgeries, and shoulder surgery, and was already determined permanently disabled, by a court of law, in the city of Miami, dating back to 1988. For plaintiff Stone's entire adult life, he had undergone some form of surgery, or physical therapy after obtaining said 1988 injuries. These previous injuries greatly exacerbated the pain plaintiff Stone had been forced to endure. See: Exhibit A12.

384. Plaintiff Stone's heart began to pound in his chest, as no blood was getting into the legs. It felt as if plaintiff Stone's chest was going to explode. Plaintiff Stone tried to

remain calm, but this was impossible. He kept screaming for the ropes to be removed. Fujisaki stated Japan could use those items. Fujisaki, and all guards left the cell. Plaintiff Stone attempted to remove the arm and hand restraints so he could remove the ropes but he was unable. This movement caused severe pain, and undue suffering. Plaintiff Stone recalled Abubakar Suraj, and his last moments, which were similar to that which plaintiff Stone was currently being subjected to. Plaintiff Stone thought this was how he was going to die, and some medical official who gets paid to protect this abusive system would write in a report that plaintiff Stone had died as a result of some previously unknown heart condition. Plaintiff Stone fell unconscious while attempting to remain motionless.

385. Plaintiff Stone awoke at some point on November 9th 2013. Plaintiff Stone had bruising to his face, bruising to his knees, ankles, feet, and wrists. Plaintiff Stone was cut about the face, right wrist and both knees. Plaintiff Stone was unable to stand. Guard 2B was in the corridor of the isolated area at that time. Guard 2B left the cell area, and soon thereafter Guard B returned. In very poor English, plaintiff Stone was told that an interpreter was present, and warned if plaintiff Stone did not cooperate, he would be subjected to the same treatment again.

386. Guard B led plaintiff Stone into an interrogation room which was adjacent to the two cell area previously described. In that room was Fujisaki, and a person identified as an "interpreter." Plaintiff Stone recognized the interpreter as a student of the school where plaintiff Stone was employed. The interpreter explained that he was brought to the NDC, at the request of Fujisaki, to have documents signed by plaintiff Stone.

387. Plaintiff Stone told the interpreter not to translate what he was about to say. Plaintiff Stone briefly told the interpreter

that he was tortured, and that he had been detained for nearly three weeks, without any legal counsel, and that the police were attempting to force him to sign false confession statements, as to a petty offense which he had not committed, and which he believed they knew he had not committed.

388. Plaintiff Stone's physical appearance was apparent, as his face was swollen, and he was covered in bruises, cuts, and unable to walk. The interpreter did not repeat what plaintiff Stone had stated, and appeared uncomfortable with being placed in the position of interpreting under said circumstances. Immediately, Fujisaki, and Guard B, began to prepare a statement that claimed plaintiff Stone had caused his own November 8th 2013 injuries.

389. When the first document was placed before plaintiff Stone to sign, plaintiff Stone told the interpreter that at no time, for nearly three weeks of threats, violence, and duress had he succumbed to signing anything. Plaintiff Stone told the interpreter that at some point, he [the interpreter], may be called as a witness as to what was occurring at that time, and that it should be obvious that plaintiff Stone was being forced to sign statements that he did not want to sign, and which were false. Then, plaintiff Stone told the interpreter that he was going to sign the document. Not as a confession as to what was on the document, but as proof that plaintiff Stone was being forced to sign a false statement, against his will, under the threat of being tortured again, and that the statement was not prepared by plaintiff Stone, but instead by Fujisaki and Guard B, and that the interpreter was entirely aware of these facts.

390. Plaintiff Stone signed the first document, but not with signature, instead with a fingerprint, and ink. Thereafter, unsure if the statement was adequate, Fujisaki, and Guard B scrutinized the language of the "signed statement." They

determined that it should be rewritten. Fujisaki placed the first document in his coat pocket.

391. Fujisaki and Guard B rewrote the statement, and plaintiff Stone reiterated to the interpreter why he was attaching his fingerprint to this second document. This pattern repeated itself a third time. Thereafter, plaintiff Stone was taken back to cell 6-1.

392. Unable to walk, plaintiff Stone sought medical treatment. This would be denied. Plaintiff Stone was refused medical treatment for the next SIX DAYS, even where it was obvious plaintiff Stone's right foot was broken.

393. Plaintiff Suzuki worked in Tokyo, and had company housing supplied by her employer. As maternity leave approached, plaintiff Suzuki was scheduled to go on maternity leave, company housing was to be vacated by November 30th 2013.

394. Detention meant that plaintiff Stone was not going to be able to help his wife move her property into his Chiba home. Plaintiff Stone was concerned about being deported, as the NPD and the CPPO were threatening deportation proceedings. Plaintiff Stone feared other false charges being filed as police and prosecutors had threatened during interrogations. On a daily basis, plaintiff Stone feared being murdered, as Chiba police had murdered the aforementioned man from Ghana, and had attempted to smuggle the man's corpse out of Japan on an Egypt Air flight. None of the ten officers involved were indicted by the CPPO, and some were transferred to the NPD.

395. By end of November, plaintiff Suzuki was more than eight months pregnant. Plaintiff Suzuki left her Tokyo apartment with few items. The remainder of plaintiff Suzuki's personal property had to be left behind. Because plaintiff Suzuki had to leave the apartment with her items left behind, she lost her deposit

of 60,000¥, and had to pay an additional fee of 60,000¥ to have the property destroyed.

396. Prior to detention, the plaintiffs had secured a child birth facility, which was a mere two blocks from plaintiff Stone's home. The plaintiffs provided a 10,000¥ security deposit (100.00 USD) to secure a room in the birth facility. Because plaintiff Stone was detained, plaintiff Suzuki no longer wanted go to the birth facility in Chiba, as she did not want to be alone. Further, as the child's birth grew near, plaintiff Suzuki had to disclose to her family what had occurred, and made plans to go to her family's hometown. Plaintiff Suzuki could not find a facility for purposes of giving child birth, which caused great emotional distress. All hospitals in plaintiff Suzuki's hometown had every available bed booked for birth purposes. At the last hour plaintiff Suzuki located a bed, giving birth to the plaintiff's child in the first week of January, 2014. Birth took place during Japan's New Years holiday. Plaintiff Suzuki was surrounded by happy families at the facility, yet she had to suffer the humiliation of bearing her child without the presence of her husband. Plaintiff Suzuki's family were enraged at plaintiff Stone, believing that he had committed the crimes alleged by Ogura and Takeuchi. They had believed that plaintiff Stone had acted recklessly at at time when the child was on the way.

397. On December 18th 2013 the evening before plaintiff Stone's initial trial date, attorney Kushida contacted plaintiff Suzuki's family and told them that he had obtained copies of two KERC videotape recordings. Kushida told plaintiff Suzuki's mother and father that those videotape recordings showed that plaintiff Stone had committed no crime. Kushida was unable to explain why plaintiff Stone was being detained, and charged with committing petty assault and battery as those videotape

recordings proved otherwise. Further, Kushida did not receive the videotape recordings until less than 12 hours before trial was to begin.

398. On November 9th 2013, plaintiff Stone began preparing a detailed statement as to what occurred on November 8th 2013 and November 9th 2013. By the time this statement was finished, it was 42-pages long. The purpose of preparing this statement was for it to be mailed to the U.S. Embassy in Tokyo. The statement detailed facts, those involved, and the torture Fujisaki, Guard B and other officers engaged in. The statement provided details of the isolation room, the devices used, where the device locations were stored, and other facts. The details could not be refuted by NPD's Yano, or the NDC supervisor Fujisaki who initially denied the incident had occurred.

399. The outcome of conduct of Fujisaki, Guard B, and the other officials acting in an official capacity was reasonably foreseeable, and that such conduct could result in serious injury, as well as serious psychological and emotional trauma. Plaintiff Stone suffered, and continues to suffer irreparable harm as a direct result of the injuries sustained on November 8th 2013 and November 9th 2013. Plaintiff Stone suffered permanent neurological injury to both wrists, and deformity to the poorly treated right foot. These injuries were entirely avoidable had these officials not engaged in hateful and biased proceedings, and had adhered to the rule of law, and had not engaged in protracted coercion for the purpose of attempting to extract confession statements.

400. In a reprehensible attempt at NDC supervisor Fujisaki "resolving" the matter, plaintiff Stone was brought into a room where an interpreter awaited. Fujisaki attempted to engage plaintiff Stone in petty banter, such as, Fujisaki having permanent kidney damage which required medications, and his

"addiction" to American TV programs such as Law and Order, and Miami Vice. Plaintiff Stone told Fujisaki that he had prepared a statement that needed to be mailed to the U.S. Embassy. Fujisaki refused to mail the statement. Then, upon discovering it was 42-pages long, Fujisaki told plaintiff Stone that he would mail the document if each page was placed in separate, stamped envelopes. Then, one envelope would be mailed out each week, over the next 42-week period. Fujisaki's clearly intended to violate the Vienna Convention on Consular Relations of 1963, and to prevent plaintiff Stone from notifying the embassy as to what had transpired on November 8th 2013 and November 9th 2013. Fujisaki would not mail this statement to the embassy, eventually it would be hand delivered by attorney Kushida. The embassy would not learn of plaintiff Stone's torture until November 25th 2013, when embassy consulate Leslie Glass visited the NPD to meet with plaintiff Stone.

401. The Vienna Convention on Consular Relations of 1963, ratified by the U.S. and Japan, is an international treaty that defines a framework for consular relations between independent states. A consul operates to protect their countrymen's interest in the host country, and to further the commercial and economic relations between the two states. Article 36 of the Consular Relations provides, "consular officers shall be free to communicate with nationals of the sending State and to have access to them." Foreign nationals who are arrested or detained must be given notice "without delay" of their right to have their embassy or consulate notified of that arrest, and "consular officers shall have the right to visit a national of the sending State who is in prison, custody or detention, to converse and correspond with [those detained], and to arrange for legal representation."

402. The U.S. and Japan are obligated under the Geneva Convention, and the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment to investigate and prosecute those that commit torture. Both nations are under obligations to prevent, and investigate allegations of torture, and bring those who commit such atrocities to justice.

403. Due to the unconscionable conditions of interrogation, and being tortured resulting in serious injuries, plaintiff Stone felt great fear for his life. Plaintiff Stone suffered emotional distress every time a phone rang inside the detention facility, or a cell door electronic buzzer sounded. Plaintiff Stone felt great fear, trembled, and often succumbed to vomiting. Plaintiff Stone would startle as footsteps approached cell 6-1, believing that he would be either tortured again, or murdered by officials wanting to cover up up their criminal conduct.

404. From November 9th 2103 - November 12th 2013, on a daily basis, plaintiff Stone was taken to interrogation at the NPD, and thereafter to the Chiba Public Prosecutor's Office, and subjected to intimidation, and threats of new charges filed, with a continuous stream of "confession statements" placed before plaintiff Stone to sign. These statements were prepared by Mizokuchi and his supervisor, or prosecutor Kume. At each interrogation plaintiff Stone sought medical treatment, which was DENIED.

405. Plaintiff Stone languished from November 8th-November 12th of 2013. During this period plaintiff Stone was not provided any medical treatment whatsoever. It would have been obvious to anyone that plaintiff Stone was unable to walk. In fact, IT WAS KNOWN, as plaintiff Stone was dragged by the arms, or carried into interrogations, and thereafter transported by Guard B to the CPPO for further interrogations, all while

plaintiff Stone was unable to walk, and refused medical treatment. During this time, officials including Kume, and Mizokuchi resorted to the use of threats, and extreme duress to coerce plaintiff Stone to sign false confession statements. When plaintiff Stone refused to be interrogated, and refused to leave cell 6-1 for such purposes, Fujisaki, Guard B and numerous other guards would enter the cell, and force plaintiff Stone to be taken to interrogations.

406. On November 12th 2013, John Doe 8 of the Tsudanuma General Hospital arrived at the Narashino Detention Center to perform routine medical inspections of detainees. Prior to seeing John Doe 8, plaintiff Stone was told by Fujisaki, and Guard B, not to discuss the leg injury with the doctor. Plaintiff Stone would be the last detainee taken to see this doctor. Regardless as to what Fujisaki and Guard B had threatened, upon entering the room where John Doe 8 was located, plaintiff Stone showed his severely swollen right foot to John Doe 8. John Doe 8 immediately declared plaintiff Stone's right foot broken. Thereafter, plaintiff Stone told John Doe 8 that Fujisaki, Guard B, and five other officers had broken his right foot. John Doe 8 told Guard B to leave the room, and asked Fujisaki if what plaintiff Stone had stated was true. Fujisaki did not answer. Fujisaki merely slunk down in the chair he was sitting in, and lowered his head. John Doe 8 ordered Fujisaki to have plaintiff Stone taken to the Tsudanuma Central General Hospital immediately, for purposes of having the right foot treated.

407. As soon as John Doe 8 left the NDC, Fujisaki refused to follow John Doe's instructions. Instead, plaintiff Stone would be taken to an interrogation with Mizokuchi. A Japanese national, who had an eye deformity, and who told plaintiff Stone that he had attended the University of Georgia was present as an interpreter. This interpreter was used several times during

interrogations. Plaintiff Stone attempted to get Mizokuchi to prepare a statement as to the facts known to plaintiff Stone. Mizokuchi would pretend to rewrite the statement, which would then be read by the interpreter, and it would be the exact same statement that Mizokuchi had attempted to have plaintiff Stone sign. This process repeated itself several times. See: Exhibits A9.

408. On November 13th 2013, fearing gangrene, and possible amputation, as plaintiff Stone's leg was severely swollen, purple blue and yellow in coloration, plaintiff Stone crawled to the cell bars of cell 6-1, stood up, and screamed toward frosted over windows which faced north, toward a public street located outside the Narashino Detention Center, which is located on the west side of the Narashino Police Department. Plaintiff Stone repeatedly screamed, HELP! Those screams violated Japan's Ministry of Justice's "silence" rule, and immediately officers arrived at the exterior of cell 6-1, shouting at plaintiff Stone to SHUT UP. Regardless, plaintiff Stone did not shut up, but kept screaming HELP toward the frosted windows until he was finally taken to the TCGH.

## F. Tsudanuma Central General Hospital

409. Plaintiff Stone was taken to the TCGH, by Guard B, and other guards in violation of Watanabe, v. Japan. Plaintiff Stone was tied up, handcuffed, and roped to a wheelchair. Plaintiff Stone was led into the hospital at the front entrance, and wheeled around before scores of patients and visitors, for no other purpose but to humiliate and degrade plaintiff Stone in violation of Watanabe, v. Japan, the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, and against the Universal Declaration of Human Rights, International Covenant on Civil and Political Rights, and the

International Covenant on Economic, Social and Cultural Rights, with a preamble and 33 articles, divided into three parts:

Part I.
Articles 1-16 contains the definition of torture under Article 1.
Article 2 commits the U.S. and Japan to take effective measures to prevent acts of torture in any territory under that nation's jurisdiction.
Article 4 is to ensure that torture is a criminal offense under U.S. state and federal law, and Japan's municipal code.
Article 5 establishes jurisdiction over acts of torture committed by Japanese nationals.
Article 8 ensures that torture is an extraditable offense. Under Articles 12 and 13, Japanese officials were to promptly investigate any allegation of torture. Under Article 14, victims of torture, or their dependents must have an enforceable right to compensation. Article 15 requires U.S. and Japanese officials to ban the use of any evidence obtained through torture for use in any court proceeding.
Under Article 10, "Parties to the Convention are required to train and educate law enforcement personnel, civilian or military personnel, medical personnel, public officials, and other persons involved in the custody, interrogation, or treatment of any individual subjected to any form of arrest, detention, or imprisonment.
Under Article 11 Japanese officials must keep interrogation rules, instructions, methods, and practices under systematic review regarding those held in custody or are in the physical control in any territory under jurisdictional control by Japanese officials.
Under Article 16, the nation of Japan is obliged to prevent all acts of cruel, inhuman, or degrading treatment or punishment in any territory under Japan's jurisdictional control. The Convention requires Japanese officials to investigate allegations of torture under Article 16.

410. On November 13th 2013, John Doe 9, an orthopedic doctor employed at the TCGH, had plaintiff Stone's right foot X-rayed, and

determined that the right foot had <u>RECENTLY BEEN BROKEN</u>. Plaintiff Stone had the same leg X-rayed prior to being detained, by orthopedic surgeon Komei Daichi, after being hit by the reckless driver which is addressed above in this complaint. Daichi's X-rays show Plaintiff Stone's leg was not broken at that time. See: Exhibit W. See: Exhibits A13.

411. John Doe 9 told plaintiff Stone his right leg would have to be cast for at least three months, perhaps longer, due to plaintiff Stone's age. Upon hearing this information, which was translated through an interpreter, plaintiff Stone pointed directly at John Doe 1, and told John Doe 9 that John Doe 1 and Fujisaki, the NDC supervisor, had broken his foot on November 8th 2013, and that they had been attempting to cover their criminal malfeasance ever since. Plaintiff Stone pleaded with John Doe 9 to contact officials that oversee the NDC, to have Fujisaki, and Guard B investigated and to have plaintiff Stone removed from the NPD and taken to some place safe. John Doe 9 did not respond to plaintiff Stone in regards to any of these communications. John Doe 1 told John Doe 9 that, "he [plaintiff Stone] had caused his own injury by kicking the floor.

412. After being cast, and returned to the NDC, plaintiff Stone was immediately forced to walk up a flight of steps with the cast on his leg. This was video recorded by an officer of the NPD, not an officer of the NDC. Plaintiff Stone was taken into an interrogation room where prosecutor Kume, awaited. Plaintiff Stone showed Kume cast on his right leg and told Kume that he wanted criminal charges brought against Fujisaki, and Guard B. Plaintiff Stone's statement was <u>IGNORED</u>.

413. As in every other interrogation, plaintiff Stone was tied, handcuffed and roped to a chair. A female interpreter was present, but this time, none of Kume's assistants were present.

Kume was emphatic that if she was unable to obtain a confession statement new charges would be brought. Plaintiff Stone told Kume, "By now, I'm certain that you have video recordings that were turned over to you by Keisei. By now, I'm certain you have seen them. If you watch those recordings with me, right now, and they show me committing ANY crime, I'll sign whatever statement you want me to sign." Kume shouted, SHOUT UP ABOUT THE VIDEOS."

414. Plaintiff Stone demanded Kume contact the CPPO supervisor and have the supervisor come to the NDC. Kume shouted at plaintiff Stone, "THIS IS NOT AMERICA! THIS IS JAPAN!" Plaintiff Stone told Kume to get him an attorney. Kume shouted, "YOUR GOOD AT COMMUNICATING WITH YOUR EMBASSY, GET YOUR EMBASSY TO GET YOU AN ATTORNEY." Plaintiff Stone responded by stating, "My embassy is not detaining me under false charges. YOU ARE!" Kume placed a writing, in Japanese, a language plaintiff Stone cannot read, or write, in front of plaintiff Stone. Kume placed a pen in front of plaintiff Stone and shouted, "SIGN!" Continuing to motion, and gesture for plaintiff Stone to sign the documents. Plaintiff Stone began to cry. Behind plaintiff Stone was a window that was locked but slightly opened. Plaintiff Stone screamed out the window several times, HELP! Kume shouted that plaintiff Stone was being charged for assaulting KERC employee Takeuchi. Several police officers, and detention officers entered the interrogation room, and forced plaintiff Stone to the booking room, where he was handed a documents by Mizokuchi, which read plaintiff Stone was charged with battery against KERC employee Takeuchi. This meant plaintiff Stone would be detained, and interrogated for at least another 23-days, without legal counsel, and that plaintiff Stone would be subjected to at least 46-days of the same methods of interrogation, prior to having an initial court hearing.

415. After being fingerprinted, and having his photograph taken again, plaintiff Stone was brought back to cell 6-1. From this point forward, until December 20th 2013, plaintiff Stone would be detained at the NDC, and interrogated daily. After interrogations with the NPD, he would be taken in very cold weather conditions, without adequate clothing to interrogations at the CPPO, within this time span, plaintiff Stone would be treated for chronic respiratory infection, which was caused by being detained in conditions that were inadequate to sustain health.

416. Plaintiff Stone's physical, psychological, and emotional state declined rapidly thereafter, as day, after day, after day, plaintiff Stone was detained under extreme conditions, suffering near starvation, and at the whim of Fujisaki, refused paper and pen, and have nearly every human right, and rule of law broken in the process.

417. On an unknown date, due to the fact that plaintiff Stone was often refused paper and pen, because he was recording details as to what was transpiring, plaintiff Stone was told by Guard B that he was to undergo "medical treatment" for his kidneys at the TCGH.

418. The tied up, handcuffed, and roped plaintiff Stone was led out of the back of the NDC toward a police transport vehicle. As the final exterior door of the NDC opened, an officer with a camera began taking photographs of plaintiff Stone. Mizokuchi read plaintiff Stone a "warrant" that plaintiff Stone was being taken to the TCGH to have blood extracted for a DNA sample. Mizokuchi, four guards, the photographer, Guard B, and an interpreter were present. Plaintiff Stone responded to Mizokuchi by stating, "Why don't you just use a cotton swab and place it in my mouth. You have one of those kits. Remember? You had attempted to use it one time already." Mizokuchi

responded by saying, "We want blood." Plaintiff Stone then
stated, "Is that the least invasive means, or do you just want
to inflict as much pain as possible?" No copy of the warrant
Mizokuchi alluded to was provided to plaintiff Stone. In
violation of Watanabe v. Japan, and the Convention Against
Torture and Other Cruel, Inhuman or Degrading Treatment or
Punishment, plaintiff Stone was tied, handcuffed and roped to
a wheelchair, and taken through the public area of the TCGH,
and paraded as a public spectacle through the corridors of the
hospital. This was especially horrific to plaintiff Stone as
one of his students, a pediatrician and her son, where students
of plaintiff Stone, and this pediatrician was employed at the
TCGH.

419. The entourage of Mizokuchi, officers, cameraman, interpreter,
Guard B, and plaintiff Stone secured in a wheelchair were led
into a tiny room. A nurse, Jane Doe 2, had been summoned to
the room. Jane Doe 2 was read the warrant by Mizokuchi, and
told to extract plaintiff Stone's blood. Upon entry, Jane Doe
2 was startled at the sight of the room filled with police,
and a foreigner tied to a wheelchair. The cameraman took
several photographs of Jane Doe 2. Jane Doe 2 immediately began
to tremble. Jane Doe 2 was disoriented and terrified. Jane Doe
2, fumbled about looking for needle, and other objects required
to extract blood. After locating them, Jane Doe 2 dropped the
items onto the floor, failed to sterilize them, and began to
use them. Jane Doe 2 was entirely incompetent to perform the
task demanded, yet proceeded anyway.

420. Jane Doe 2 stabbed plaintiff Stone in his left arm, but
couldn't draw blood. She removed the needle and stabbed into
plaintiff Stone's arm a second time, again, unable to extract
blood. Jane Doe 2's trembling hands twisted the needle about
while it was still inside plaintiff Stone's left arm. This

caused severe pain, and plaintiff Stone reflexively, and involuntarily, forcefully remove the needle from his arm. With the needle now in plaintiff Stone's hands, Jane Doe 2 lowered her head, and began whimpering. Plaintiff Stone tossed the needle onto the counter and pointed toward the trembling Jane Doe 2, and shouted at Mizokuchi, "Are you satisfied?" Mizokuchi grunted, "Mmmm." In Japanese this guttural sound means, "Yes!"

421. Blood began rolling down plaintiff Stone's left arm. Jane Doe 2 gave no thought as to how much pain she was causing plaintiff Stone, her trembling and whimpering was due to her own ineptness. Blood continued to run down plaintiff Stone's left arm, pooling into his palm, dripping onto the floor.

422. Plaintiff Stone offered his right arm to the nurse. Jane Doe 2 drew three vials of plaintiff Stone's blood. Mizokuchi placed those vials in an unsealed, light blue, Styrofoam container, and began to leave the TCGH with plaintiff Stone's blood samples, ALONE. Plaintiff Stone protested, and demanded to know how under such circumstances there could be any guarantee that the blood would not be tampered with. Mizokuchi ignored plaintiff Stone, and left the hospital with plaintiff Stone's blood. Plaintiff Stone feared Mizokuchi would make good on his threat of bringing false charges, and that plaintiff Stone's blood samples would be used for this purpose.

423. After 38-days had passed, plaintiff Stone was appointed attorney Kushida as counsel, by the CPPO. Plaintiff Stone would be shown a photograph of TWO vials of blood that were supposed to be plaintiff Stone's own blood. Plaintiff Stone openly questioned, even to a pre-trail judge, "Where is the third vial of blood?" No one could, or would answer this question.

424. Forty-two days into detention, attorney Kushida, went to the NDC with an interpreter named Shoko Doi. Among other matters, plaintiff Stone showed Kushida the broken right foot, which

was still cast, and the injury he had sustained by Ogura, the aforementioned left leg, shin area kick wound. Even after forty-two days the injury remained. As of the writing of this complaint, the plaintiff still has visible scarring due to the battery Ogura committed. Plaintiff Stone asked Kushida to take a photograph of the injury. Kushida said he did not have his cell phone, as the NDC had taken it from him, prior to entering the interview room. Shoko Doi, who was openly enraged by what plaintiff Stone had communicated, produced a cell phone, and used it to take a photograph of the kick injury that the NDC, the CPPO and three pretrial judges had refused to preserve as evidence. See: Exhibit A. Defendant Ogura's kick would photograph taken on day 42 of detention by court interpreter Shoko Doi.

425. On December 18th 2013 plaintiff Stone met with attorney Kushida and interpreter Shoko Doi. This would be the last meeting before trial was to begin on December 19th 2013. Kushida told plaintiff Stone that if he fought the charges he would be detained approximately eight months for the proceedings. Plaintiff Stone explained that his visa would expire during that time and then he would be forcibly deported. Further, Kushida told plaintiff Stone that he had been a defense attorney nine years, and had never won a case. Kushida had brought a laptop computer with him, and offered to show plaintiff Stone videotape recordings of the October 19th 2013 incident. Kushida stated he had two videotape recordings, and they showed plaintiff Stone had committed no crime. Plaintiff Stone first refused to look at the videotape recordings, but Kushida played the recordings anyway. The videotape recordings emphatically show plaintiff Stone had not assaulted Ogura, but instead was the victim of Ogura. Next, Kushida produced a photograph of what was claimed to be Ogura's shirt, worn at

the time of the October 19th 2013 incident. Kushida replayed one of the videotape recordings, and it showed Ogura was wearing a tie. Plaintiff Stone had not noticed this, and it was never discussed by police or prosecutors. Kushida stated, "It's impossible that your DNA got on Kushida's shirt in the way the prosecutors claim." Plaintiff Stone told Kushida that without doubt the DNA was planted after the officials had extracted blood. Plaintiff Stone told Kushida that he would not going to participate in the farcical proceedings on the following morning.

426. On December 18th 2013, after Kushida left the NDC, plaintiff Stone was taken to the TCGH under the guise of having the right foot treated, and the original cast replaced. Guard B told plaintiff Stone that detainees could not appear before a judge in a manner where they may appear to have been neglected. Plaintiff Stone refused to go to the TCGH, as he wanted the judge to see the filthy cast, which appeared dark gray in color. Plaintiff Stone was told that he would be taken to the TCGH by force if he did not comply.

427. To deceive judges, plaintiff Stone was also always provided a bath, a shave, and a change of clothing before appearing before a judge, including at pretrial proceedings. Bathing was only provided every five days.

428. After arriving at the TCGH, in the manner previously described, tied to a wheelchair, handcuffed and roped, plaintiff Stone would not have the cast replaced, but instead removed.

429. John Doe 9, an orthopedic doctor, employed at the TCGH already had a cast out of a box, and ready to place on plaintiff Stone's foot. John Doe 9 removed the initial cast, and had the right foot X-rayed. See: Exhibit K.

430. John Doe 9 had previously explained, on November 13th 2013, the cast would need to remain on for at least three months. Prior

replacing the cast, and after viewing the December 18th 2013 X-ray, John Doe 8 stated the cast needed to remain on plaintiff Stone's right foot for another 4-6 weeks.

431. John Doe 1 (Guard B) interrupted John Doe 8, telling John Doe 9 that the cast must not be replaced, but removed. The purpose of the removal of the cast was to deceive the trial court judge. This was discussed between John Doe 1, and John Doe 9. An interpreter was present, and the communication between John Doe 9 and John Doe 1 was translated to plaintiff Stone. Plaintiff Stone vehemently protested.

432. The "rationale" John Doe 1 (Guard B) had provided John Doe 9 for not replacing the cast was because the NDC supervisor did not want plaintiff Stone wheeled into the court in a wheelchair, and have the judge ask questions as to how the plaintiff had obtained the injury.

433. John Doe 9, after removing the initial cast, placed the replacement cast back in its container, and told plaintiff Stone the leg no longer needed to be cast. This, even after communicating otherwise, and where plaintiff Stone was unable to walk. The terror of being placed in this circumstance, the extent of official corruption, heaped together with all that had already transpired cannot be communicated adequately in this complaint. Plaintiff Stone told John Doe 9 that he would be sued for malpractice. John Doe 9 did not respond, he merely walked out of the room, and thereafter John Doe 1 took plaintiff Stone back to the NDC, without a replacement cast. See: Exhibit A13.

434. The following morning, John Doe 1 would take plaintiff Stone to the District Court of Chiba, without a wheelchair, and force plaintiff Stone to hop on one leg down public corridors in the courthouse, which eventually led to the rear of the courtroom where trial was to be held. By the time plaintiff Stone reached

the rear of the courtroom he was already crying. The District Court judge exited his chambers to see what the matter was, and after noticing plaintiff Stone on the floor, unable to walk, turned and reentered his chamber without saying a word, and without intervening.

### G. Chiba District Court Initial Proceeding

435. Plaintiff Stone's initial trial date was December 19th 2013. As aforementioned, plaintiff Stone's attorney, who could only communicate through an interpreter, told plaintiff Stone not to answer prosecutor's questions, but answer the judge's questions.

436. Plaintiff Suzuki could not be present as she was past due for giving birth, and her family's home was approximately five hours away by shinkansen train. The only person in the court that wasn't Japanese was plaintiff Stone. Ogura and Takeuchi were present.

437. Plaintiff Stone entered the court room incapable of walking. Plaintiff Stone had a rope tied around his waist, and had a pair of Type II double locking handcuffs placed on his wrists. This is the only time the handcuffs were not intentionally placed on tightly. The rope that was tied around plaintiff Stone's waist was held by Guard B, and this would be the only time the rope was not placed on intentionally too tight.

438. Plaintiff Stone was led to a podium that was at the center of the room. Because plaintiff Stone could not stand, a chair was placed to the side of the podium. Guard B sat directly behind plaintiff Stone, holding the rope that was attached to plaintiff Stone's waist.

439. The judge sat above everyone in the room. To the judge's right sat interpreter Shoko Doi. To the judges left sat Kushida. To the far right sat Jane Doe 1, the CPPO trial prosecutor.

440. Plaintiff Stone was not permitted to communicate with attorney Kushida. Plaintiff Stone was not permitted to pass notes to attorney Kushida. Plaintiff Stone was not permitted to bring any evidence, document, etc. into the courtroom for trial purposes. Plaintiff Stone was not permitted to have a pen, and paper to take notes.

441. The judge notified plaintiff Stone that the trial would be scheduled for forty-minutes. The judge asked plaintiff Stone how he pled. Plaintiff Stone stated, "I am unable to fight this." The judge did not ask plaintiff Stone why he was unable to defend the matter. Plaintiff Stone never entered a pleading.

442. Prosecutor Jane Doe 1 did not call Ogura, or Takeuchi to make a statement. Jane Doe 1 did not call any eyewitness. Jane Doe 1 provided no evidence whatsoever. Jane Doe 1 was permitted to ask plaintiff Stone questions. Plaintiff Stone refused to answer any questions. Regardless Jane Doe 1 continued to ask questions. Absurd questions, such as, "Did you say fuck?" The prosecutor kept asking plaintiff Stone why he refused to answer questions. The judge permitted this to go on and on, as Jane Doe 1 intentionally used up the vast majority of the forty minutes allotted. Finally, plaintiff Stone motioned to Kushida that the time was running out. Plaintiff Stone interrupted the prosecutor, stating to the judge, "I'm not answering questions, why are you permitting this harassment to continue unabated?" Finally, Kushida stood and stated plaintiff Stone was invoking his "constitutional" right to remain silent. Regardless, the judge permitted Jane Doe 1 to continue to harass plaintiff Stone, and to continue to use up the time allotted. And like that... the forty minutes was over, and the judge scheduled the matter to be held over for another 34-days. Kushida attempted to plead with the judge to finish the matter so plaintiff Stone could go home and be present at the birth of

his child, but the judge IGNORED Kushida, and quickly exited the courtroom.

443. Plaintiff Stone would not be present at the birth of his child.

444. Plaintiff Stone was returned to the NDC.

445. On December 20th 2013, the following day, plaintiff Stone was transported by John Doe 1 (Guard B), and other guards, to Chiba Prison, under order of the CPPO's, Kume.

**H. Chiba Prison**

446. Chiba Prison houses 85% of Japan's convicted murderers. Plaintiff Stone would remain at Chiba Prison until being released from detention on February 4th 2014.

447. Plaintiff Stone was initially held at Chiba Prison for twelve days without a bath, shave, or adequate clothing. The average temperature was near freezing. At night it was often well below freezing.

448. Plaintiff Stone suffered brutal conditions at Chiba Prison, including physical torture, and severe frostbite that resulted in permanent injuries, with frostbite scarring that remains on plaintiff Stone's hands and feet as of the date of filing this complaint.

449. Conditions in detention at Chiba Prison was far worse than those at the NDC. Plaintiff Stone was frozen, starved, abused, traumatized and tortured in violation of said Japanese, U.S., and international law.

450. Detainees spend their days kneeling on the floor directly in front of a cell door. The cells have no furnishings whatsoever. Having to remain on a frozen floor was tantamount to torture that continued unabated the entire time plaintiff Stone was detained.

451. Plaintiff Stone has had five knee surgeries, shoulder surgery, and underwent many years of physical therapy prior to

detention. Plaintiff Stone's injuries included a two-year period where he was unable to walk. Having to kneel in the manner stated was a physical impossibility. The guards employed at Chiba Prison, as well the medical staff gave the medical history of plaintiff Stone no consideration whatsoever, instead believing plaintiff Stone's "refusal" to spend entire days in a kneeling position on a hard floor was an act of "disobedience."

452. As plaintiff Stone had been subjected to freezing conditions on a daily basis, medical staff sat in well-heated offices. These officials knew, or should have known, the extreme conditions at Chiba Prison were unfit, and unsafe for any human being, and amounted to torture, conditions unsuitable for human beings. Indifferent medical staff, and officers violated the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, the International Convention on the Elimination of All Forms of Racial Discrimination, and the the Minimum Standards for the Treatment of Prisoners by forcing detainees to remain in stress positions at all times.

453. During the entire time plaintiff Stone was detained at Chiba Prison, the exterior grounds were covered in several feet of snow. Freezing wind blew through cracks in the walls, and through dilapidated window frames into the Cellblock C cell plaintiff Stone was placed in. On the south facing wall of the cell plaintiff Stone was detained in was a hole approximately one foot in square. That hole was open, and permitted wind to blow into the cell at all times. The hole itself was covered with a piece of cardboard. Approximately 3' from the south facing wall were metal bars for purposes of preventing escape. If plaintiff Stone had an opportunity to escape, he would have

emphatically escaped, as survival required such extreme actions.

454. All foreigners, including plaintiff Stone were segregated from Japanese detainees.

455. Where Narashino police and prosecutors were not able to coerce false confession statements, Chiba Prison officials took over, going so far as to prepare an in-court statement which was to be practiced on a daily basis, and read by plaintiff Stone at the next court proceeding. The statement was handwritten, in Romanji. Romanji is the romanization of the Japanese language.

456. The statement, prepared by Chiba Prison officials, placed criminal blame on plaintiff Stone due to, "insufficient ability to communicate in the Japanese language." Chiba Prison officials aided plaintiff Stone in "practicing" the statement. This coerced statement, made under duress and conditions of torture remains in plaintiff Stone's possession, as evidentiary proof to show that Japanese officials resort to extreme duress to aid prosecutors in obtaining a false conviction. See: Exhibit P.

457. Plaintiff Stone recorded several notebooks detailing as much as possible what occurred at Chiba Prison. These notes include daily routine, and the details of abuse plaintiff Stone suffered, and witnessed. Because letters, and notebooks were read by translators, and destroyed if the content preserved negative information, or named certain officials, plaintiff Stone feared these records would be destroyed. Plaintiff Stone intentionally wrote sloppily in said notebooks, used code, and wrote pages out of order so officials would not understand what was being preserved. Said notes include daily temperatures at Chiba Prison. Temperatures were accurately recorded as there was a thermometer nailed to a wall, across from the cell plaintiff Stone was detained in. The average indoor temperature

was 35-39 Fahrenheit, often much lower. Temperatures at night were severe.

458. Detention at Chiba Prison were undertaken without adequate food, and without adequate clothing, including socks, shoes, jacket, coat, gloves, cap, blankets, and any other essentials to present frostbite, and freezing.

459. Plaintiff Stone was held in isolation, provided bathing only every five days, often irrational "punishment" prevented bathing for longer periods. Plaintiff Stone was denied soap, toothpaste, toothbrush, and other hygienic materials even where he had money to purchase these items.

460. Plaintiff Stone was not permitted writing paper or pen during the initial twelve days, and at any other time at the whim of Chiba Prison officials. Paper and pen were necessities for sanity. Without them monotony, psychosis, panic, and rage took over.

461. The only heat plaintiff Stone had access to was when convicted prisoners brought a small pot of tea, and left it at the cell window. Once the pot was received, plaintiff Stone crouched on the floor, placing as much of his hands, and feet on the pot as possible to absorb the heat. If the tea spilt, it froze on the floor. If the tea spilt onto plaintiff Stone's clothing, it turned to ice.

462. All possessions, including reading material, even stamps purchased at the NPD, which were purchased to communicate with the U.S. Embassy were confiscated and destroyed.

463. Plaintiff Stone was not permitted to contact the U.S. Embassy in violation of the Vienna Convention. Plaintiff Stone was subjected to cruel and unusual punishment that included being held in isolation 24/7, and subjected to an arbitrary, and draconian "silence" rule. This silent rule forbade communications by speaking with anyone, at any time. This

silent rule caused plaintiff Stone to suffer excessive use of force, battery and further confinement and restraints suffered by plaintiff Stone.

464. Plaintiff Stone suffered irreparable nerve damage to his wrists from the intentional misuse of Type II Handcuffs. See: Exhibit A14. See: Exhibit T.

465. At Chiba Prison, John Doe 7 was responsible for plaintiff Stone's neurological damage, and for other harm suffered. Several times the floor manager of Cellblock C, who is the Kendo Master in the town that Chiba Prison is located, intervened, attempting to protect plaintiff Stone from the abuses committed by John Doe 7, and guards under John Doe 7's command. But for the kindness and rationale conduct of this floor manager, plaintiff Stone would have suffered even greater damages.

466. Chiba medical staff refused to administer treatment for plaintiff Stone's broken right foot, and permitted the prematurely removed cast to remain off plaintiff Stone's right leg, which resulted in deformed healing, and unnecessary suffering, which continues as of writing this complaint. Plaintiff Stone received no medical treatment in regards to the broken right foot the entire time detained at Chiba Prison. Attempting to engage in self therapy on the uncast broken right foot was forbidden.

467. Cleaning the body, including washing hands at a sink located inside the tiny cell was forbidden. Using water from this sink was often impossible as water froze in the pipes that led to the sink. Condensation buildup caused water to freeze as icicles from the faucet of the sink.

468. Physical exercise to stay warm was forbidden. Attempting to exercise to stay warm resulted in punishment. Even with the extreme cold conditions which was often at, or below freezing,

plaintiff Stone was not permitted to exercise so as to circulate blood and warm the body.

469. On a daily basis, plaintiff Stone was injected unknown drugs, against his will. The drugs were meant to keep plaintiff Stone lethargic, and "silent." The drugs caused hallucinations. Plaintiff Stone recorded the Japanese writing of what these drugs were in one of his Chiba notebooks.

470. Plaintiff Stone was subjected to a humiliating "punishment committee", for speaking, and placed in further isolation for "refusing to bow to the committee." The officials used excessive force, battery, and threats while attempting to force plaintiff Stone to comply with bowing. See: Exhibit R.

471. Plaintiff Stone was dragged naked through heavy snow, and forced to sit in a wooden box that was only high enough to sit in, and not wide enough to even turn one's head to the right or left. A wooden board was placed across plaintiff Stone's arms to prevent movement. Approaching these torture devices is one of the most sickening memories plaintiff Stone has of Chiba Prison, as others forced into those boxes screamed, perhaps due to being claustrophobic, or from the excessive length they were forced to endure in those cramped confines. The only noticeable part of the body while placed in these torture boxes were the toes of the hapless victims, jutting out at the bottom.

472. Day after day of this continued abuse resulted in serious mental illness, exacerbated by hallucinations caused by the unknown drugs. No manner of "artful" description could adequately relate the conditions of abuse, degradation, fear and torture Chiba Prison officials spitefully, and recklessly heaped upon plaintiff Stone. Plaintiff Stone was certain he would die prior to release.

473. U.S. Embassy consulate Thomas A. Duval, having been aware of the excessive conditions plaintiff Stone was being detained under, smuggled a camera into Chiba Prison. While meeting with plaintiff Stone, Duval took photographs, preserving for evidentiary purposes the conditions of torture that Japan's Ministry of Justice permits.

474. Duval noted that plaintiff Stone was unable to walk, and that both feet were entirely covered in black skin. Duval noted plaintiff Stone's hands were severely swollen, brittle, and filled with various cracks which were purple, black and yellow. Plaintiff Stone's skin bled a type of fluid that was clear in color. These frostbite related injuries were extremely painful and caused near total incapacity.

475. During the entire time plaintiff Stone was detained he was intentionally kept from having access to his jacket, and shoes. The conditions of cold were so dire heaters, blankets, coats, thick socks, gloves, and wool caps were absolutely required to maintain health, yet none were provided.

476. The U.S. Department of State, the United Nations, and respected human right groups have protested these conditions for decades. Annual reports describe these conditions as torture, especially were numerous detainees have frozen to death, or suffered permanent limb loss. Freezing conditions occur even where Chiba Prison has indoor heating, and ventilation in each cell for heating purposes.

477. To further exacerbate the suffering, plaintiff Stone had a stack of wool blankets located inside the cell, but their use was forbidden. Plaintiff Stone had attempted to place his feet under the blankets when guards were not present, but each cell has a camera overhead, and immediately the station phone would ring, warning guards of this "infraction." Guards would go to the cell and hammer on a plate glass window located on the

north facing wall of the cell until plaintiff Stone removed his feet from under the blankets. The loud banging caused ringing in plaintiff Stone's ears. If the removal of the feet did not occur immediately, plaintiff Stone would be punished. See: Exhibits O, which shows Chiba Prison's fake prison cell display, intended to deceive family members, and visitors of prisoners that they are being held in clean, and hygienic conditions. The photographic image reveals a stack of wool blankets. These blankets remained in each cell, however their use was not permitted, unless it was time to go to sleep. Nearly every other item in this image is a false representation in regards to a Chiba Prison cell.

478. Cell space that was actually available was equivalent to one tatami mat. A tatami mat is straw mat, 6'x4' in size. Trying not to panic in such confines is how plaintiff Stone passed each day. Sounds of crying, depression, screams, anxiety, and insanity broke the endless monotony.

479. Futons for bedding was permitted but only at night. The futons had a removable sheet as a cover, and which could be washed, but generally the futon itself was ragged and filthy. The futon was covered in human filth, including dried urine, blood, mucus, semen, and fecal matter. Plaintiff Stone feared obtaining some kind of infectious disease from having contact with the "bedding."

480. Prison clothing were rags, having the appearance of prison garb that dated back to the 1920s, or 30s. Buttons that had been sewn on numerous times fell off often.

481. Plaintiff Stone wore four shirts, two pants, and four socks, but even this was inadequate to prevent freezing. When clothing was to be washed, much less clothing was available during that period.

482. One-time plaintiff Stone was taken to an "exercise" yard. The freezing air made exposure to the exterior unbearable. The exercise area was actually a small section of a circular metal cage. Although it snowed on a near daily basis, the ground inside the exercise cages were not covered in snow, but instead covered in several years, perhaps decades of finger and toenail clippings. See: Exhibit S.

483. After more than 90-days of detention, plaintiff Stone's hallucinations increased severely.

484. Plaintiff Stone's hands and feet were covered in bloody cracks that were often so painful that it was impossible to use fingers to pick up, or grasp an object like soap when bathing was permitted. When bathing was permitted, and under such physical condition, plaintiff Stone was only permitted 15-minutes to undress, bath, shave, dry off, and redress. This was the only time plaintiff Stone was permitted outside of the tiny aforementioned cell. Frostbite made it impossible to enter the bathtub. Upon entering the tub, plaintiff Stone had to immediately exit involuntarily, as the cuts his extremities were covered in caused severe neurological pain that rushed throughout the body.

485. The only "medicine" provided for frostbite was a waxy substance that didn't provide any relief whatsoever.

486. It was entirely apparent that detention in Japan was designed to place a detainee, someone not yet convicted of a crime, and who may be exonerated, to excessive, cruel, unusual, and stressful conditions that can only be described as protracted torture.

487. Plaintiff Stone was unable to walk due to the untreated broken right foot, and the frostbite that covered both feet. Plaintiff Stone's hands and feet were covered in black skin, and cracks that bled, and swelled significantly. Skin turned yellow,

bright red, purple, and finally black. Black skin remained on plaintiff Stone for more than three years. See: Exhibits M.

488. By January of 2014, panic and involuntary trembling due to the confines of the small space, unknown unwanted and imposed drugs, stress positions, extreme temperature, hallucinations, and unknown outcome, was no longer controllable. Reality was skewed. On January 14th 2014, plaintiff Stone wrote a three-page statement, and placed in on a shelf in the cell. This letter was addressed to Attorney Kushida, Chiba Prison Warden, the U.S. Embassy, plaintiff's sister, and plaintiff's wife and child. Plaintiff Stone wrote:

"*I felt like I was in Auschwitz death camp... The average indoor temperature is two degrees Celsius. I spend my time bleeding internally, freezing, and suffering from a broken foot which was the result of Narashino Detention Center... I was locked in an isolation chamber for five days... a quote from the Correction Bureau Ministry of Justice Penal Institution in Japan. "How offenders are treated is a reflection of the state's socio-cultural condition, supported by the values and views of its citizenship. The only thing I'm guilty of is being victimized by a lying, racist, asshole, and a pathetic example of a civilized nation's legal system.*"

489. After writing that letter, which plaintiff Stone felt would be his last words, plaintiff Stone undressed, and folded the few articles of clothing he had on, and placed them in a pile. Plaintiff Stone stood at the cell window with the only view being that of the exterior wall, and grounds covered in a thick blanket of snow. Plaintiff Stone watched as a crow flew over the Chiba Prison outer wall. Plaintiff Stone flew over that wall with that crow. Tears were frozen on plaintiff Stone's face.

490. Naked, plaintiff shouted, "My name is Stone, not 2061." Immediately, numerous guards came to the cell, and began to bang on the glass window with batons. Plaintiff Stone ignored

the guards, and shouted again, "My name is Stone, not 2061." The guards, all wearing black gloves, entered the cell, and dragged plaintiff Stone through heavy snow to the opposite side of Chiba Prison. The entire matter was recorded on a handheld camera by one of Chiba Prison's guards. This videotape recording has been refused to be released by Chiba Prison's warden, as no doubt, they are ashamed of the criminal, tortious and reprehensible conduct they engage in under the guise of acting in an official capacity.

491. Plaintiff Stone was placed in an isolation chamber. The chamber appeared to have never been cleaned. It was extremely cold. The cell was designed so that any sound reverberated, like sound would inside an echo chamber. There was no access to water. The "toilet" was a hole in the floor, and could not be flushed. Down the corridor, someone else in a similar situation screamed again and again.

492. Plaintiff Stone remained in the isolation chamber for several days. The entire time, the room was brightly lit. Before long the bright light became maddening. There was no manner in which to alleviate the pain that light caused. Plaintiff Stone became savage, and refused to eat. Plaintiff Stone did not eat while held in that isolation chamber. In fact, the entire time plaintiff Stone was detained he did not eat, approximately one-third of the time, an estimated 30-40 days.

493. Exacerbating the circumstances is that no one would tell plaintiff Stone if his child had been born.

494. Plaintiff Stone was placed in confinements, including a retraining suit, and two pairs of double locking Type II handcuffs, placed as tightly as possible on the wrists, and behind the back. This occurred because plaintiff Stone had saved several cups of water, and used it to bath in, which was not permitted. The Chiba official responsible for these

injuries was John Doe 7, the Chiba Prison Cellblock C supervisor. The improper use of handcuffs resulted in immediate wrist and phalange swelling. This swelling made the handcuffs tighten further. Very quickly, any movement, including breathing resulted in pain that cannot be described in mere words. The improper use of handcuffs felt like plaintiff Stone's hands were being slowly cut off with a knife. Exacerbating the matter is where plaintiff Stone had undergone shoulder surgery while in law school. While in law school, plaintiff Stone had to take final exams speaking into a tape recorder as a result of shoulder injury, and the subsequent surgery. The placement of two pairs of double locking handcuffs behind plaintiff Stone's back, placed on as tightly as possible was the worst torture plaintiff Stone was subjected to while being detained. See: Exhibit T.

495. The improper use of handcuffs by John Doe 7, resulted in permanent neurological damage to both of plaintiff Stone's wrists.

496. Said excessive, and protracted conditions left plaintiff Stone in a helpless state. Plaintiff Stone no longer felt human, and had already expected to die. The indignity of knowing he was innocent, and detained under such barbaric, illogical and asinine conditions, not knowing if his child was born, and where those that detained him knew he was innocent, and cared not, was too heavy to bear. Plaintiff Stone began to bite chunks out of his wrists, so as to reach the brachial artery, for the purpose of bleeding to death. This process was interrupted when several guards entered the isolation chamber. If plaintiff Stone had access to a weapon he would have killed everyone of those guards who had entered that cell.

497. Plaintiff Stone spent the remainder time in detention heavily sedated, and forced to sit on a cardboard box in front of a

cell door. When plaintiff Stone fell over, the phone would ring, and guards would rush into the cell, and place plaintiff Stone back on the cardboard box. All this... to obtain a written confession that plaintiff Stone had committed petty assault against KERC employees Ogura and Takeuchi, which officials were entirely aware was untrue.

498. When plaintiff Stone finally left Chiba Prison on February 4th 2014, he was unable to walk, and addicted to the unknown drugs he was forced to take. It took plaintiff Stone FOUR DAYS to withdraw from the unknown drugs as aforementioned.

499. Plaintiff Stone who had only learned of the birth of his child on the day of release, was in no condition to see his child. By that time, the child was already more than one month old.

500. Plaintiff Stone, having weighed 155 pounds prior to detention, left Chiba Prison, having lost more than 30 pounds.

501. Plaintiff Stone returned home on February 4th 2014, to discover the heavy snow had collapsed the carport, destroying plaintiff's automobile. See: Exhibit U.

502. The destruction of this car was entirely avoidable as if plaintiff Stone had not been detained, he would have prevented the structural collapse by removing the snow buildup, as he had always previously done.

503. After seeing the destroyed car, plaintiff Stone entered his home, and immediately noticed that it had been ransacked. Property, including plaintiff's Montague Paratrooper Pro folding bicycle was gone. No warrant had been issued by any judicial officer, or sought by the NPD, who had entered plaintiff Stone's home unlawfully, without a required warrant issued by a competent judicial officer.

## VIII. COURT PROCEEDINGS

### A. Chiba District Court Proceeding

504. Plaintiff Stone was subjected to a total of three Chiba Court Proceedings. Plaintiff Stone sought, and was denied bail. It was communicated by the judge that all foreigners are denied bail "because they are a flight risk." Plaintiff Stone read the in-court statement that had been prepared for him to read by Chiba Prison officials as previously described herein. See: Exhibit P.

505. After a second court trial appearance which occurred on January 23rd 2014, the case was held over again for a proceeding that would take place on February 4th 2013, resulting in plaintiff's sentencing.

506. Plaintiff Stone was released on February 4th 2013, after receiving a 1.5-year prison sentence, under hard labor, suspended for four years. Plaintiff Stone was warned that immigration proceedings would be initiated immediately.

**B. Tokyo High Court Proceeding**

507. In March of 2014, plaintiff Stone filed for an appeal.

508. Plaintiff Stone went to the Tokyo Bar Association (TBA) and presented a detailed report, seeking human rights redress and for the TBA to represent plaintiff Stone on appeal. After several months of taking no action whatsoever, the matter was forwarded to the Chiba Bar Association. Delaying tactics, and forwarding the matter to other agencies is how Japanese officials handled plaintiff Stone's complaint for redress.

509. On March 18th 2014 TBA appointed attorney Takeshi Kato to represent plaintiff Stone. Kato set two different appointments for initial meetings to take place at the TBA. Kato did not show up at either of these meetings. Kato also did not call plaintiff Stone to cancel the meetings either. Plaintiff Stone bore the cost of train transportation to Tokyo for both of

these meetings, totaling 3360 ¥. Because plaintiff Stone had lost his job due to the underlying matter, and lost housing in Chiba, and had to pay expenses related to relocating, these transportation fees were costly.

510. After the second time Kato didn't show for an initial meeting, plaintiff Stone motioned to the high court to have Kato removed. The court refused. The deadline to file the appeal was May 14th 2014. At no time before May 14th 2014 had Kato met with plaintiff Stone. Plaintiff Stone provided his own appeal statement to Shoko Doi who translated it for the appeals court. On May 14th 2014 the appeals court refused to permit plaintiff Stone to speak during the hearing, which only lasted a few minutes. Kato was at the appeals proceeding, but did not speak. Plaintiff Stone attempted to provide the court photographic evidence of the injuries sustained while detained, but the three judge panel refused to view them.

511. On July 14th 2014, having considered none of the human rights, or constitutional issues raised by plaintiff Stone, the Tokyo High Court upheld the lower court's disposition. Plaintiff Stone immediately filed an appeal to Japan's Supreme Court.

### C. Japan's Supreme Court Proceeding

512. On September 2nd 2014, plaintiff Stone obtained attorney Shinji Okoshi to represent him for an appeal to Japan's Highest Court. Plaintiff Stone had less than six weeks to prepare for this appeal. Plaintiff Stone obtained Okoshi's address and contact phone number, but no email address was provided by the TBA, who had appointed Okoshi. Plaintiff Stone contacted Okoshi over the next several weeks by telephone, leaving messages every time. Okoshi never answered any telephone call, and didn't have an answering machine to leave messages on. With only one week left for the deadline to submit plaintiff Stone's brief, and

having never met with, or having never had any phone call returned, Okoshi quit the case, and quit without providing notice to plaintiff Stone.

513. Plaintiff Stone sought the removal of Okoshi, and more time to prepare an adequate statement. The Supreme Court reprimanded Okoshi, and ordered Okoshi back on the case.

514. With only a few days remaining to file plaintiff Stone's appeal, plaintiff Stone provided Okoshi a 32-page statement which the TBA was to have translated into Japanese for the court. After several days Okoshi sent a one paragraph email to plaintiff Stone, written in Japanese stating, the TBA was unable to translate more than the first paragraph of plaintiff Stone's statement, claiming it was too difficult.

515. Plaintiff Stone went to the Supreme Court and filed a motion to be provided more time to prepare his own statement because Okoshi had never met with plaintiff Stone, and because the TBA and Okoshi were incompetent to translate plaintiff Stone's statement. Plaintiff Stone was given one week to prepare the appeal statement. The TBA was appointed by the Supreme Court to have plaintiff Stone's appeal statement translated. After translating only one paragraph, as aforementioned, the translator quit. Plaintiff Stone motioned to the Court to be permitted time to have the appeal statement translated into Japanese. On October 31st 2014, the Supreme Court denied plaintiff Stone motion to have the appeal statement translated into Japanese. The Court then ruled there were no constitutional violations, and upheld the District Court ruling.

516. Plaintiff Stone sought retrial which by Japanese law had to be presented by the Tokyo Bar Association, or the Chiba Bar Association. Neither agency prepared any documentation for a retrial. Plaintiff Stone sought retrial directly from the

Supreme Court, which is also permitted by Japanese procedural law. The Supreme Court never responded to the demand for a retrial.

### D. Japan's Ministry of Justice Human Rights Redress

517. Immediately after the Supreme Court proceedings, plaintiff Stone sought redress from Japan's Ministry of Justice's Human Rights Division. Plaintiff Stone presented more than 400 pages in support of his due process and human rights violation claim.

518. The HR division stated that they had only ever dealt with matters such as where a foreigner had been denied a haircut, or housing, and never had to address human rights issues associated with its own government. The Human Rights Division of Japan's Ministry of Justice refused to acknowledge plaintiff Stone's human rights claim, in violation of the aforementioned treaties Japan has ratified.

519. Finally, on May 22nd 2014, Japan's National Police responded to plaintiff Stone's complaint in regards to injuries sustained at the Narashino Police Department and at Chiba Prison. The National Police is the oversight body of both of these institutions. The unsigned response states, "... the National Police Agency is not in a position to deal with individual matters. The issue you indicated in your letter should be addressed by the Chiba Prefectural Police. ... contact the Narashino Police Station in Chiba Prefecture... to consult about your problem. See: Exhibit A15.

520. August 7th 2014, plaintiff Stone received an unsigned response from the National Public Safety Commission in response to a communication plaintiff Stone had sent in regards to the unlawful treatment suffered by the Narashino Police Department, the Chiba Public Prosecutor's Office, and Chiba Prison. The National Public Safety Commission is the government

agency that supervises the National Police Agency. The National Public Safety Commission sends representatives to United Nation delegations in regards to human rights and treaties Japan has ratified including the aforementioned treaties address in this complaint.

521. The National Public Safety Commission responded to plaintiff Stone's statement as follows, "Please be informed that the National Public Safety Commission is an administrative organization responsible for supervising the National Police Agency and that the Commission has no authority to handle each individual case."

522. The National Public Safety Commission provided a copy to the Chiba Prefectural Public Safety Commission. The plaintiff received no response. The aforementioned Eriko Yamatani, a racist that poses for photographs with hate groups like Zaitokukai and attends hate rallies, is head minister for the National Public Safety Commission. Yamatani oversees the actions of the police and prosecutors.

See: For Top Police in Japan Crime Doesn't Pay But Hate Crimes Do:
https://thedailybeast.com/for-top-pols-in-japan-crime-doesnt-pay-but-hate-crime-does.
Also see: Japan Trade Minister Questioned Over Expenses in Latest Scandal Involving Women:
http://foxnews.com/world/2014/10/16/japan-trade-minister-questioned-over-expenses-in-latest-scandal-involving-women.html.
See: Exhibit A16.

523. As per the National Police Agency's communication plaintiff Stone attempted to file criminal charges against the defendants named herein at the Chiba Prefectural Police Headquarters. The chief of police of the Chiba Prefectural Police Headquarters had recently resigned in disgrace due to being exposed in the aforementioned Yusuke Katayama matter. Plaintiff Stone used a hidden camera and recorded the audio while presenting his

evidentiary material at a meeting with Chiba Prefectural Police officials. This meeting took place at the Chiba Prefectural Police Headquarters. Plaintiff Stone provided a copy of the same 400+ page report he had prepared for Japan's Ministry of Justice HR department. This included X-rays taken at the Tsudanuma Central General Hospital, and other pertinent information, including FOIA released documents that show defendant John Doe 1, the transportation driver of the NPD, under the influence of alcohol while driving a police vehicle. The Chiba Prefectural Police Headquarters officials were not interested in anything plaintiff Stone had to say in regards to the criminal and tortious conduct he was subjected to. The only document they were interested in was photocopying the U.S. Embassy in Tokyo's report by Leslie Glass which address defendant John Doe 1's drunkenness while on duty. Plaintiff Stone was told that he would not be permitted to file criminal charges. Plaintiff Stone was warned to stop attempting to seek a legal remedy. A National Police Agency official who had joined the meeting, threatened plaintiff Stone with being taken to the National Police Agency headquarters for questioning.

**E. The Plaintiffs Filed Suit in U.S. District Court, Southern District of Florida: Jack Stone, et al. vs. Keisei Electric Railway Company, et al. Case No. 1:17-CV-20694-KMW**

524. ORDER denying Without Prejudice 4 Motion for Leave to Proceed in forma pauperis (Second Amended Complaint due by 9/29/2017.); All Pending Motions DENIED AS MOOT. Signed by Judge Kathleen M. Williams on 9/6/2017. (pes) (Entered: 09/06/2017).

525. Williams made a ruling that required the plaintiffs to respond by a designated deadline. Without a response from the plaintiffs the case would be dismissed without prejudice.

526. William never provided said ruling to the plaintiffs, and in fact the court consistently placed insufficient postage

resulting in Williams' communications never being received by the plaintiffs. Not one communication sent by Williams to the plaintiffs was received via regular mail. The plaintiffs never received Williams' ruling, which Local Rules required to be sent via regular mail. The plaintiffs made the U.S. District Court, Southern District, judge Williams, and senior judge K. Michael Moore aware of this matter. Plaintiffs attempts at resolving this matter includes a total of 27 phone calls and email communications made directly to the judge's chambers.

527. Further, even if Williams ruling had been received via regular mail timely, Williams did not provide enough time to adequately respond. The ruling was mailed from Miami, Florida, destined for Japan. It generally takes three weeks or longer for regular mail to be received from the U.S. to Japan. The ruling required a response within 23-days. Williams knew, or should have known 23-days was an insufficient amount of time to respond to said ruling. Finally, here, this refiled complaint addresses each issue raised by Williams in her Docket 20 ruling.

528. The Court has since corrected chronic mailing oversights by now permitting pro se litigants to receive electronic notice in regards to court rulings, and notices. This much needed change no doubt was made to address the failure of this court to communicate adequately with pro se litigants.

529. The plaintiffs had attempted to appeal Williams ruling, merely seeking an adequate time to respond to said ruling, however the appeal was denied, where that court demanded the plaintiffs to pay an excessive filing fee in order for the matter to be heard. The plaintiffs could not afford to pay the excessive fee, and an affidavit, and ample evidence as such. The appeal was certainly merit based. The appeals court judge assigned to plaintiff's appeal was a former magistrate of the U.S. District Court of the Southern District of Florida, who knows, and who

had previously worked with Williams. That appeal court judge should have recused herself from being involved in the matter.

530. As per William's Docket Entry 20 order denying without prejudice, the plaintiffs refile their complaint. The plaintiffs request Williams not be permitted to preside over this refiled complaint as Williams showed herself incapable of communicating with the plaintiffs as per Local Rules, regular mail service.

531. On January 31st, 2017, Florida Senator Bill Nelson communicated directly with plaintiff Stone via letter. Senator Nelson stated that Congress gave this Court power to hear the plaintiffs' complaint. Nelson wrote, "... your situation involves a legal issue which falls under the jurisdiction of the judicial system."

532. Senator Nelson was one of the chairs on the Senate Intelligence Committee which published the Committee Study of the Central Intelligence Agency's Detention and Interrogation Program "enhanced interrogation techniques" used by U.S. government officials on detainees between 2001 and 2006 during the U.S. "War on Terror."

533. It's time for a court of law to finally address the plaintiffs' rights in regards to this filing, and for there to be no more delays.

534. In closing, there are several hundred Americans detained, and imprisoned in Japan under the conditions stated herein. No U.S. citizen should be detained under circumstances that are tantamount to torture.

535. It is the duty of this Court to send a strong message to Japan that the United States will not tolerate American citizens to be denied due process, denied fundamental human rights, and be subjected to coerced confessions under circumstances of duress that is tantamount to torture as defined under international

law and the Torture Victim's Prevention Act of 1991, codified as <u>106 Stat. 73</u>.

## IX. RELIEF

1. The plaintiffs seek $3500.00, the reasonable market value of plaintiff Suzuki's personal property that was abandoned while having to go on maternity leave.

2. The plaintiffs seek the reimbursement of the deposit that plaintiff Suzuki lost when leaving company provided housing. The current exchange rate as of this filing come to $714.17.

3. The plaintiffs seek the rental increase of 31,200 ¥ monthly, from March 2014, to March of 2018. The current exchange rate per month as of this filing come to $276.87. For a total of 48 months in the amount of $13289.76.

4. The plaintiffs seek the loss of wages which currently exceeds $90,000, and which continues to toll.

5. The plaintiffs seek the loss of rental security deposit where after being detained, plaintiff Stone lost employment and had to relocate, and leave company supplied housing. The lost deposit amounts to $892.67.

6. The plaintiffs seek to be reimbursed the cost for having to relocate to the U.S., in excess of $3500.00.

7. The plaintiffs seek to be reimbursed the costs to file immigration related documents pertaining to plaintiff Suzuki, which exceeds $1750.00, and which continues to toll.

8. The plaintiffs had to sell, or destroy most of their property, including all furnishings, located in Japan, prior to moving to the U.S. The fair market value of this property amounts to $12,000.

9. The plaintiffs seek the fair market value of a Toyota Fun Cargo, which was destroyed due to heavy snow, in the amount

of $5500.00.

10. The plaintiffs seek past and future medical expenses pertaining to the injuries plaintiff Stone has received due to the poor medical treatment sustained while detained. The future costs of medical must be determined by a medical expert at trial.

11. The plaintiffs seek reimbursement of the cost of a Montague Folding Bicycle, damaged by KERC employee Takeuchi, and which was sold for a loss of $1000.00.

12. The plaintiffs seek punitive damages in an unspecified amount to be determined by the trier of fact. Given the nature of the conduct, and the severity of damages suffered by the plaintiffs, due to the defendant's conduct, the punitive amount should not be less than $5,000,000.00. Given the extent of damages, this punitive damages amount is not unreasonable, and equity requires it.

13. The plaintiffs seek to be reimbursed the total out-of-pocket expenses related to this, and all underlying proceedings, which is more than 3500.00 USD, and which continues to toll.

14. Total damages sought by the plaintiffs, excluding future medical expenses and other losses that continue to toll is 5,132,346.60 USD.

## X. CERTIFICATION AND CLOSING

Under Federal Rule of Civil Procedure 11, by signing below, the plaintiffs certify to the best of their knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

Respectfully submitted on behalf of the plaintiffs,

9/27/2018

Jack Stone
4301 S.W. 109th Court
Miami, Florida 33165
Email: stack.jones@mail.com
Telephone: 305.226.7972

Cushion Mailer
10 1/2"x16"

UNITED STATES
POSTAL SERVICE.

**P**

US POSTAGE PAID
**$7.90**

Origin: 33175
Destination: 33128
2 Lb 14.30 Oz
Sep 26, 18
1856809/07-25                    1005

EXPECTED DELIVERY DAY: 09/29/2018

PRIORITY MAIL 1-Day ®                    C075

Retail

USPS TRACKING NUMBER

9505 5162 0803 8271 2251 35

FROM:
Jack Stone
430 SW 109th Ct
Miami, Fl
33165

TO:
Clerks office
United States District Co
Southern District of Flo
400 North Miami Aven
Miami, Fl 33128-187



PRIORITY
★ MAIL ★

TRACKED ★ INSURED

UNITED STATES
POSTAL SERVICE.

For Domestic and International Use
Label 107L, May 2014

*Overnight Priority*

**93090030**
Cushion Mailer
**10" x 14"** (usable inside dimension)

- Self-sealing fold-over flap
- Cushion material made from 100% recycled fibers

♻ Please Recycle

■ **UNITED STATES**
**POSTAL SERVICE** ®

USPS.com®

PULL TAB TO OPEN

0 15645 72722 9

AIC-093
Product Code 93090030 - July 2013
www.usps.com
A product of the United States Postal Service ®
MADE IN THE U.S.A.

**$1.89**
**Cushion Mailer**